## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

THE MENDHAM METHODIST CHURCH; and
THE ZION LUTHERAN CHURCH LONG
VALLEY,

   Plaintiffs,

   v.

MORRIS COUNTY, NEW JERSEY; MORRIS
COUNTY BOARD OF COUNTY
COMMISSIONERS; MORRIS COUNTY
HISTORIC PRESERVATION TRUST FUND
REVIEW BOARD; and JOHN KRICKUS, in his
official capacity as Commissioner Director for the
Morris County Board of County Commissioners,

   Defendants,

ATTORNEY GENERAL OF NEW JERSEY,

   Intervenor-Defendant.

Hon. Evelyn Padin, U.S.D.J.
Hon. Jessica S. Allen, U.S.M.J.

Docket No. 2:23-cv-2347-EP-JSA

---

### BRIEF IN SUPPORT OF DEFENDANT-INTERVENOR NEW JERSEY ATTORNEY GENERAL'S MOTION TO STAY

---

Michael L. Zuckerman
  *Deputy Solicitor General*

David E. Leit
  *Assistant Attorney General*

Jessica L. Palmer
Nathaniel I. Levy
Joshua P. Bohn
Emily W. Erwin
Christopher J. Ioannou
Samuel L. Rubinstein
  *Deputy Attorneys General*

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, New Jersey 08625
(862) 350-5800
Michael.Zuckerman@njoag.gov

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ....................................................................1

BACKGROUND ........................................................................................4

    A.  New Jersey's Religious Aid Clause. ...........................................4

    B.  The New Jersey Supreme Court's Opinion in *FFRF*...............8

    C.  Subsequent U.S. Supreme Court Free-Exercise Decisions......11

    D.  This Case. ....................................................................................13

ARGUMENT .............................................................................................15

  I.  This Court Should Abstain Under *Pullman*.................................15

    A.  The First Two *Pullman* Factors Are Met. ...............................18

    B.  The Third *Pullman* Factor Is Also Met....................................29

    C.  The Discretionary Factors Favor Abstention. ..........................33

        1.  Abstention Will Not Produce Undue Delay..................33

        2.  That This Case Involves The First Amendment Does Not Change The Analysis. ..................................................35

  II.  This Court Should Abstain And Hold This Case In Abeyance, Or In The Alternative, Allow For Discovery. ...............................................38

CONCLUSION ..........................................................................................40

CERTIFICATE OF SERVICE ...................................................................41

i

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*ACLU of N.J. v. Hendricks,*
   183 A.3d 931 (N.J. 2018)....................................................................................39

*Artway v. Att'y Gen. of N.J.,*
   81 F.3d 1235 (3d Cir. 1996)..............................................................................33

*Babbitt v. United Farm Workers Nat'l Union,*
   442 U.S. 289 (1979).................................................................................... 37, 38

*Baggett v. Bullitt,*
   377 U.S. 360 (1964).................................................................................... 36, 38

*Bank of America v. Summerland Cnty. Water Dist.,*
   767 F.2d 544 (9th Cir. 1985) ...................................................................... 27, 31

*Behnke v. New Jersey Highway Authority,*
   97 A.2d 647 (N.J. 1953)............................................................................. 22, 23

*Carson v. Makin,*
   596 U.S. 767 (2022)................................................................................. *passim*

*Chez Sez III Corp. v. Twp. of Union,*
   945 F.2d 628 (3d Cir. 1991)..................................................................... *passim*

*City of Houston v. Hill,*
   482 U.S. 451 (1987)................................................................................. *passim*

*Colby v. J.C. Penney Co.,*
   811 F.2d 1119 (7th Cir. 1987) ...........................................................................32

*Comm. to Recall Robert Menendez from the Off. of U.S. Senator v. Wells,*
   7 A.3d 720 (N.J. 2010)......................................................................................21

*Connecticut State Fed'n of Tchrs. v. Bd. of Ed. Members,*
   538 F.2d 471 (2d Cir. 1976)...............................................................................34

*Cristina v. Dep't of State of N.Y.*,
  417 F. Supp. 1012 (S.D.N.Y. 1976) .......................................................34

*Doe v. Poritz*,
  662 A.2d 367 (N.J. 1995)......................................................................21

*Dombrowski v. Pfister*,
  380 U.S. 479 (1965)....................................................................... 36, 37

*E & J Equities, LLC v. Bd. of Adjustment of the Twp. of Franklin*,
  146 A.3d 623 (N.J. 2016)......................................................................21

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
  485 U.S. 568 (1988)..............................................................................32

*Espinoza v. Mont. Dep't of Revenue*,
  140 S. Ct. 2246 (2020)................................................................. *passim*

*Everson v. Bd. of Ed. of Ewing Twp.*,
  330 U.S. 1 (1947)......................................................................... 4, 5, 7

*Everson v. Bd. of Ed. of Ewing Twp.*,
  44 A.2d 333 (N.J. 1945).................................................................. 7, 20

*Feller v. Brock*,
  802 F.2d 722 (4th Cir. 1986) ...............................................................31

*Freedom From Religion Found. v. Morris Cnty. Bd. of
  Chosen Freeholders*,
  181 A.3d 992 (N.J. 2018)............................................................. *passim*

*Georgevich v. Strauss*,
  772 F.2d 1078 (3d Cir. 1985)................................................ 15, 26, 34, 35

*Gospel Missions of Am. v. City of Los Angeles*,
  419 F.3d 1042 (9th Cir. 2005) ..............................................................37

*Gottfried v. Med. Plan. Servs., Inc.*,
  142 F.3d 326 (6th Cir. 1998) ...............................................................31

*GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.*,
   445 U.S. 375 (1980) ................................................................32

*Harris Cnty. Comm'rs Court v. Moore*,
   420 U.S. 77 (1975) ......................................................... 16, 38

*Harrison v. Nat'l Ass'n for the Advancement of Colored People*,
   360 U.S. 167 (1959) ........................................................ *passim*

*Hawaii Hous. Auth. v. Midkiff*,
   467 U.S. 229 (1984) ....................................................... 26, 27

*Hayse v. Wethington*,
   110 F.3d 18 (6th Cir. 1997) ....................................................32

*In re Contest of Nov. 8, 2011 Gen. Election of Office of N.J. Gen. Assembly*,
   40 A.3d 684 (N.J. 2012) ........................................................21

*In re Forsythe*,
   450 A.2d 499 (N.J. 1982) .......................................................21

*Knight v. Int'l Longshoremen's Ass'n*,
   457 F.3d 331 (3d Cir. 2006) ...................................................35

*Locke v. Davey*,
   540 U.S. 712 (2004) ...................................................... 5, 10, 39

*Merritts v. Richards*,
   62 F.4th 764 (3d Cir. 2023) ...................................................15

*Morris Cnty. Bd. of Chosen Freeholders v. Freedom From Religion Found.*,
   139 S. Ct. 909 (2019) .............................................................38

*New Jersey Republican State Comm. v. Murphy*,
   236 A.3d 898 (N.J. 2020) .......................................................20

*Planned Parenthood of Greater Texas Surgical Health Servs. v. City of Lubbock, Texas*,
   542 F. Supp. 3d 465 (N.D. Tex. 2021) ...................................34

*Potrero Hills Landfill, Inc. v. County of Solano,*
    657 F.3d 876 (9th Cir. 2011) ..................................................................31

*Presbytery of N.J. of the Orthodox Presbyterian Church v. Whitman,*
    99 F.3d 101 (3d Cir. 1996)....................................................................36

*Pustell v. Lynn Pub. Schs.,*
    18 F.3d 50 (1st Cir. 1994)....................................................................37

*R.R. Comm'n of Tex. v. Pullman Co.,*
    312 U.S. 496 (1941) .................................................................. 1, 3, 15

*Ran-Dav's Cnty. Kosher, Inc. v. State,*
    608 A.2d 1353 (N.J. 1992)....................................................................21

*Reetz v. Bozanich,*
    397 U.S. 82 (1970) .................................................................... 18, 26

*Robinson v. New Jersey,*
    806 F.2d 442 (3d Cir. 1986)....................................................................27

*Schlesinger v. Councilman,*
    420 U.S. 738 (1975) .................................................................... 1, 26

*State v. Bell,*
    274 A.3d 594 (N.J. 2022)....................................................................21

*State v. Cassidy,*
    197 A.3d 86 (N.J. 2018)....................................................................34

*State v. Comer,*
    266 A.3d 374 (N.J. 2022)........................................................ 2, 9, 20, 26

*State v. Davenport,*
    827 A.2d 1063 (N.J. 2003)....................................................................21

*State v. Fortin,*
    969 A.2d 1133 (N.J. 2009)....................................................................19

*State v. Handy*,
18 A.3d 179 (N.J. 2011) ..........................................................................22

*State v. Hunt*,
450 A.2d 952 (N.J. 1982) ........................................................................22

*State v. Johnson*,
766 A.2d 1126 (N.J. 2001) ......................................................................19

*State v. Loftin*,
724 A.2d 129 (N.J. 1999) ........................................................................35

*State v. Natale*,
878 A.2d 724 (N.J. 2005) ........................................................................19

*State v. Pomianek*,
110 A.3d 841 (N.J. 2015) ........................................................................19

*State v. Townsend*,
897 A.2d 316 (N.J. 2006) ........................................................................21

*State v. Zito*,
254 A.2d 769 (N.J. 1969) .................................................................. 20, 24

*Tafflin v. Levitt*,
493 U.S. 455 (1990) ................................................................................30

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017) ........................................................................ *passim*

*U.S. ex rel. Lawrence v. Woods*,
432 F.2d 1072 (7th Cir. 1970) ...............................................................30

*U.S. Lockhart v. Fretwell*,
506 U.S. 364 (1993) ........................................................................... 3, 30

*United States v. Defreitas*,
29 F.4th 135 (3d Cir. 2022) ....................................................................40

*United States v. Hansen*,
  599 U.S. 762 (2023) ...................................................................................37

*Va. Off. for Protect. & Advoc. v. Stewart*,
  563 U.S. 247 (2011) ...................................................................................16

*Zwickler v. Koota*,
  389 U.S. 241 (1967) ...................................................................................36

## Constitutional Provisions

N.J. Const. art. VIII, § IV, ¶ 3 ...........................................................................8

N.J. Const. art. I, ¶ 3 ...................................................................................1, 4

1776 N.J. Const., art. XVIII-XIX ...................................................................5, 6

## Court Rules

N.J. Ct. R. 2:12-1 ...........................................................................................34

N.J. Ct. R. 2:12-2 ...........................................................................................35

N.J. Ct. R. 2:12-4 ...........................................................................................34

N.J. Ct. R. 2:12A-1 ........................................................................................39

## Other Authorities

17A Wright & Miller, Fed. Prac. & Proc. § 4242 (3d ed. 2023) ...........................26

Michael C. Dorf, *Dynamic Incorporation of Foreign Law*,
  157 U. Pa. L. Rev. 103 (2008) ....................................................................22

## PRELIMINARY STATEMENT

Plaintiffs brought this federal suit to challenge the New Jersey Constitution's founding-era Religious Aid Clause. But their suit raises implicit questions about the Clause's meaning that only the New Jersey courts can answer, because "[s]tate courts … alone can define and interpret state law." *Schlesinger v. Councilman*, 420 U.S. 738, 755 (1975). Allowing the New Jersey courts to consider Plaintiffs' challenge could therefore narrow or even obviate this dispute. If, by contrast, this Court were to proceed to judgment and rule in Plaintiffs' favor, it would put Morris County and other New Jersey entities to the impossible choice of either violating this Court's decision or a prior decision of the New Jersey Supreme Court, each construing the federal Free Exercise Clause, and neither of which can trump the other. To avoid that untenable risk, and consistent with federal courts' "scrupulous regard" for state courts' prerogative to interpret state law and "the smooth working of the federal judiciary," this Court should stay this matter under the *Pullman* doctrine. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941).

First ratified in the State's initial Constitution of 1776, New Jersey's Religious Aid Clause was again ratified (with minor changes) in New Jersey's Second Constitution (1844) and its modern Constitution of 1947. The Clause prohibits public funding "for building or repairing any church or churches, place or places of worship." N.J. Const. art. I, ¶ 3. The New Jersey Supreme Court examined the

1

Clause, alongside the federal Free Exercise Clause, in *Freedom From Religion Foundation v. Morris County Board of Chosen Freeholders*, 181 A.3d 992 (N.J. 2018) ("*FFRF*"). There, a nonprofit sued various Morris County entities—including some of the Defendants here—along with several churches, claiming that the Religious Aid Clause prohibited the churches from accessing Morris County's historic-preservation grant program. Interpreting both the Religious Aid Clause and the federal Free Exercise Clause, the state supreme court held (1) that the Religious Aid Clause barred such direct funding and (2) that this restriction was consistent with the Free Exercise Clause, as interpreted in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017). Accordingly, the court enjoined Morris County from awarding its grants to active houses of worship.

The U.S. Supreme Court has since explained that the Free Exercise Clause sweeps more broadly than had been clear in *Trinity Lutheran*. *See Carson v. Makin*, 596 U.S. 767 (2022); *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246 (2020). This lawsuit asks this Court to declare that these more recent precedents render the Religious Aid Clause, as construed in *FFRF*, unconstitutional under the Free Exercise Clause. But by asking this Court to so rule, Plaintiffs ask this Court to skip a necessarily antecedent state-law question: whether the New Jersey Supreme Court would construe the Religious Aid Clause today in the exact same way it did prior to *Carson* and *Espinoza*. Allowing the New Jersey Supreme Court to have that

opportunity could substantially reduce or even eliminate the federal claims asserted here, which would both conserve judicial resources and safeguard the broader federalism and comity interests that underlie the *Pullman* doctrine.

Abstention also avoids the risk of an untenable collision between coequal judicial rulings. Plaintiffs ask this Court to hold that the Religious Aid Clause (as interpreted in *FFRF*) violates the federal Free Exercise Clause, but the New Jersey Supreme Court already ruled in *FFRF* that it does not. Because neither this Court nor the New Jersey Supreme Court can countermand the other's interpretation of federal law, *see*, *e.g.*, *U.S. Lockhart v. Fretwell*, 506 U.S. 364, 376 (1993) (Thomas, J., concurring), a ruling from this Court in Plaintiffs' favor would place Morris County (and other entities across the State) in an impossible position: either follow this Court's decision and risk contempt of the New Jersey Supreme Court, or follow the New Jersey Supreme Court's decision and risk contempt of this Court. Allowing the New Jersey courts to address the underlying state-law question first would protect all involved from that untenable risk, advancing comity and federalism.

This Court should therefore abstain under *Pullman* and hold this case in abeyance. In the alternative, it should allow discovery prior to summary judgment.

## BACKGROUND

A.   <u>New Jersey's Religious Aid Clause</u>.

The Religious Aid Clause has "deep roots in [New Jersey]'s history." *FFRF*, 181 A.3d at 997. It first appeared in the State's 1776 Constitution, and was subsequently re-adopted at the constitutional conventions of 1844 and 1947 with only minor changes. *Id.* at 998-1002. Today, under the State's 1947 Constitution, it reads: "No person shall be ... obliged to pay tithes, taxes, or other rates for building or repairing any church or churches, place or places of worship, or for the maintenance of any minister or ministry, contrary to what he believes to be right or has deliberately and voluntarily engaged to perform." N.J. Const. art. I, ¶ 3.

The Framers of the New Jersey State Constitution sought both to protect religious liberty and to prevent religious strife. Sectarian discord had been a significant part of the "experience of many of the nation's earliest settlers," *FFRF*, 181 A.3d at 1011, who "came here from Europe to escape the bondage of laws which compelled them to support and attend government-favored churches," and the centuries of "turmoil, civil strife, and persecutions" that resulted from state-sponsored "religious supremacy," *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 8-9 (1947). Nevertheless, the "practices of the old world were transplanted to and … thrive[d] in the soil of the new America." *Id.* at 9. Not only were adherents of certain faiths persecuted by followers of others, but "dissenters were compelled to pay tithes

and taxes to support government-sponsored churches," and in particular, "to pay ministers' salaries and to build and maintain churches and church property." *Id.* at 10-11. "These practices became so commonplace as to shock the freedom-loving colonials into a feeling of abhorrence" and "indignation." *Id.* at 11. Those feelings "found expression [not only] in the First Amendment," *id.*, but also in New Jersey's Constitution of 1776.

Like the U.S. Constitution, the State's 1776 Constitution both protected religious free exercise and guarded against religious establishment, codifying those dictates in separate clauses. *See* 1776 N.J. Const., art. XVIII-XIX, https://tinyurl.com/yrzumnc3. New Jersey's drafters went a step further, adding a "formal prohibition[] against using tax funds to support the ministry" or to build or repair houses of worship. *Locke v. Davey*, 540 U.S. 712, 723 (2004) (collecting examples of Founding-era state constitutional provisions, including New Jersey's). Although other States included similar provisions in their constitutions, *see id.*, "of the twelve states that adopted constitutions from 1776 to 1780, none included a compelled support clause as precise and clear as [New Jersey's] Religious Aid Clause," *FFRF*, 181 A.3d at 999.[1] That "signaled" New Jersey's "longstanding and

---

[1] That provision, highly similar to today's operative text, stated in relevant part: "nor shall any Person within this Colony ever be obliged to pay Tithes, Taxes, or any other Rates, for the Purpose of building or repairing any Church or Churches, Place or Places of Worship, or for the Maintenance of any Minister or Ministry, contrary

vigorous commitment" to both "religious liberty and freedom from compelled support." *Id.* at 1001. And "[n]o history of discrimination taints the provision" as it "did not reflect animus toward any religion," *id.* at 1012—in contrast to some of the "no-aid provisions" added to other state constitutions in "the 19th century," *Espinoza*, 140 S. Ct. at 2259 (2020).

The Clause's text has remained largely unchanged since. When New Jersey adopted its Second Constitution in 1844, it again ratified the Religious Aid Clause. In that iteration, the drafters moved the Clause and streamlined a few phrases— replacing, for instance, "any other Rates" with "other rates," and "taxes ... for the purpose of building or repairing any church" with "taxes for building or repairing any church." *See FFRF*, 181 A.3d at 998, 1001.[2] The text was then "left virtually untouched in the modern Constitution of 1947." *Id.* at 1001.

The framers of the 1947 Constitution did re-ratify the Clause, however, against a noteworthy federal-law backdrop. In February 1947—four months before New Jersey's constitutional convention assembled—the U.S. Supreme Court issued a landmark decision addressing the federal Religion Clauses, in a case involving a New Jersey statute. That case, *Everson*, began with a state court challenge to a New

---

to what he believes to be right, or has deliberately or voluntarily engaged himself to perform." 181 A.3d at 998 (quoting N.J. Const. of 1776 art. XVIII) (emphasis deleted).

[2] "[N]o record explains those edits." *FFRF*, 181 A.3d at 1001.

Jersey statute requiring that if a school district provided public-school students with transportation to and from school, it must do the same for students at private schools, including religious ones. *See* 330 U.S. at 3 & n.1. The New Jersey high court rejected both the state and federal constitutional challenges. *Everson v. Bd. of Ed. of Ewing Twp.*, 44 A.2d 333 (N.J. 1945). The U.S. Supreme Court also rejected the federal Establishment Clause claim, explaining—with reference to both "complementary clauses," *Everson*, 330 U.S. at 15—that while the Establishment Clause prohibits a State from "contribut[ing] tax-raised funds to the support of an institution which teaches the tenets and faith of any church," it does not bar a State from "extending … general State law benefits to all … citizens without regard to their religious belief," *id.* at 16. Thus, the Court harmonized the Religion Clauses' two mandates (anti-establishment and free exercise), explaining that while the constitutional "wall between church and state … must be kept high and impregnable," "[s]tate power is no more to be used so as to handicap religions, than it is to favor them." *Id.* at 18.

Everson was discussed at the New Jersey Constitutional Convention later that year. Some delegates deeply opposed *Everson*'s ruling, and "proposed a Blaine Amendment"[3] that sought to nullify or blunt *Everson*'s impact (according to the

---

[3] "[T]he Blaine Amendment is a remnant of nineteenth-century religious bigotry promulgated by nativist political leaders who were alarmed by the growth of immigrant populations and who had a particular disdain for Catholics." *FFRF*, 181 A.3d at 1002; *see Espinoza*, 140 S. Ct. at 2259 (noting that the original, federal

amendment's proponents) by modifying the Religious Aid Clause to expressly bar the use of any "public money or property" to support any "sectarian institution," whether "directly or indirectly." 5 Proceedings of the Constitutional Convention of 1947 (Proceedings) 792; *see id.* 789-806; 3 Proceedings 151. That effort "did not succeed." *FFRF*, 181 A.3d at 1005 (citing 2 Proceedings 1247-49). Instead, a majority of the delegates accepted *Everson*, weaving it into the State's new constitution and expressly authorizing the Legislature to "provide for the transportation of children … to and from any school." N.J. Const. art. VIII, § IV, ¶ 3. In other words, the body that re-ratified the Religious Aid Clause in 1947 evinced a commitment to ensuring that the 1947 Constitution would continue to operate in harmony with the Religion Clauses of the Federal Constitution, as recently (and saliently) construed by the U.S. Supreme Court.

B.      The New Jersey Supreme Court's Opinion in *FFRF*.

While New Jersey's Religious Aid Clause dates back to 1776, the case before this Court originates in a dispute that played out in the New Jersey courts between 2015 and 2018, involving some of the same parties. The Morris County Historic Preservation Trust Fund Review Board (the "Trust Fund"), also a defendant here, has for many years administered a taxpayer-funded historic-preservation grant

"Blaine Amendment was 'born of bigotry' and 'arose at a time of pervasive hostility to the Catholic Church and to Catholics in general'; many of its state counterparts have a similarly 'shameful pedigree'" (citation omitted)).

program. In 2015, the Freedom From Religion Foundation and one of its Morris County–based members (collectively, the "Foundation") brought a state-court suit against the Trust Fund and various Morris County officers, as well as a number of churches that had received grants from the Trust Fund, claiming that those grants violated the Religious Aid Clause.

The New Jersey Supreme Court ruled for the Foundation, looking first to the Religious Aid Clause's text. Since very few New Jersey cases had "construe[d] the Religious Aid Clause," and none had "focused on the prohibition against … the 'repair' of 'any church,'" *FFRF*, 181 A.3d at 1005, the court relied heavily on the Clause's plain language, rejecting the argument that the Clause must permit some implicit "exception for historic preservation." *Id.* Put simply, the court held that the Clause bans "the use of public funds to build or repair any place of worship," including any "active house[] of worship." *Id.* at 1004.

The court also interpreted the federal Free Exercise Clause—closely analyzing the U.S. Supreme Court's then-recent decision in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017)—to ensure that the Religious Aid Clause, as construed, would not be "at odds with the Federal Constitution." *FFRF*, 181 A.3d at 1006; *see id.* at 1007-12 (finding no conflict). *Trinity Lutheran* involved a Missouri preschool, affiliated with a church, that had sought to access a state funding program—available to help schools and various nonprofits resurface

playgrounds using recycled tires—but had been turned away by a state agency, citing a provision of the Missouri Constitution. *See* 582 U.S. at 453-56. The preschool challenged the denial as a free-exercise violation, and the U.S. Supreme Court agreed. *Id.* at 467. In *FFRF*, the New Jersey Supreme Court read *Trinity Lutheran* to teach that a religious group "cannot be denied 'a public benefit solely because of its religious character,'" but not to "opine on whether that key principle … extends to religious uses of funding." *Id.* at 1008. That was evident from "[f]ootnote 3 of the [*Trinity Lutheran*] majority opinion," which expressly declined to "address religious uses of funding or other forms of discrimination" because *Trinity Lutheran* "involve[d] express discrimination based on religious identity with respect to playground resurfacing." *Id.* (quoting *Trinity Lutheran*, 582 U.S. at 465-66 & n.3). Moreover, the court observed, *Trinity Lutheran* distinguished, but did not reconsider, *Locke v. Davey*, 540 U.S. 712 (2004), which had held that a state-law restriction on "using taxpayer funds to pay for the training of clergy" through a scholarship program did not violate the Free Exercise Clause. 181 A.3d at 1008 (quoting *Trinity Lutheran*, 582 U.S. at 465).

In light of that guidance, the New Jersey Supreme Court concluded that the Religious Aid Clause did not conflict with the Free Exercise Clause. The court observed that "*Trinity Lutheran*'s scope" was particularly "important because the facts of [*FFRF*] extend well beyond playground resurfacing." *Id.* at 1009. Rather, in

*FFRF*, "public funds were used to repair stained glass windows" and "interior space[s]" of churches "where prayer services were held," in addition to churches' structural exteriors, ventilation systems, and the like. *Id.* at 1010. Because public funds "sustain[ed] the continued use of active houses of worship for religious services and finance[d] repairs to religious imagery," the facts of *FFRF* stood "in stark contrast to the setting in *Trinity Lutheran*." *Id.* at 1010-11. And because the Religious Aid Clause embodied an "antiestablishment interest in not using public funds to build or repair churches or maintain any ministry" that "did not reflect animus toward any religion," it remained valid under *Locke* and not in tension with *Trinity Lutheran*. *Id.* at 1012. The federal and state Clauses could coexist.

C.     Subsequent U.S. Supreme Court Free-Exercise Decisions.

The U.S. Supreme Court's Free Exercise Clause jurisprudence has continued to develop since *FFRF*, primarily through two cases: *Espinoza* and *Carson*.

*Espinoza*, decided in 2020, involved a Montana program that, through a tax credit for donations to certain "student scholarship organization[s]," helped families cover the cost of private-school tuition. *See* 140 S. Ct. at 2251-52. Montana's Department of Revenue, relying on a "no aid-provision" of the Montana Constitution that prohibited state funding to sectarian schools, had adopted a rule that "prohibited families from using scholarships at religious schools." *Id.* at 2252. Plaintiffs challenged that exclusion, first in state court and then at the U.S. Supreme Court,

which ultimately held that the Montana constitutional provision, as construed by Montana's high court, violated the Free Exercise Clause. Specifically, the Court found the Montana no-aid provision to unlawfully disfavor religion in the same way the Missouri rule did in *Trinity Lutheran*: by "denying public benefits solely because of the religious character" of the ultimate recipients. *Id.* at 2255. As in *Trinity Lutheran*, the Court held that the discrimination at issue "turn[ed] expressly on religious status and not religious use," while adding that "[s]tatus-based discrimination remains status-based even if one of its goals or effects is preventing religious organizations from putting aid to religious uses." *Id.* at 2256. As it had in *Trinity Lutheran*, the Court distinguished *Locke*, noting that in *Locke* the State had denied public scholarship funds to an applicant "because of what he proposed *to do*—use the funds to prepare for the ministry," not who or what he was. *Id.* at 2257 (quoting *Trinity Lutheran*, 528 U.S. at 464).

Two years later, in *Carson,* the Court considered a state-run school-choice program that similarly operated to prevent families from accessing state-subsidized funding to defray the costs of sending their children to religious schools. Unlike Montana's program in *Espinoza*, however, Maine officials determined whether funds could flow to a given school based on the degree to which religion was enmeshed within the school's broader curriculum. *See Carson*, 596 U.S. at 776-77, 783-85. The Court held that such a distinction made little difference under the First

Amendment; rather, as in *Espinoza* and *Trinity Lutheran*, religious schools were disqualified from receiving public benefits "solely because" they were religious. *Id.* at 780. That state officials looked at how state funds would ultimately be *used*—and not just *by whom*—was of no moment, the Court wrote, because *Trinity Lutheran* and *Espinoza* "never suggested that use-based discrimination is any less offensive to the Free Exercise Clause." *Id.* at 787. To the contrary, the Court continued, the Free Exercise Clause's "prohibition on status-based discrimination … is not a permission to engage in use-based discrimination." *Id.* at 788. And *Locke* could not "be read beyond its narrow focus on vocational religious degrees to generally authorize the State to exclude religious persons from the enjoyment of public benefits on the basis of their anticipated religious use of the benefits." *Id.* at 789.

*Espinoza* and *Carson* set the stage for the challenge now before this Court.

D.    <u>This Case</u>.

Here, two churches that wish to benefit from Morris County's program challenge the constitutionality of the New Jersey Constitution's Religious Aid Clause. They present substantially the same arguments advanced by the churches in *FFRF*, but this time in light of *Carson* and *Espinoza*.

The case began in April 2023, when the two Plaintiffs sued the Trust Fund, Morris County, and various Morris County officers (collectively, the "County"), alleging that by denying them historic-preservation funding—that is, by complying

with the Religious Aid Clause as construed in *FFRF*—the County is violating federal constitutional law, as interpreted in *Espinoza* and *Carson*. Am. Compl. ¶¶ 91-131. Plaintiffs seek, among other things, a declaration that the Religious Aid Clause, as applied to Plaintiffs, violates the Free Exercise Clause, and a permanent injunction against the County from denying "otherwise-eligible" "religious organizations from eligibility" for historic-preservation funding. *Id.* ¶¶ 12, 24; *see id.* at 48-49. Plaintiffs have thus far suggested three reasons that, in their view, it would be appropriate for this Court to issue a ruling in conflict with *FFRF*: (1) that *FFRF* "is nonbinding" because they "were not parties to *FFRF*" (although the County was); (2) that this challenge "presents a question of pure *federal* law"; and (3) that *FFRF* "is wrong." Pls'. Mot. for Summ. J., ECF 18 at 19.

No dispositive motions have been fully briefed. On July 26, 2023, the Plaintiffs and the County jointly moved to proceed directly to summary judgment, without either an Answer or a Motion to Dismiss being filed. ECF 13. The Court granted that motion, but subsequently stayed summary-judgment briefing pending its resolution of the Foundation's motion to intervene. ECF 19. Meanwhile, the Attorney General also moved to intervene to defend the validity of a state constitutional provision. ECF 26. On February 5, 2024, this Court granted the Attorney General's intervention motion. ECF 33, 34. This motion follows.

14

**ARGUMENT**

**I.    This Court Should Abstain Under *Pullman*.**

The *Pullman* abstention doctrine is especially well-suited to this unusual set of circumstances. The doctrine allows a federal district court, when confronted with federal constitutional claims that are intertwined with indeterminate state-law questions, to hold the case and await the input of the state courts on the underlying state-law issues before ruling on the federal claims. So long as the state resolution of the state-law issues could "chang[e] the light in which [the federal claims] must be viewed," abstention is likely warranted. *Georgevich v. Strauss*, 772 F.2d 1078, 1089 (3d Cir. 1985), *cert. denied,* 475 U.S. 1028 (1986).

The doctrine safeguards not only judicial resources but also core principles of federalism and comity. Giving state courts the opportunity to weigh in on state-law issues at the outset of a federal proceeding reduces "needless friction with state policies," *Pullman*, 312 U.S. at 500, including state courts' prerogative to interpret their own laws—or, as in this case, their own constitutions. Thus, while abstention is "an extraordinary and narrow exception to the 'virtually unflagging obligation of the federal courts to exercise the jurisdiction given them,'" *Merritts v. Richards*, 62 F.4th 764, 773 (3d Cir. 2023) (citation omitted), the exception recognized in *Pullman* remains "essential to the balanced working of our federal system," *Harrison v. Nat'l Ass'n for the Advancement of Colored People*, 360 U.S. 167, 176 (1959), by

"limiting federal judicial intervention in state affairs to cases where intervention is *necessary*," *Va. Off. for Protect. & Advoc. v. Stewart*, 563 U.S. 247, 264 (2011) (Kennedy, J., concurring) (emphasis added).

As the Third Circuit has framed the test, *Pullman* abstention is generally appropriate when "three special circumstances" are present:

(1) Uncertain issues of state law underlying the federal constitutional claims brought in federal court;

(2) State law issues amenable to a state court interpretation that would obviate the need for, or substantially narrow, the scope of adjudication of the constitutional claims;

(3) A federal court's erroneous construction of state law would be disruptive of important state policies.

*Chez Sez III Corp. v. Twp. of Union*, 945 F.2d 628, 631 (3d Cir. 1991). If those conditions are met, the district court "weigh[s] the advantages and disadvantages of abstention." *Id.* But so long as all three special circumstances are present, then "absent significant reasons to the contrary, abstention is generally proper." *Id.* at 633. When a court abstains under *Pullman*, it should typically stay the case "pending determination of the state-law questions in state court." *Harris Cnty. Comm'rs Court v. Moore*, 420 U.S. 77, 88 n.14 (1975).

Here, all the relevant considerations weigh in favor of abstention. The first two special circumstances are met because Plaintiffs' claims require evaluating the Religious Aid Clause against the federal Free Exercise Clause, which entails an open

16

question of state law that could change (or obviate) Plaintiffs' federal claims. As discussed below, the New Jersey Supreme Court regularly construes state law, including the State Constitution, to harmonize with the Federal Constitution, and routinely incorporates the meaning of the latter into the former. When the State's high court last construed the Religious Aid Clause, it did so against the backdrop of *Trinity Lutheran*, not *Carson* or *Espinoza*. But if, as Plaintiffs aver, the federal constitutional backdrop has changed, then given both state courts' general obligations under the Supremacy Clause and specific principles of New Jersey law, the proper interpretation of the Religious Aid Clause may have changed too.

*Pullman*'s third special circumstance is also present: advancing directly to a merits ruling would risk a collision course with the New Jersey Supreme Court. If this Court were to rule for Plaintiffs, Defendants (and other entities across the State) would be put in the impossible position of having to choose between violating an order of this Court or an order of the New Jersey Supreme Court, neither of which can overrule the other on the federal-law question at issue. Such an unnecessary conflict would, naturally, disrupt state policies, along with the broader interests of federalism and comity that the *Pullman* doctrine serves to protect.

A.    <u>The First Two *Pullman* Factors Are Met</u>.

New Jersey interpretive principles explain why the meaning of the Religious

Aid Clause is not currently foreordained, and why state-court interpretation could

narrow (or even obviate) Plaintiffs' federal claims.

**1.** This is a case in which "the nub of the whole controversy may be the state

constitution." *See Reetz v. Bozanich*, 397 U.S. 82, 87 (1970) (calling such a situation

the "classic case" for *Pullman* abstention). *FFRF* interpreted both New Jersey's

Religious Aid Clause and the federal Free Exercise Clause, concluding that the

reading urged by the Foundation in 2018 fit with both the Religious Aid Clause's

text and the meaning of the federal Free Exercise Clause as most recently interpreted

in *Trinity Lutheran*. *See* 181 A.3d at 1004-12; *supra* at 9-11. Plaintiffs now claim,

citing subsequent U.S. Supreme Court precedent, that *FFRF* brought the two clauses

into conflict. *See supra* at 13-14. But even assuming for argument's sake that they

are right (which the Attorney General of course does not concede), then the question

becomes whether the New Jersey Supreme Court would construe the Religious Aid

Clause today the same way it did in 2018. New Jersey law makes especially clear

that it might not, since New Jersey courts regularly work to harmonize state laws

and the state constitution with the federal constitution. This makes *Pullman*

abstention particularly appropriate here. *See, e.g.*, *Harrison*, 360 U.S. at 177-78

(abstaining given the "possibility of [a] limiting interpretation [of state law], characteristic of constitutional adjudication").

Related interpretive principles of state law link the sweep of New Jersey's Constitution to the Federal Constitution in various contexts. Begin with New Jersey's tradition of constitutional avoidance. In New Jersey, courts tread especially carefully before invalidating an enactment of the people's representatives on constitutional grounds. Thus, "whenever possible," New Jersey courts "avoid interpreting a legislative enactment in a way that would render it unconstitutional." *State v. Fortin*, 969 A.2d 1133, 1139 (N.J. 2009). And "[w]hen necessary," New Jersey courts "have engaged in 'judicial surgery' to save an enactment that otherwise would be constitutionally doomed." *State v. Natale*, 878 A.2d 724, 740 (N.J. 2005). That approach stems from a state-law presumption about intent: New Jersey courts presume that the people and their representatives "would want [the state judiciary] to construe the statute in a way that conforms to the Constitution." *State v. Pomianek*, 110 A.3d 841, 855 (N.J. 2015); *see also, e.g.*, *State v. Johnson*, 766 A.2d 1126, 1136 (N.J. 2001) (similarly rooting the "power and obligation inherent in this State's constitutional doubt doctrine" in presumed intent).

New Jersey's avoidance doctrine is particularly robust. Typically, "[t]he doctrine of constitutional avoidance comes into play when a statute is susceptible to two reasonable interpretations, one constitutional and one not." *Pomianek*, 110 A.3d

at 855. But under state law, the avoidance doctrine can carry force even where there is no obvious textual alternative, *see, e.g.*, *State v. Comer*, 266 A.3d 374, 399 (N.J. 2022) ("We add a look-back provision here to preserve the homicide statute because we have no doubt the Legislature would want the law to survive."), or where similar kinds of "judicial surgery" are needed to "bring [a] statute within the Constitution," *State v. Zito*, 254 A.2d 769, 775 (N.J. 1969) (reading disorderly-persons statute's "good-account provision to assure the suspect a chance to explain away the circumstances which appear inculpatory" rather than as an element of the crime). In short, New Jersey courts embrace a strong form of the avoidance doctrine—and, indeed, the New Jersey Supreme Court emphasized its commitment to the avoidance doctrine in *Everson* itself. *See* 44 A.2d at 336 ("The rule is that courts will presume in favor of the constitutionality of a statute and will incline to a construction favoring its validity unless its invalidity plainly appears.").

Constitutional avoidance doctrine applies to the interpretation of state constitutions with the same force as to the interpretation of state statutes. Indeed, if avoidance principles serve as a means of effectuating the *Legislature's* presumed intent, there is no reason they would operate differently as to the presumed intent of the 1947 Constitution's framers. *See New Jersey Republican State Comm. v. Murphy*, 236 A.3d 898, 908 (N.J. 2020) (interpretive principles, including legislative intent, "apply with equal force to the interpretation of both statutory language and

the text of the Constitution"); *In re Contest of Nov. 8, 2011 Gen. Election of Office of N.J. Gen. Assembly*, 40 A.3d 684, 706 (N.J. 2012) (New Jersey courts "strain to save a statute and, perforce, of course also every part to the State Constitution"); *In re Forsythe*, 450 A.2d 499, 502 (N.J. 1982) ("Courts are admonished to find and to heed the intent of legislators, constitutional as well as statutory."); *see also, e.g.*, *Comm. to Recall Robert Menendez from the Off. of U.S. Senator v. Wells*, 7 A.3d 720, 750 (N.J. 2010) (performing "judicial surgery" on an invalid provision of the State Constitution to "preserve [its] other aspects").

One especially common example of state constitutions shifting dynamically with the Federal Constitution is the practice of parallel interpretation—as when a state court interprets a state constitution's provision as being "co-extensive" with its federal analog. *E.g.*, *E & J Equities, LLC v. Bd. of Adjustment of the Twp. of Franklin*, 146 A.3d 623, 634 (N.J. 2016) (noting that "our State Constitution's free speech clause is generally interpreted as co-extensive with the First Amendment"). New Jersey courts do so regularly. *See, e.g.*, *id.*; *State v. Bell*, 274 A.3d 594, 607 (N.J. 2022) (double-jeopardy protection); *State v. Townsend*, 897 A.2d 316, 325 (N.J. 2006) (speedy-trial right); *State v. Davenport*, 827 A.2d 1063, 1071 (N.J. 2003) (right to counsel and to proceed *pro se*); *Doe v. Poritz*, 662 A.2d 367, 388 n.10 (N.J. 1995) (ex post facto clauses); *see also Ran-Dav's Cnty. Kosher, Inc. v. State*, 608 A.2d 1353, 1358 (N.J. 1992) (noting "New Jersey's Religion Clause" is "informed

by" federal Establishment Clause precedent). And other courts do as well. *See generally* Michael C. Dorf, *Dynamic Incorporation of Foreign Law*, 157 U. Pa. L. Rev. 103, 110 & n.16 (2008) (noting that "some states interpret their state constitutions in 'lockstep' with the U.S. Supreme Court's interpretation of parallel provisions of the Federal Constitution" and collecting cases). Under this approach, "a change in U.S. Supreme Court constitutional jurisprudence can change the meaning of the state constitution," even where the state constitutional text remains the same. *See id.* at 110. Even where the New Jersey courts construe a state constitutional provision "to provide greater protections … than would its federal counterpart"—as is the case with some aspects of search-and-seizure law, *State v. Handy*, 18 A.3d 179, 186 (N.J. 2011)—developments in federal constitutional law still trigger corresponding changes in state law. So, while the New Jersey "state courts build[] an independent body of state constitutional law," "federal and state constitutional doctrine" remain dynamically intertwined. *State v. Hunt*, 450 A.2d 952, 964 (N.J. 1982) (Handler, J., concurring).

Other developments in the background legal context can also work a change in the meaning of state constitutional provisions under New Jersey law. *Behnke v. New Jersey Highway Authority*, 97 A.2d 647 (N.J. 1953), is instructive. There, the New Jersey Supreme Court confronted a provision of the 1947 Constitution that states that the "credit of the State shall not be directly or indirectly loaned in any

case." *Id.* at 651. The plaintiffs in *Behnke* claimed that this provision barred the State from providing, through legislation, an "unconditional guaranty" on the debts of state-created corporations, or "authorities," legal creations that were relatively new at the time. *Id.* (cleaned up). The plaintiffs argued that because the 1844 Constitution did not permit guarantees "of the State's credit to a separate, autonomous corporation," and because the provision's text was incorporated wholesale into the new constitution a century later, its meaning must have remained fixed. *Id.* at 652. But the *Behnke* Court disagreed, noting that because "the limitation embodied in the 1844 Constitution had not been the subject of judicial scrutiny and assessment," the "adoption of the limitation [in 1947] without phraseological change is without determining significance." *Id.* Instead, the court found that the changed context— the creation of state authorities—justified "accommodation" of the constitutional provision "to new needs," even while recognizing that the provision's raw wording remained the same. *Id.* at 653. In other words, changes in the legal context yielded changes in the meaning of the constitutional text. That is just one further reason that, as a matter of state law, when an open question about the scope of the Federal Constitution arises, it carries with it a question about the scope of any interrelated provisions of the New Jersey Constitution.

**2.** In light of these state-law principles, the developments in U.S. Supreme Court Free Exercise jurisprudence following *FFRF* raise state-law questions about

the meaning of the Religious Aid Clause today, which satisfies the first *Pullman* factor. Only the New Jersey courts can authoritatively answer those questions, which satisfies the second *Pullman* factor.

According to Plaintiffs' own allegations, federal free-exercise doctrine has changed—though how far remains open to dispute—in the years since *FFRF*. While *Trinity Lutheran* focused on the status-based discrimination at issue and distinguished cases involving religious "use," *see* 582 U.S. at 464-65, *Espinoza* held that even "preventing religious organizations from putting aid to religious uses" may itself constitute "[s]tatus-based discrimination," 140 S. Ct. at 2256, and *Carson* stated that the Free Exercise Clause's "prohibition on status-based discrimination … is not a permission to engage in use-based discrimination." 596 U.S. at 788.

Given the state-law principles just discussed, Plaintiffs' reliance on these later cases calls for allowing the New Jersey Supreme Court to address the Religious Aid Clause's current meaning in the first instance. *See, e.g.*, *Zito*, 254 A.2d at 775. When that court last addressed the State's Religious Aid Clause, it did so "[b]ased on [the court's] understanding of the current state of [free-exercise] law" at that time— embodied in *Trinity Lutheran*—prior to the issuance of *Espinoza* or *Carson*. *See FFRF*, 181 A.3d at 1006. The *FFRF* court thus relied on *Trinity Lutheran*'s holding that the Free Exercise Clause prohibits discrimination against recipients of public funds based on their religious "status," not their "intended use of the funds." *Id.* at

24

1008 (citing *Trinity Lutheran*, 582 U.S. at 465); *see id.* at 1011-12 (contrasting the

Religious Aid Clause with "the setting in *Trinity Lutheran*"). But *Espinoza* and

especially *Carson* rejected that distinction in the school-choice context, *see, e.g.*,

*Carson*, 596 U.S. at 788, prompting Plaintiffs' claims here, under the "state of the

law" today, *cf. FFRF*, 181 A.3d at 1006 (interpreting the Free Exercise Clause in

light of *Trinity Lutheran*). So whether framed as a matter of constitutional avoidance,

dynamic incorporation, or changed legal context, *see supra* at 18-23, the "state …

law underlying the federal" free-exercise challenge here is "uncertain" enough that

*Pullman*'s first special circumstance is met. *See Chez Sez III*, 945 F.2d at 632.

For closely related reasons, *Pullman*'s second special circumstance is present

because any alleged conflict between the Religious Aid Clause and the Free Exercise

Clause is "amenable to a state court interpretation that would obviate the need for,

or substantially narrow, the scope of adjudication of the [federal] constitutional

claims." *Id.* at 631. As noted, abstention is appropriate when "[t]he possibility of

limiting interpretation, characteristic of constitutional adjudication," could clarify,

simplify, or even obviate a dispute. *E.g.*, *Harrison*, 360 U.S. at 177. A new

construction of the Religious Aid Clause could narrow or even eliminate the federal

issues in this case. For instance, *FFRF* read the Clause's text to establish a

categorical prohibition, 181 A.3d at 1005, without distinguishing between whether

the funding would be used to repair "roofs [or] bell towers," "stained glass windows

25

[or] ventilation systems," "religious imagery above the church altar" or "the exterior of church structures." *Id.* at 1004, 1010. But if the New Jersey Supreme Court were to accept Plaintiffs' reading of *Carson* and *Espinoza*, it could employ a narrowing construction or "judicial surgery," *Comer*, 266 A.3d at 399—whether aided by avoidance principles, dynamic incorporation, changed circumstances, the unique history of the 1947 Constitution (which played out against the backdrop of *Everson* and expressly *rejected* a proposed Blaine Amendment), or all of the above. *See supra* at 18-23. The problem is that federal courts cannot definitively answer the question, *see, e.g.*, *Schlesinger v. Councilman*, 420 U.S. 738, 755 (1975), particularly when there is no direct federal analog to the state provision at issue, *e.g.*, *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 237 n.4 (1984); 17A Wright & Miller, Fed. Prac. & Proc. § 4242 (3d ed. 2023). Only the New Jersey courts can.

That the New Jersey Supreme Court had an opportunity to construe the Religious Aid Clause in *FFRF* does not change the analysis. What matters for *Pullman* purposes is the present question about the Clause's meaning in light of the subsequent decisions in *Espinoza* and *Carson* and the fact that "a construction by the [New Jersey Supreme Court] might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem." *See Harrison*, 360 U.S. at 177; *see also, e.g.*, *Reetz*, 397 U.S. at 87; *Georgevich*, 772 F.2d at 1089. Indeed, the Third Circuit has applied *Pullman* even

after the New Jersey Supreme Court addressed the very state-law provisions challenged in a federal suit, because the prior state-court decision "le[ft] open a number of issues." *Robinson v. New Jersey*, 806 F.2d 442, 449 (3d Cir. 1986); *see also Bank of America v. Summerland Cnty. Water Dist.*, 767 F.2d 544, 547 (9th Cir. 1985) (abstaining after state-court decision was "called into question" by separate writings by U.S. Supreme Court Justices and it was "appropriate as a matter of comity" to let state courts first assess their "own law").

It bears emphasizing that this is not a case in which the state constitutional provision is a mere equivalent to a federal provision. That was the case in *Midkiff*, which observed that where a state constitutional provision is "parallel" to its federal counterpoint, "abstention is not required" because the meaning of the parallel state provision automatically matches the federal provision's meaning. *See* 467 U.S. at 237 n.4 (citations omitted). Here, by contrast, the Religious Aid Clause does *not* parallel a pre-existing federal constitutional provision, so its exact meaning in light of subsequent federal free-exercise developments is not preordained.

*City of Houston v. Hill*, 482 U.S. 451 (1987), is also not to the contrary. *Hill* observed, in the context of a free-speech challenge to a criminal ordinance, that federal courts "may not properly ask a state court if it would care in effect to rewrite a statute." 482 U.S. at 471. It did so, in that distinct context, because the municipal ordinance was "neither ambiguous nor obviously susceptible of a limiting

27

construction," since the proposed limiting constructions would not eliminate the overbreadth but rather raise *more* constitutional "questions" than answers. *Id.* at 467-71 & n.22. The situation here differs in several key ways. First, this is neither a free-speech case—which would trigger special doctrinal exceptions to avoid the particularly intolerable "chilling" of free expression, *see, e.g.*, *id.* at 467-68; *see also id.* at 458-59; *infra* at 35-37—nor a criminal case. Nor is it a case in which New Jersey courts would be asked to rewrite a statute; rather, they would be tasked with interpreting a state constitutional provision to assess whether the meaning of that provision has shifted given the subsequent developments in federal free-exercise doctrine. *See supra* at 18-25. Nor, in contrast to *Hill*, is this a case where no limiting construction is plausibly available; indeed, the church defendants in *FFRF* proposed limiting constructions, 181 A.3d at 1003-04, which the New Jersey Supreme Court simply deemed unnecessary to adopt "[b]ased on [its] understanding of the current state of the [free-exercise case] law, including … *Trinity Lutheran*," *id.* at 1006-12. For all the reasons already given, whether the New Jersey Supreme Court would give that same answer today is a question that neither the parties nor this court can definitively answer. Only the New Jersey Supreme Court can.

The first two *Pullman* special circumstances are met.[4]

---

[4] The Attorney General has focused on Plaintiffs' free-exercise claims for purposes of *Pullman* abstention because those claims form the core of this challenge. *See*

B.   <u>The Third *Pullman* Factor Is Also Met</u>.

The third special circumstance for *Pullman* abstention—that an erroneous federal construction of state law "would be disruptive of important state policies," *Chez Sez III*, 945 F.2d at 631—is also satisfied. A ruling in Plaintiffs' favor would not only disrupt the important state policy embodied in the Religious Aid Clause itself—hindering New Jersey's "longstanding and vigorous commitment to [both] religious liberty and freedom from compelled support," *FFRF*, 181 A.3d at 1001— but also put public entities across New Jersey to the impossible choice of either (1) violating a decision of this Court interpreting the Free Exercise Clause, or (2) violating the New Jersey Supreme Court's decision interpreting both the Free Exercise Clause *and* the New Jersey Constitution.

The potential collision course is unusual, but plain here. Plaintiffs sued the County, and claim that the County, by complying with the order issued in *FFRF*, is violating the federal Free Exercise Clause. But *FFRF* already interpreted the Free Exercise Clause, so Plaintiffs now effectively ask this Court to rule that the New Jersey Supreme Court's interpretation of the Free Exercise Clause was in error. *See* Am. Compl. ¶¶ 6-13. Yet under our "system of dual sovereignty," the U.S. Supreme

---

*Espinoza*, 140 S. Ct. at 2263 n.5 (declining to address equal-protection claim "[i]n light of [the Court's free-exercise] holding"); *FFRF*, 181 A.3d at 1013 ("Courts, in general, approach religious discrimination claims through the First Amendment religion clauses."). But further clarification of the meaning of the Religious Aid Clause could impact each of Plaintiffs' constitutional claims.

Court has "consistently held that state courts have inherent authority, and are thus presumptively competent, to adjudicate" federal claims as coequals. *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). Just as this Court cannot definitively construe the Religious Aid Clause, it *also* cannot countermand the New Jersey Supreme Court's interpretation of federal law—only the U.S. Supreme Court can do so. *See, e.g.*, *U.S. ex rel. Lawrence v. Woods*, 432 F.2d 1072, 1076 (7th Cir. 1970); *Lockhart*, 506 U.S. at 376 (Thomas, J., concurring); *cf. Tafflin*, 493 U.S. at 465 (dismissing fears of nonuniformity by noting that "[s]tate court judgments misinterpreting federal criminal law would, of course, also be subject to direct review by this Court."). Thus, if this Court were to rule that the New Jersey Supreme Court erred—and thus to impose an injunction that directly conflicts with the *FFRF* mandate—then the County and other public entities across New Jersey would be forced to choose between following this Court's mandate and the New Jersey Supreme Court's mandate, with no legal rule to guide that choice. The County itself—as a party to both suits—would be risking contempt either way, and other public entities would, at the very least, be forced to choose between dueling decisions of coequal courts.

*Pullman* abstention—and the principles of federalism and comity that animate it—avoids that problem, by appropriately giving the New Jersey courts an opportunity to address those underlying state-law issues in the first instance. As the Sixth Circuit has explained, the "policies underlying" *Pullman* specifically—and

comity and federalism generally—"require the federal court[s] to give the state [courts] the first chance to bring" their prior judgments "into compliance with [federal] constitutional law." *Gottfried v. Med. Plan. Servs., Inc.*, 142 F.3d 326, 330-31 (6th Cir. 1998). In *Gottfried*, where the federal plaintiff claimed an earlier-issued state-court injunction infringed her federal free-speech rights, *Pullman* principles meant that a "state court should … have the first opportunity to address any significant changes in the law" that warranted limiting the scope of the injunction on state-law grounds. *Id.* at 332; *see also Bank of America*, 767 F.2d at 547 (abstaining as "a matter of comity" to let state courts assess their prior interpretation of state law when that interpretation "was called into question" by the U.S. Supreme Court); *cf. Potrero Hills Landfill, Inc. v. County of Solano*, 657 F.3d 876, 899-90 (9th Cir. 2011) (remanding for consideration of *Pullman* abstention because state proceeding could yield "definitive state court interpretation" of challenged ordinance). And, as already explained, state courts—and New Jersey courts especially—typically aim to harmonize state law with federal law. *See supra* at 18-23.

Abstention would be unremarkable here, as courts routinely rely on comity to avoid needless conflicts between competing orders or injunctions of coordinate courts, whether through abstention or other, related tools. *See Feller v. Brock*, 802 F.2d 722, 727-28 (4th Cir. 1986) (recognizing that conflicting judgments work a "grave disservice to the public interest in the orderly administration of justice," and

that "[p]rudence requires that whenever possible, coordinate courts should avoid issuing conflicting orders"); *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1124 (7th Cir. 1987) ("Where different outcomes would place the defendant under inconsistent legal duties, the case for the second court's not going into conflict with the first is particularly strong."); *cf. Hayse v. Wethington*, 110 F.3d 18, 21 (6th Cir. 1997) (*Younger* abstention prevents "intolerable conflicts between the orders of state and federal courts"). Those efforts make good sense, because anyone subject to a jurisdictionally proper "injunctive order" is "expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order." *GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.*, 445 U.S. 375, 386 (1980). Advancing directly to a merits ruling here, by contrast, would risk putting the County (and other New Jersey public entities) to an intractable dilemma, in marked tension with courts' well-established interests in ensuring "that constitutional issues not be needlessly confronted." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

In short, Plaintiffs' suit risks an unnecessary and untenable conflict, harming state entities, state and federal courts, and broader principles of federalism and comity. The third *Pullman* special circumstance is met.

C.  <u>The Discretionary Factors Favor Abstention</u>.

The presence of *Pullman*'s three threshold circumstances in this case creates a presumption in favor of abstention, which is not rebutted by any "significant reasons to the contrary." *Chez Sez III*, 945 F.2d at 631-33.

1.  *Abstention Will Not Produce Undue Delay.*

This case is not far enough along that any concern about delay could overcome the reasons for abstention. As part of the equitable analysis involved in assessing this factor, courts consider "the length of time the litigation has been pending, and the impact of [any supposed] delay on the litigants." *Artway v. Att'y Gen. of N.J.*, 81 F.3d 1235, 1270 (3d Cir. 1996). This case is still at "such an early stage," as the "Court has not ruled on any substantive issue, and no dispositive motions have been fully briefed." ECF 33 at 5.[5] There would be no unfairness, therefore, in holding this matter in abeyance while allowing plaintiffs to bring an action in state court to resolve the underlying state-law questions—and thus no basis to rebut the presumption in favor of abstention. *See, e.g.*, *Chez Sez III*, 945 F.2d at 631-33. "In any event, the possibility of delay alone should not serve as the basis for eschewing abstention when," as here, "the plaintiffs could have pursued their remedies in state

_____

[5] Though Plaintiffs and the County initially agreed to proceed to summary judgment without an Answer or Motion to Dismiss, ECF 13, only Plaintiffs' opening brief for summary judgment was actually filed before this Court stayed summary-judgment briefing. *See* ECF 18, 19. That briefing remains stayed.

court in the first instance," *Georgevich*, 772 F.2d at 1094—with review available in the U.S. Supreme Court on any federal issues not obviated by state-court review.

That abstention would require Plaintiffs to initiate a new state-court action does not alter the analysis, because *Pullman* "abstention does not depend" on the existence of a pending state-court proceeding. *Connecticut State Fed'n of Tchrs. v. Bd. of Ed. Members*, 538 F.2d 471, 487 n.10 (2d Cir. 1976). Indeed, "[t]here was no state action pending in … *Pullman*" itself. *Cristina v. Dep't of State of N.Y.*, 417 F. Supp. 1012, 1018 (S.D.N.Y. 1976). It is therefore unsurprising that multiple courts, including the Third Circuit, have found *Pullman* abstention appropriate even in the absence of a pending state court proceeding. *See, e.g.*, *Georgevich*, 772 F.2d at 1094, 1100; *Planned Parenthood of Greater Texas Surgical Health Servs. v. City of Lubbock, Texas*, 542 F. Supp. 3d 465, 488, 495-96 (N.D. Tex. 2021).

Moreover, pursuing these claims in state court would not require undue delay. *See Georgevich*, 772 F.2d at 1094. Upon filing suit, Plaintiffs could ask the New Jersey Supreme Court to "certify [the] action … for appeal." N.J. Ct. R. 2:12-1; *see also State v. Cassidy*, 197 A.3d 86, 89 (N.J. 2018) (granting the Attorney General's motion for direct certification). Certification would likely be appropriate because the appeal would "present[] a question of general public importance which has not been but should be settled by the Supreme Court": the meaning of the Religious Aid Clause after *Espinoza* and *Carson*. N.J. Ct. R. 2:12-4. And as for discovery, the New

Jersey Supreme Court could appoint a special master to conduct it. *See, e.g.*, *State v. Loftin*, 724 A.2d 129, 146 (N.J. 1999). Alternatively, Plaintiffs could litigate the matter in the state trial court, and then, should an appeal be filed, Plaintiffs could move for certification in the New Jersey Supreme Court while the intermediate appeal remains pending. *See* N.J. Ct. R. 2:12-2. Thus, while "the possibility of delay alone should not serve as the basis for eschewing abstention," that possibility is mitigated here by the procedural tools at Plaintiffs' disposal. *Georgevich*, 772 F.2d at 1094; *see also Harrison*, 360 U.S. at 178-79 (discussing state procedures that would "provide[] an expeditious avenue" for relief).

> 2. *That This Case Involves The First Amendment Does Not Change The Analysis.*

That Plaintiffs raise a First Amendment claim (under the Free Exercise Clause) is no obstacle to this court abstaining under *Pullman*. Although federal courts have expressed reluctance to abstain "in cases involving facial challenges to laws or provisions that curtail free speech," *Knight v. Int'l Longshoremen's Ass'n*, 457 F.3d 331, 337 (3d Cir. 2006); *accord Hill*, 482 U.S. at 467, such reluctance is inapplicable here for two independent reasons: (1) Plaintiffs have brought an as-applied, not a facial, challenge, and (2) Plaintiffs' First Amendment arguments are based on free-exercise, rather than free-speech, grounds.

Initially, the reluctance to abstain that arises in free speech cases stems in part from a concern that to resolve a facial challenge, "'extensive adjudications, under a

variety of factual situations, would be required to bring the [provision] within the bounds of permissible constitutional certainty.'" *Chez Sez III*, 945 F.2d at 633 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 378 (1964)). "In such case[s,] to force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect." *Zwickler v. Koota*, 389 U.S. 241, 252 (1967) (citations omitted). By contrast, "there is no such restriction with respect to an 'as applied' challenge because there is less of a concern that protected activity will be inhibited if the court abstains from deciding the First Amendment issues." *Presbytery of N.J. of the Orthodox Presbyterian Church v. Whitman*, 99 F.3d 101, 107 (3d Cir. 1996) (citing *Chez Sez III*, 945 F.2d at 633-34). Plaintiffs' challenge, however, is as-applied, not facial. *See* Am. Compl. ¶ 24. So even if this were a free-speech challenge (which it is not), that basis for special reluctance would not be implicated here.

Relatedly, that this is not a free-speech challenge makes a crucial doctrinal difference. The First Amendment "chilling" that prompts a reluctance to abstain is the risk of chilling "free expression," *see Dombrowski v. Pfister*, 380 U.S. 479, 489-90 (1965) (emphasis added)—a uniquely intolerable constitutional harm that justifies relaxing both the ordinary rules for facial invalidation through the overbreadth doctrine *and* the ordinary rules for abstention. The overbreadth exception to facial challenges is all about "chill," *see Hill*, 482 U.S. at 459; *see also*

*United States v. Hansen*, 599 U.S. 762, 769-70 (2023), just as the reluctance to abstain stems from "the impermissible chilling of" the free-speech right at issue. *See Hill*, 482 U.S. at 468 (citation omitted). Those special rules exist because of free speech's "transcendent value to all society, and not merely to those exercising their rights." *Dombrowski*, 380 U.S. at 486. "[I]f would-be speakers remain silent, society will lose their contributions to the 'marketplace of ideas.'" *Hansen*, 599 U.S. at 770 (citation omitted).

   Plaintiffs' challenge, however, is not a free-speech challenge, and they do not allege any risk of a chilling effect. And while other rights—including other First Amendment rights—are undoubtedly fundamental, they have not been understood to trigger these unique doctrinal exceptions. *See Gospel Missions of Am. v. City of Los Angeles*, 419 F.3d 1042, 1051 (9th Cir. 2005) (rejecting invitation to extend overbreadth doctrine to free-exercise claims); *cf. Pustell v. Lynn Pub. Schs.*, 18 F.3d 50, 51-54 (1st Cir. 1994) (abstaining from a free-exercise claim). Because Plaintiffs undisputedly raise as-applied, free-exercise challenges to the Religious Aid Clause, *see* Am. Compl. ¶¶ 1, 24, the special-reluctance doctrine is not implicated.

   In any event, there is no ironclad rule barring abstention even in facial, free-speech challenges under the First Amendment. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 305-312 (1979). When evaluating such a challenge, the Court has abstained where "[state] courts may determine in a single proceeding" the

meaning of a challenged provision, such that "an authoritative construction of [that] provision may significantly alter the constitutional questions requiring resolution." *Id.* at 308. In other words, abstention is still appropriate when the challenged provision is "open to one or a few interpretations, [not] to an indefinite number." *Baggett*, 377 U.S. at 378. Just so here. *See supra* at 24-25. There is thus no reason to deny the New Jersey courts "a reasonable opportunity to pass upon" the Clause's meaning, *Babbitt*, 442 U.S. at 308 (citation omitted)—and least of all where a judgment for Plaintiffs would create a needless collision between coequal courts.

## II.   This Court Should Abstain And Hold This Case In Abeyance, Or In The Alternative, Allow For Discovery.

Because *Pullman* abstention is appropriate, this Court should follow the "proper course" and "stay the [Plaintiffs'] suit pending determination of the state-law questions in state court." *Harris Cnty.*, 420 U.S. at 88 n.14.

However, if the Court declines to abstain, it should direct the parties to engage in limited fact discovery before briefing dispositive motions. The way in which Morris County's program intersects with the Religious Aid Clause and the federal Free Exercise Clause is a factual question, and assessing its constitutionality therefore requires some factual development. *Cf. Morris Cnty. Bd. of Chosen Freeholders v. Freedom From Religion Found.*, 139 S. Ct. 909, 911 (2019) (Kavanaugh, J.) (noting it was "appropriate to deny certiorari" in the *FFRF* litigation because "the factual details of the Morris County program [were] not entirely clear,"

including "precisely what kinds of buildings can be funded under the Morris County program," which "could hamper our analysis of petitioners' religious discrimination claim"); *ACLU of N.J. v. Hendricks*, 183 A.3d 931, 941 (N.J. 2018) (remanding for factual development on different challenge to religious funding). Ultimately, if this Court does not abstain, it would be relevant to the underlying analysis to understand how exactly the Morris County program works, and to what extent Plaintiffs' theory would require overturning an "historic and substantial state interest" in avoiding direct public funding of religious devotion. *See Carson*, 596 U.S. at 788 (quoting *Locke*, 540 U.S. at 722); *cf. Hendricks*, 183 A.3d at 942 ("Our task in this matter will eventually require an assessment of whether the grant distributions to the Yeshiva and to the Seminary are more like the program at issue in *Locke* or more like the one at issue in *Trinity Lutheran*, and of how the Religious Aid Clause's prohibition against 'maintenance of any minister or ministry' comports with that assessment."). That would require at least tailored discovery regarding the Trust Fund's grantmaking operations and Plaintiffs' applications for funding, beyond what is provided in the exhibits appended to their pleadings. *See* ECF 11-6, 11-8.

Finally, the Attorney General notes that while certification would ordinarily be another way to obtain guidance from the New Jersey Supreme Court on the proper construction of the Religious Aid Clause today, that option is not available in this Court. *See* N.J. Ct. R. 2:12A-1 (allowing for only the "United States Court of

Appeals for the Third Circuit" to certify questions to the New Jersey Supreme Court). Thus, if this case reaches the Third Circuit, the Attorney General would expect to seek certification at that time, based on the same underlying principle that "open questions of state constitutional law should nearly always be left to the state courts." *United States v. Defreitas*, 29 F.4th 135, 142 (3d Cir. 2022).[6] But for the reasons already given, the best course is for this Court to abstain under *Pullman* and to stay this case so that the Plaintiffs can seek relief in the New Jersey courts directly.

## CONCLUSION

This Court should hold this matter in abeyance under *Pullman*. In the alternative, this Court should allow discovery prior to summary-judgment briefing.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:   /s/ Michael L. Zuckerman
Michael L. Zuckerman (N.J. No. 427282022)
Deputy Solicitor General
Michael.Zuckerman@njoag.gov

Dated: April 10, 2024

---

[6] Indeed, the Third Circuit has recognized that "several states do not allow certification from district courts," and thus a district court "enter[ing] judgment … does not by itself mean that certification was requested out of time or as an 'insurance policy.'" *Defreitas*, 29 F.4th at 142 n.5.

## **CERTIFICATE OF SERVICE**

I certify that on April 10, 2024, I electronically filed the foregoing brief and accompanying papers with the Clerk of the U.S. District Court for the District of New Jersey. Counsel for all parties will be served via CM/ECF.

By:   /s/ Michael L. Zuckerman
Michael L. Zuckerman (N.J. No. 427282022)
Deputy Solicitor General

Dated: April 10, 2024