THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| THE MENDHAM METHODIST CHURCH; and THE ZION LUTHERAN CHURCH LONG VALLEY, | ) ) ) ) ) | Case No. 2:23-cv-02347 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Plaintiffs' Brief In Opposition to Motion to Stay and In Support Of Motion For Preliminary Injunction |
| MORRIS COUNTY, NEW JERSEY, et al., | ) ) ) | |
| Defendants; | ) ) | |
| ATTORNEY GENERAL of NEW JERSEY, | ) ) ) | Return date: July 1, 2024 |
| Intervenor-Defendant. | ) ) | |

Jeremy Dys (*pro hac vice*)
Ryan Gardner (*pro hac vice*)
First Liberty Institute
2001 W. Plano Pkwy, Suite 1600
Plano, TX 75075

Camille P. Varone (*pro hac vice*)
First Liberty Institute
1331 Pennsylvania Avenue, NW,
Suite 1410
Washington, DC 20004

Eric C. Rassbach (*pro hac vice*)
The Hugh and Hazel Darling
Foundation Religious Liberty Clinic
Pepperdine University Caruso
School of Law
24225 Pacific Coast Highway
Malibu, CA 90263

Mark Roselli (NJ Bar No. 038431988)
Roselli Griegel Lozier, PC
1337 Highway 33
Hamilton, NJ 08690
Telephone: (609) 586-2257
mroselli@roselligriegel.com

Noel J. Francisco (*pro hac vice*)
Megan Lacy Owen (*pro hac vice*)
Christopher C. Pagliarella (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Telephone: (202) 879-3939
njfrancisco@jonesday.com

*(Additional contact information for counsel in signature)*

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..............................1

FACTUAL AND PROCEDURAL BACKGROUND ...........................................3

I.    The Historic Preservation Trust Fund .................................................3

II.   Plaintiff Churches and Their Historical Significance ........................4

III.  The Religious Exclusion Policy and the Churches' Denied Applications .......6

IV.   The Initial Summary Judgment Filing and the Intervention Proceedings ........8

ARGUMENT .................................................................................................9

I.    The Court Should Not Stay This Case Under *Pullman*. ...................9

    A.  There is no uncertain issue of state law. ...................................10

    B.  No narrowing construction of the Religious Aid Clause authorizes abstention. ..................................................................13

    C.  There is no risk of substantial disruption to important state policies. ......19

    D.  *Pullman* abstention is disfavored, particularly in this context..................21

    E.  Refusing to abstain under *Pullman* does not risk inconsistent obligations. ..................................................................24

II.   The Court Should Grant Preliminary Injunctive Relief to the Churches........26

    A.  Plaintiffs are likely to succeed on the merits of their Free Exercise Clause claims. ..................................................................28

    B.  Plaintiffs have suffered and will continue to suffer irreparable harm as a result of the religious exclusion policy.............................33

    C.  The balance of hardships and public interest favor a preliminary injunction. ..................................................................36

CONCLUSION ............................................................................................37

CERTIFICATE OF SERVICE ..........................................................................40

i

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Arizonans for Off. Eng. v. Arizona,*
520 U.S. 43 (1997)......................................................................22, 24

*Artway v. Att'y Gen. of N.J.,*
81 F.3d 1235 (3d Cir. 1996) ...........................................10, 11, 14, 21

*Baggett v. Bullitt,*
377 U.S. 360 (1964).....................................................................10, 22

*Bank of Am. Nat'l Tr. and Sav. Ass'n v. Summerland Cnty.,*
767 F.2d 544 (9th Cir. 1985) ...............................................................19

*Bellotti v. Baird,*
428 U.S. 132 (1976)..............................................................................12

*Bogan & Root Braun, Inc. v. Bogan Inc.,*
54 F. App'x 542 (3d Cir. 2002) ...........................................................20

*Caplan v. Fellheimer Eichen Braverman & Kaskey,*
68 F.3d 828 (3d Cir. 1995) ..................................................................36

*Carson v. Makin,*
596 U.S. 767 (2022)......................................................................passim

*Chez Sez III Corp. v. Twp. of Union,*
945 F.2d 628 (3d Cir. 1991) ...........................................11, 12, 13, 21

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993)..............................................................................30

*City of Houston v. Hill,*
482 U.S. 451 (1987)......................................................................passim

*Colby v. J.C. Penney Co.*,
  811 F.2d 1119 (7th Cir. 1987) ..........................................................25

*Colo. River Water Conservation Dist. v. United States*,
  424 U.S. 800 (1976)...........................................................................9

*Deck House, Inc. v. N.J. State Bd. of Architects*,
  531 F. Supp. 633 (D.N.J. 1982) ........................................................31

*Dep't of Homeland Sec. v. New York*,
  140 S. Ct. 599 (2020).........................................................................24

*Elrod v. Burns*,
  427 U.S. 347 (1976)...........................................................................28

*England v. La. State Bd. of Med. Examiners*,
  375 U.S. 411 (1964)...........................................................................17

*Espinoza v. Mont. Dep't of Revenue*,
  591 U.S. 464 (2020)......................................................................*passim*

*Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*,
  426 U.S. 572 (1976)......................................................................16, 17

*Fid. Union Tr. Co. v. Field*,
  311 U.S. 169 (1940)...........................................................................20

*Fischer v. Thomas*,
  52 F.4th 303 (6th Cir. 2022) (per curiam) ........................................27

*Franklin Armory, Inc. v. New Jersey*,
  2021 WL 222808 (D.N.J. 2021) ........................................................20

*Freedom From Religion Found. v. Morris Cnty. Bd. of Chosen Freeholders*,
  181 A.3d 992 (N.J. 2018) .............................................................*passim*

*Gottfried v. Med. Plan Servs., Inc.*,
  142 F.3d 326 (6th Cir. 1998) ......................................................10, 26

*Harman v. Forssenius*,
   380 U.S. 528 (1965)..................................................................................22, 23

*Harris v. Pernsley*,
   755 F.2d 338 (3d Cir. 1985) ..............................................................16

*Haw. Hous. Auth. v. Midkiff*,
   467 U.S. 229 (1984)..................................................................10, 14, 17

*Hill v. Snyder*,
   900 F.3d 260 (6th Cir. 2018) .........................................................12, 13

*Hobby Lobby Stores, Inc. v. Sebelius*,
   723 F.3d 1114 (10th Cir. 2013) .........................................................27

*Hostetter v. Idlewild Bon Voyage Liquor Corp.*,
   377 U.S. 324 (1964)..................................................................20, 23

*In re Contest of Nov. 8, 2011 Gen. Election*,
   40 A.3d 684 (N.J. 2012) ..................................................................25

*Johnson v. Am. Credit Co. of Ga.*,
   581 F.2d 526 (5th Cir. 1978) .............................................................17

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
   710 F.3d 99 (3d Cir. 2013) .........................................................33, 37

*Kusper v. Pontikes*,
   414 U.S. 51 (1973)..................................................................11, 12, 14

*Mangual v. Rotger-Sabat*,
   317 F.3d 45 (1st Cir. 2003)..................................................16, 17, 22

*Marshall v. Lauriault*,
   372 F.3d 175 (3d Cir. 2004) .........................................................10, 21

*Morris Cnty. Bd. of Chosen Freeholders v. Freedom From Religion Found.*,
   139 S. Ct. 909 (2019)..........................................................................7

*Moses H. Cone Mem'l Hosp. v. Mercury Constr.*,
 460 U.S. 1 (2004) ................................................................21

*N.J. State Bd. of Higher Educ. v. Bd. of Dirs.*,
 448 A.2d 988 (N.J. 1982) ...................................................18

*N.J.-Phila. Presbytery of Bible Presbyterian Church v. N.J. State Bd.*
 *of Higher Educ.*,
 654 F.2d 868 (3d Cir. 1981) .........................................27, 31

*N.Y. Progress & Prot. PAC v. Walsh*,
 733 F.3d 483 (2d Cir. 2013) ...............................................28

*Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*,
 938 F.3d 424 (3d Cir. 2019) ..........................................33, 36

*Nken v. Holder*,
 556 U.S. 418 (2009).............................................................36

*NOPSI v. Council of New Orleans*,
 491 U.S. 350 (1989).............................................................21

*Orr v. Orr*,
 440 U.S. 268 (1979).......................................................12, 14

*Peridot Tree, Inc. v. City of Sacramento*,
 94 F.4th 916 (9th Cir. 2024) ...............................................16

*Perry v. Sindermann*,
 408 U.S. 593 (1972).............................................................33

*Planned Parenthood of Cent. N.J. v. Farmer*,
 220 F.3d 127 (3d Cir. 2000) ....................................10, 12, 21

*Presbytery of N.J. v. Whitman*,
 99 F.3d 101 (3d Cir. 1996) ......................................19, 20, 22

*Pursuing Am.'s Greatness v. FEC*,
 831 F.3d 500 (D.C. Cir. 2016)..............................................27

*Quint v. A.E. Staley Mfg. Co.*,
  172 F.3d 1 (1st Cir. 1999)...................................................................20

*R.R. Comm'n v. Pullman Co.*,
  312 U.S. 496 (1941)................................................................*passim*

*Richards v. Thurston*,
  424 F.2d 1281 (1st Cir. 1970)...........................................................14

*Robinson v. New Jersey*,
  806 F.2d 442 (3d Cir. 1986) .......................................................18, 19

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020) (per curiam).....................................22, 28, 33, 34

*San Remo Hotel, L.P. v. City & Cnty. of S.F.*,
  545 U.S. 323 (2005)...........................................................................16

*Schrader v. Dist. Att'y of York Cnty.*,
  74 F.4th 120 (3d Cir. 2023) ..............................................................31

*St. Augustine Sch. v. Evers*,
  906 F.3d 591 (2018)............................................................................18

*State v. Comer*,
  266 A.3d 374 (N.J. 2022) ...................................................................18

*State v. Pomianek*,
  110 A.3d 841 (N.J. 2015) ...................................................................18

*Tandon v. Newsom*,
  593 U.S. 61 (2021) (per curiam)........................................................33

*Tenafly Eruv Ass'n v. Borough of Tenafly*,
  309 F.3d 144 (3d Cir. 2002) ......................................................*passim*

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  582 U.S. 449 (2017)..................................................................*passim*

*United Servs. Auto. Ass'n v. Muir*,
792 F.2d 356 (3d Cir. 1986) .............................................................10, 11, 12, 13

*United States v. City of Pittsburgh*,
757 F.2d 43 (3d Cir. 1985) ......................................................................18, 20

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008).........................................................................................27

*Wisconsin v. Constantineau*,
400 U.S. 433 (1971).................................................................................12, 26

*Zablocki v. Redhail*,
434 U.S. 374 (1978).............................................................................16, 21, 26

*Zwickler v. Koota*,
389 U.S. 241 (1967).............................................................................22, 26, 35

## CONSTITUTIONAL AUTHORITIES

U.S. Const. amend. I ..........................................................................*passim*

N.J. Const. art. I, ¶ 3 .............................................................................6, 12

N.J. Const. art. I, ¶ 12 ..............................................................................18

## OTHER AUTHORITIES

Historic Preservation Trust Fund, Rules and Regulations § 5.2................................3

Historic Preservation Trust Fund, Rules and Regulations § 5.3................................3

Historic Preservation Trust Fund, Rules and Regulations § 5.4................................3

Historic Preservation Trust Fund, Rules and Regulations § 5.6.2.............................3

Historic Preservation Trust Fund, Rules and Regulations § 5.6.3.............................3

Historic Preservation Trust Fund, Rules and Regulations § 5.6.4...................*passim*

*Morris County Historical Preservation Trust Fund 2017 Grants*,
  Morris County ........................................................................................4

*Morris County Historical Preservation Trust Fund 2022 Grants*,
  Morris County ........................................................................................4

N.J. Ct. R. 2:12-4 .........................................................................................23

Charles A. Wright et al., *Federal Practice & Procedure* (3d ed.) ...................13, 31

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

For over two decades, Morris County has provided generally-available grant funding to support the preservation of the County's many historically significant buildings. The County previously awarded such grants to churches alongside other recipients. But in 2018, the New Jersey Supreme Court ruled that the New Jersey Constitution's Religious Aid Clause prohibits the issuance of grants to churches. *Freedom From Religion Found. v. Morris Cnty. Bd. of Chosen Freeholders* (*FFRF*), 181 A.3d 992 (N.J. 2018). As a result, Morris County adopted a categorical religious exclusion policy: "Any property that is currently used for religious purposes or functions is ineligible for Historic Preservation grant funding." Historic Preservation Trust Fund, Rules and Regulations § 5.6.4, https://perma.cc/XE5D-4GRP (hereinafter "FR"). Under that policy, theaters, Masonic lodges, and restaurants may continue to receive grants, but any property used for religious purposes may not.

That policy violates the federal Free Exercise Clause. As the U.S. Supreme Court has held, States may not deny public benefits to religious applicants solely because of their religious nature or activities. *See Carson v. Makin*, 596 U.S. 767 (2022); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020); *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017). The same principle applies here: The County may not exclude Plaintiff Churches from its

historic preservation grant program solely because they are churches that use their property for religious purposes.

Plaintiffs are Morris County churches that sought preservation funds to repair their historically significant buildings. Their applications for grant funding were denied under the County's religious exclusion policy on the ground that their church buildings are used for religious purposes. After the Churches filed suit and moved for summary judgment—based on stipulated facts and an agreed briefing schedule concluding in October 2023—the Attorney General intervened in this litigation.

The Attorney General now asks this Court to stay this case pursuant to *Pullman* abstention, so state courts can resolve "implicit questions" about the New Jersey Constitution's Religious Aid Clause. ECF 46-1 at 1. But this case does not come close to meeting *Pullman*'s requirements. Morris County's religious exclusion policy is unambiguous. And the New Jersey Supreme Court has already foreclosed any state-law uncertainty by holding that granting funds to churches would "violate[] the Religious Aid Clause of the State Constitution." *FFRF*, 181 A.3d at 1004.

The Attorney General makes no suggestion that he believes the New Jersey Supreme Court misconstrued the Religious Aid Clause and offers no construction that would yield a different result in a second attempt at interpreting it. The only apparent purpose of abstention is thus to delay resolution of Plaintiffs' federal Free Exercise Clause claims. As a result of the Attorney General's intervention and

abstention motion, the Churches have already lost the benefit of the stipulated order, ECF 15, under which the Court could have resolved those claims on summary judgment months ago. The further delay that would result from relitigating settled questions of state law as a result of abstention would only prolong Plaintiffs' ongoing and irreparable First Amendment injury. To remedy this protracted First Amendment violation, the Court should enter a preliminary injunction to secure the Churches' free exercise rights while this litigation proceeds.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    The Historic Preservation Trust Fund

Decades ago, Morris County voters created the Morris County Historic Preservation Trust Fund to preserve the County's historic resources. *See FFRF*, 181 A.3d at 994; FR §§ 5.2, 5.4. To obtain a grant, owners of historic properties submit applications. FR § 5.3. Applicants must show that their property is historically significant, as demonstrated by inclusion, or eligibility for inclusion, on the National or State Registers of Historic Places, and describe the condition of the property and repairs proposed. FR §§ 5.6.2, 5.6.3. The Board of County Commissioners considers applications and issues final decisions on project funding. FR § 5.3; *see FFRF*, 181 A.3d at 994–95. Past recipients of these grants include properties of all sorts. The Mountain Lakes Train Station (which houses a restaurant), a community theater, a Masonic lodge housed in a former church building, and a woman's club have all

received historic preservation grants under Morris County's program.[1] And before the New Jersey Supreme Court's decision in *FFRF*, churches were for many years also eligible to receive grant funds. *See* 181 A.3d at 995. Indeed, Plaintiff Zion Lutheran received a grant through the program in 2017.[2]

## II.   Plaintiff Churches and Their Historical Significance

Mendham Methodist Church is a Christian church located in Morris County; its congregation was formed in the 1800s, and its current building dates to 1893. *See* Ex. 1, Declaration of Elaine Warren ("Warren Decl.") ¶¶ 3–5. The church possesses many historic architectural features, including a bell tower and stained glass windows. *Id.* ¶ 6. The church stands in the center of the Mendham Historic District, which is listed on the State and National Registers of Historic Places. *Id.* ¶¶ 7–8. While Mendham Methodist opens its doors for community events, its core and regular use is for worship services. *Id.* ¶¶ 10–13.

Mendham Methodist Church has significant restoration needs. The church's roof has weathered to the point that rain leaks into the sanctuary. *Id.* ¶ 15. One of the church's basement walls recently collapsed, causing stones and dirt to invade the building and threatening the building's foundation. *Id.* ¶ 20. The church's bell

---

[1] *Morris County Historical Preservation Trust Fund 2022 Grants*, Morris County, https://perma.cc/R6Y2-MGP3.

[2] *Morris County Historic Preservation Trust Fund 2017 Grants*, Morris County, https://perma.cc/N5FZ-Z4W9.

tower—the focal point of its architecture—requires repair to its damaged siding. *Id.* ¶ 23. Operating on a meager budget with a small congregation, Mendham Methodist cannot afford to make these repairs to preserve the building's integrity and its distinctive characteristics without preservation grants. *Id.* ¶¶ 11, 29.

Zion Lutheran Church Long Valley is another Christian church located in Morris County; its congregation dates to 1760, and its current building was constructed in 1832. Ex. 2, Declaration of Ingrid Wengert ("Wengert Decl.") ¶¶ 4–5. The church building retains many of its classic Gothic Revival feature and its 1861 bell tower. *Id.* ¶¶ 5–6. The National Register of Historic Places recognizes Zion Lutheran as a key building in the German Valley Historic District. *Id.* ¶ 7. While Zion Lutheran hosts a nursery school and a number of community events, its central use remains congregational worship. *Id.* ¶¶ 9–12.

Zion Lutheran's historic church building requires repair. The walls and ceiling have begun to crack. *Id.* ¶ 17. The historic stained glass windows in the sanctuary require maintenance. *Id.* ¶ 18. The church has also suffered flood damage from the nearby Raritan River. *Id.* ¶ 19. Zion Lutheran cannot afford to make these repairs to preserve the building's integrity and its distinctive characteristics without preservation grants. *Id.* ¶ 23.

### III.   The Religious Exclusion Policy and the Churches' Denied Applications

Historic churches shape Morris County's identity at least as much as its historic theaters, restaurants, and other structures. For that reason, the County long provided grants through the Fund to support church buildings. Between 2002 and 2017, the County awarded grants to at least twenty-two churches, including Plaintiff Zion Lutheran.[3] *Id.* ¶ 14. Today, however, the Fund's rules provide that "[a]ny property that is currently used for religious purposes or functions is ineligible for . . . grant funding." FR § 5.6.4. The County's policy thus excludes otherwise-qualifying buildings—like the Churches'—from eligibility based solely on religious use.

The County adopted its religious exclusion policy on the heels of *FFRF* in 2019. ECF 18-2 (Stipulated Statement of Facts) ¶ 39. In *FFRF*, the New Jersey Supreme Court considered the state's Religious Aid Clause, which provides that "[n]o person shall . . . be obliged to pay tithes, taxes, or other rates for building or repairing any church or churches, place or places of worship, or for the maintenance of any minister or ministry." N.J. Const. art. I, ¶ 3. The court concluded that providing "public funding to repair a house of worship" violated the "plain language of the clause." *FFRF*, 181 A.3d at 1004–06. The court then separately considered whether the clause was "at odds with the Federal Constitution." *Id.* at 1006. It said

---

[3]   *See Funded Sites*, Morris County Historic Preservation, https://perma.cc/T8ZE-FL8E.

6

no, reasoning that the Free Exercise Clause bars discrimination based on *religious status*, but not discrimination based on *religious use*. *Id.* at 1006–12.

Morris County sought certiorari in the U.S. Supreme Court, which declined review. *Morris Cnty. Bd. of Chosen Freeholders v. Freedom From Religion Found.*, 139 S. Ct. 909 (2019). Justice Kavanaugh wrote to emphasize *FFRF*'s "serious tension with [the] Court's religious equality precedents," as "[b]arring religious organizations because they are religious from a general historic preservation grants program is pure discrimination against religion." *Id.* at 909, 911. But he concurred in denial of discretionary review, given the lack of further case law developing the Court's decision in *Trinity Lutheran* and limited factual development in the prior proceeding about "what kinds of buildings" received funding. *Id.* at 911.

The Supreme Court has since made clear that States may not limit eligibility for generally-available grant funds based on religious *use* any more than on the basis of the recipient's religious character. *See Carson*, 596 U.S. at 787–88 ("any status-use distinction lacks a meaningful application"). And the facts are plain. Since 2019, the County has implemented *FFRF* through an expressly discriminatory policy that denies churches' eligibility for grant funds solely because of their buildings' religious uses. Given their buildings' need for repairs, the Churches here submitted

grant applications to the County.[4] Wengert Decl. ¶ 26; Warren Decl. ¶ 31. Both indicated that the grants would be used to preserve the Churches' historic houses of worship. Wengert Decl. ¶¶ 26–29; Warren Decl. ¶¶ 31–34. But for the Fund's policy, the County agreed, both Churches would be eligible for a grant. ECF 18-2 (Statement of Stipulated Facts) ¶¶ 43–44. But Morris County rejected the Churches' applications solely because their buildings are "used for religious purposes or functions." *Id.* ¶ 45; *see* Wengert Decl. ¶ 35; Warren Decl. ¶ 30. The County has denied several other applications on the same basis. ECF 18-2 ¶ 46.

## IV. The Initial Summary Judgment Filing and the Intervention Proceedings

The Churches sued the County over its religious exclusion policy in April 2023. ECF 1. After conferring to seek prompt resolution of this case in light of the plain facts, the Churches and Morris County agreed to factual stipulations and a summary judgment briefing schedule to conclude in October 2023, which the Court entered. ECF 13, 15. After the Freedom From Religion Foundation moved to intervene, the Court administratively terminated the Churches' motion for summary judgment. ECF 19. The New Jersey Attorney General then also moved to intervene. ECF 26. On February 5, 2024, the Court granted the Attorney General's motion to intervene. ECF 33. The Attorney General moved for a stay on April 10. ECF 46.

---

[4] Mendham Methodist filed a declaration of intent to apply for funds on February 28, 2022. ECF 11-6. Zion Lutheran did so on February 3, 2023. ECF 11-8.

Seeking to avoid the merits, the Attorney General urges this Court to abstain from deciding this case by employing *Pullman* abstention. *R.R. Comm'n v. Pullman Co.*, 312 U.S. 496 (1941). That course is neither permissible nor appropriate. None of the conditions necessary for *Pullman* abstention are present here, and even if it were otherwise, the costs to the Churches' liberties under the First Amendment, and to their historic properties, weigh decisively against abstention. If the Court were to abstain, however, a preliminary injunction would be imperative, lest the Churches be forced to labor under a clearly unconstitutional policy for the months and years needed to litigate in state courts.

## ARGUMENT

### I.   The Court Should Not Stay This Case Under *Pullman*.

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Abstaining from that jurisdiction under *Pullman* is an "exception and not the rule." *City of Houston v. Hill*, 482 U.S. 451, 468 (1987). And it is "an extraordinary and narrow exception" at that. *Colo. River*, 424 U.S. at 813.

The Court may stay this case under the doctrine of *Pullman* abstention only if it finds that (1) "uncertain issues of state law underlie" the federal claims; (2) the state law is "amenable to a state court interpretation that would obviate the need for, or substantially narrow" the federal issue; and (3) an "erroneous construction of state

law" would disrupt "important state policies." *Artway v. Att'y Gen. of N.J.*, 81 F.3d 1235, 1270 (3d Cir. 1996). A court "*must* find" each condition met to even "consider whether abstention is appropriate." *Id.* (emphasis added). Even when every prerequisite condition is met, abstention is not "automatic," but rather a "discretionary" and disfavored approach. *Baggett v. Bullitt*, 377 U.S. 360, 375 (1964); *see Marshall v. Lauriault*, 372 F.3d 175, 183 (3d Cir. 2004) (describing "the strong antipathy to abstention"); *Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 149 (3d Cir. 2000) ("*Pullman* abstention should be rarely invoked."). But none of those prerequisites is satisfied here.[5]

### A.    There is no uncertain issue of state law.

*Pullman* permits abstention only when an "unsettled question[] of state law" is "obviously" subject to an interpretation that would eliminate the federal constitutional question. *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236–37 (1984) (quotation omitted). A state law may be uncertain if its text is "ambiguous" or "contradictory." *United Servs. Auto. Ass'n v. Muir*, 792 F.2d 356, 361 (3d Cir. 1986). But when a law "is plain and its meaning unambiguous," abstention is inappropriate,

---

[5] While *Pullman* abstention dates to 1941, the mandatory prerequisites adopted by the Third Circuit in *Artway* and like cases (as well as Supreme Court precedents disfavoring *Pullman* abstention) are more recent. Many of the Attorney General's authorities (particularly out-of-circuit authorities) do not require these prerequisites, and so provide limited guidance on whether abstention is proper under Third Circuit precedent. *See, e.g.*, ECF 46-1 at 39 (citing *Gottfried v. Med. Plan Servs., Inc.*, 142 F.3d 326, 330–31 (6th Cir. 1998)).

"even if state courts have never interpreted [it]." *Hill*, 482 U.S. at 468–69. Even if a state law is "otherwise ambiguous," moreover, "abstention is *not* appropriate if [the provision] has been authoritatively construed by the state courts." *Muir*, 792 F.2d at 361 (emphasis added); *Chez Sez III Corp. v. Twp. of Union*, 945 F.2d 628, 632 (3d Cir. 1991) (same). In other words, the "uncertainty" necessary for *Pullman* abstention is "foreclosed by the decision" of a state's highest court. *Kusper v. Pontikes*, 414 U.S. 51, 55 (1973); *see Hill*, 482 U.S. at 470 (same for rulings from state trial courts). Abstention is inappropriate in this case because there are no "uncertain issues of state law." *Artway*, 81 F.3d at 1270.

*First*, the religious exclusion policy plainly excludes properties "used for religious purposes or functions." FR § 5.6.4. Its application here is equally plain, as the Churches use their facilities for religious purposes. *See* Warren Decl. ¶¶ 10–12; Wengert Decl. ¶¶ 9–11. Under the rules, the Churches are thus "ineligible"—a conclusion Morris County reached easily. ECF 11-7 at 1 ("As this building is currently used for religious purposes or functions, it is ineligible for Historic Preservation grant funding. . . .); ECF 11-9 at 2 (same); *see Artway*, 81 F.3d at 1270–71 (concluding a state law "is not 'uncertain'" if it "clearly applies to [the plaintiff]").

*Second*, the New Jersey Supreme Court has definitively construed the New Jersey Constitution's Religious Aid Clause. That Clause provides that "[n]o person shall . . . be obligated to pay tithes, taxes, or other rates for building or repairing any

11

church or churches, place or places or worship, or for the maintenance of any minister or ministry." N.J. Const. art. I, ¶ 3. In 2018, the New Jersey Supreme Court squarely held that it "banned the use of public funds to build or repair any house of worship." *FFRF*, 181 A.3d at 1004. According to the Court, in view "of the plain language of the clause, the question [of whether the State could provide preservation funds to churches] answer[ed] itself." *Id.* at 1004. In other words, *FFRF* "authoritatively construed" the Religious Aid Clause. *Muir*, 792 F.2d at 361; *see Hill v. Snyder*, 900 F.3d 260, 265–66 (6th Cir. 2018) (finding "no unsettled state-law question" where state court had "addressed the very statutory provision" at issue). And it applied that construction to the County program, requiring the County "to do what [it] did to the [Churches]"—deny their applications due to active religious use of their properties. *Wisconsin v. Constantineau*, 400 U.S. 433, 439 (1971).

In light of *FFRF*, binding Third Circuit precedent forecloses application of *Pullman* abstention.  As the Third Circuit has held, *Pullman* is only "appropriate [for] an *unconstrued* state statute." *Farmer*, 220 F.3d at 149 (emphasis added) (quoting *Bellotti v. Baird*, 428 U.S. 132, 147 (1976)); *see Chez Sez III*, 945 F.2d at 632. Indeed, case after case confirms that such an on-point holding from a state's highest court bars abstention. *See, e.g.*, *Kusper*, 414 U.S. at 55 (refusing to abstain where uncertainty was "foreclosed by the decision of the [state] Supreme Court"); *Hill*, 482 U.S. at 470 (similar); *Orr v. Orr*, 440 U.S. 268, 278 n.8 (1979) (refusing

to abstain when the state court had "already considered the case"); *Chez Sez III*, 945 F.2d at 632 ("If an otherwise ambiguous statute has been authoritatively construed by the state courts, abstention would not be appropriate"); *Muir*, 792 F.2d at 361 (same); *Snyder*, 900 F.3d at 265–66 (concluding "there is no unsettled state-law question" because the state court "addressed the very statutory provision" at issue). Leading treatises agree. *See* Charles A. Wright et al., *Federal Practice & Procedure* § 4242 (3d ed.) (Abstention is not appropriate if a state law's "meaning has already been authoritatively decided by the state courts."). That should be the end of the matter; since *FFRF* has definitively resolved the state constitutional question here, *Pullman* abstention does not apply.

## B. No narrowing construction of the Religious Aid Clause authorizes abstention.

In any event, the Attorney General cannot satisfy any of the other *Pullman* factors either. As to the second *Pullman* prerequisite, the Attorney General suggests that the New Jersey Supreme Court could change its current interpretation of the Religious Aid Clause to accord with federal law. *See* ECF 46-1 at 26–27. But the New Jersey Supreme Court already squarely held that no alternative reading of that Clause is available, and has issued no intervening decisions that undermine that square holding. Nor does the Attorney General suggest any limiting construction of that Clause that he would advocate to persuade that Court to overrule its recent on-point precedent. And in any event, the hypothesis that the New Jersey Supreme

Court *might* reverse its interpretation of the Religious Aid Clause does not suffice to authorize abstention.

In addition to the mandate that the state law be "uncertain," *Pullman* abstention separately requires that the law be "*obviously* susceptible of a limiting construction" that would avoid or narrow the federal question. *Midkiff*, 467 U.S. at 237 (emphasis added) (quotation omitted). "[A] bare, though unlikely possibility that state courts *might* render adjudication of the federal question unnecessary" is insufficient. *Id.* at 237 (emphasis added). Crucially, a decision from a state's high court "foreclose[s]" even that bare possibility. *Kusper*, 414 U.S. at 55.

No such limiting construction is available here. Morris County's exclusion policy is clear and leaves no room for alternative constructions—let alone ones that are "obvious[]." *Midkiff*, 467 U.S. at 237; *see Artway*, 81 F.3d at 1270–71 (when a state law "clearly applies," it "is not 'amenable' to a contrary interpretation"). As to the Religious Aid Clause, a state law provision "is not fairly susceptible" of a narrowing construction when, as here, it "is foreclosed by the decision of the [state's highest court]." *Kusper*, 414 U.S. at 55; *see Richards v. Thurston*, 424 F.2d 1281, 1282 (1st Cir. 1970) (reasoning that a state court decision "foreclose[d]" narrowing constructions); *Orr*, 440 U.S. at 278 n.8 (similar).

For his part, the Attorney General does not offer any limiting construction of the Religious Aid Clause or of the Morris County exclusion policy that he would

support. *See* ECF 46-1 at 25. The Attorney General says such constructions must be available because the churches in the *FFRF* litigation offered them. ECF 46-1 at 36.[6] Assuming that to be true, it is utterly irrelevant here, since *FFRF* roundly rejected those arguments, finding that nothing in them "affects the plain meaning of the Religious Aid Clause." *FFRF*, 181 A.3d at 1006.[7]

Despite his failure to propose any limiting construction of the text (let alone one that would save it from a First Amendment violation), the Attorney General nevertheless speculates that the New Jersey Supreme Court could change its interpretation of the Religious Aid Clause to be consistent with the federal Free Exercise Clause. ECF 46-1 at 27. Whatever the mechanism—"constitutional avoidance," "dynamic incorporation," "parallel interpretation," or otherwise, *id.* at 27–33—the only legal basis the Attorney General offers for a narrowing construction of the Religious Aid Clause arises from the U.S. Supreme Court's decisions in *Espinoza* and *Carson*—that is, from federal law. The Attorney General, in other words, seeks abstention so that a state court may have the first opportunity to apply federal law.

---

[6] None of the Plaintiffs in this case were church plaintiffs in *FFRF*.

[7] Because the New Jersey Supreme Court definitively interpreted the Religious Aid Clause in *FFRF* and is the final arbiter of the meaning of that Clause, Plaintiffs need not and do not take any position as to whether *FFRF* correctly decided that question of New Jersey constitutional law.

The Attorney General misunderstands *Pullman*. A federal court "may postpone adjudication of a federal constitutional issue" only if it could "be mooted or presented in a different posture by a state court determination of *a state law issue*." *Harris v. Pernsley*, 755 F.2d 338, 344 (3d Cir. 1985) (emphasis added). By contrast, a state-court interpretation that relies on federal law does not "obviate[]" the "need for a federal constitutional ruling." *Mangual v. Rotger-Sabat*, 317 F.3d 45, 63 (1st Cir. 2003). It simply changes which venue applies federal law. The New Jersey courts here "would be faced with exactly the same issues as this Court"—whether New Jersey's religious exclusion policy violates the federal Free Exercise Clause. *Id.* at 63. And yet, "the purpose of abstention is not to afford state courts an opportunity to adjudicate an issue that is functionally identical to the federal question." *San Remo Hotel, L.P. v. City & Cnty. of S.F.*, 545 U.S. 323, 339 (2005).

Nor is it to provide state courts with "the initial opportunity to pass on [a] constitutional attack." *Zablocki v. Redhail*, 434 U.S. 374, 379 n.5 (1978). Absent a narrowing construction of New Jersey law that is *independent* of the federal Constitution—which the Attorney General nowhere offers—this Court cannot abstain. *San Remo Hotel*, 545 U.S. at 339; *Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 598 (1976) (rejecting argument for abstention "even though the plaintiffs might have sought relief under a similar provision of the state constitution" (quotation omitted)); *see also Peridot Tree, Inc.*

*v. City of Sacramento*, 94 F.4th 916, 928 (9th Cir. 2024) (reasoning that "abstention is unwarranted" when a state's provision is "co-extensive" with the federal provision); *Mangual*, 317 F.3d at 63–64 (similar).

Countenancing abstention on the Attorney General's hypothetical federal-constitutional-avoidance theory, moreover, "would require abstention in every case in which a state statute is facially challenged on federal constitutional grounds, even when, as here, the [state law has been held] . . . unambiguous and has been recently upheld by the highest state court." *Johnson v. Am. Credit Co. of Ga.*, 581 F.2d 526, 530 n.6 (5th Cir. 1978). That is not just absurd, it is not the law: Abstention is "the exception and not the rule." *Hill*, 482 U.S. at 467. Federal courts are vested with "primacy" over "questions of federal law." *England v. La. State Bd. of Med. Examiners*, 375 U.S. 411, 415–16 (1964). Yet, "this approach would drive all such cases out of the federal forum," *Johnson*, 581 F.2d at 530 n.6, and it "would convert abstention from an exception into a general rule." *Flores de Otero*, 426 U.S. at 598.

Setting that aside, it is far from "obvious[]" that the New Jersey courts would apply constitutional avoidance to change the settled meaning of the Religious Aid Clause. *Midkiff*, 467 U.S. at 237. Again, *FFRF* already rejected avoidance. The New Jersey Supreme Court first determined the Religious Aid Clause's plain meaning, and only then turned to the "more challenging question" of whether the Free Exercise Clause foreclosed the Religious Aid Clause's application. 181 A.3d at 1006.

17

In any event, the best the Attorney General can say is that the New Jersey courts "could" hypothetically change course to apply avoidance this time when the New Jersey Supreme Court already chose not to do so. ECF 46-1 at 34. That "mere possibility . . . is insufficient reason to require abstention." *United States v. City of Pittsburgh*, 757 F.2d 43, 45 (3d Cir. 1985). Federal courts "may not properly ask a state court it if would care in effect to rewrite" state law.[8] *Hill*, 482 U.S. at 471. Instead, when a state's highest court "has already resolved the critical questions of state law" and "also disapproved" of any alternative reading—as *FFRF* did here—abstention is "both unnecessary and inappropriate." *St. Augustine Sch. v. Evers*, 906 F.3d 591, 600 (2018), *vacated on other grounds*, 141 S. Ct. 186 (2020).

*Robinson v. New Jersey* does not change matters. 806 F.2d 442 (3d Cir. 1986); *see* ECF 46-1 at 35. The Third Circuit abstained there because the state law was

---

[8] The Attorney General cites one case where a narrow majority of the New Jersey Supreme Court "implied" a procedural mechanism (a "look-back provision") to the state's "homicide statute" after concluding that a mandatory 30-year sentence for juveniles would otherwise "contravene Article I, Paragraph 12 of the State Constitution." *State v. Comer*, 266 A.3d 374, 380, 399 (N.J. 2022); *see id.* at 403 (Solomon, J., dissenting in part) (asserting that "the majority today act 'as legislators' instead of judges" in inserting a provision). *Comer* does not demonstrate that the New Jersey Supreme Court would revise the unambiguous County rules or a provision of the State Constitution it has already determined to be unambiguous. *State v. Pomianek*, 110 A.3d 841, 855 (N.J. 2015) (explaining that "rewriting [a] statute" is "beyond our authority"); *N.J. State Bd. of Higher Educ. v. Bd. of Dirs.*, 448 A.2d 988, 993 (N.J. 1982) (similar). But even assuming that the New Jersey Supreme Court would do so, federal courts "may not properly ask a state court it if would care in effect to rewrite" state law by abstention. *Hill*, 482 U.S. at 471.

"largely silent" on the relevant point, the only prior New Jersey court decision that had addressed the issue "le[ft]" the issue "open," and the State was actively revising its rules to accord with federal law. *Robinson*, 806 F.2d at 448–49. None of that is true here.

Nor is *Bank of America National Trust and Savings Association v. Summerland County* helpful to the Attorney General. 767 F.2d 544 (9th Cir. 1985); *see* ECF 46-1 at 35. The Ninth Circuit noted that California might change a principle of its land-use policy after five members of the Supreme Court disapproved of it. *Summerland Cnty.*, 767 F.2d at 547. But it did so in dicta only after it had already decided to abstain because the case involved "a number" of other, non-land-use questions with "doubtful outcomes" that California courts had "not definitively determined"—including whether land-use law applied at all. *Id.* The Attorney General has not identified even one "doubtful" state issue here. To the contrary, the County's regulation and the New Jersey Supreme Court's *FFRF* decision are clear and definitive. *Pullman* does not apply.

## C.   There is no risk of substantial disruption to important state policies.

The Attorney General also fails to satisfy the third condition for *Pullman* abstention, which requires that "an erroneous construction of state law by the federal court would disrupt important state policies." *Presbytery of N.J. v. Whitman*, 99 F.3d 101, 106 (3d Cir. 1996). This condition does not apply if interference would be

19

"minimal." *City of Pittsburgh*, 757 F.2d at 45. Rather, it is satisfied only when a federal decision "could eviscerate" an entire statutory structure, *Whitman*, 99 F.3d at 107, or disrupt "an entire legislative scheme," *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 329 (1964).

This condition is not satisfied here for two reasons. *First*, a ruling acknowledging that New Jersey law "ban[s] the use of public funds to build or repair any house of worship," *FFRF*, 181 A.3d at 1004, is not plausibly "erroneous." Instead, it accepts *FFRF*'s construction of state law, as this Court must. *See Fid. Union Tr. Co. v. Field*, 311 U.S. 169, 178 (1940) (explaining a "federal court was not at liberty" to disregard "the construction and effect which the State itself accorded to its statute"); *Bogan & Root Braun, Inc. v. Bogan Inc.*, 54 F. App'x 542, 547 (3d Cir. 2002) (A state court ruling binds "even if we think that [it] would change its mind were it ever to revisit the subject." (quotation omitted)); *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 17 (1st Cir. 1999) (similar).

*Second*, a ruling for the Churches would not be disruptive. The Churches seek equitable relief only for "otherwise-eligible religious organizations" like themselves, only as to this County program, and only as to the Defendants in this case. ECF 11 at 48. "There is little potential of disruption" where the ruling would be so "limited." *Franklin Armory, Inc. v. New Jersey*, 2021 WL 222808, at *7 (D.N.J. 2021). The Churches, moreover, merely seek to return the County to its pre-*FFRF* policy,

pursuant to which it considered their applications on equal terms with historic buildings that are not used for religious purposes. ECF 11 at 48. The Attorney General cannot point to any disruptive results stemming from those earlier grants. Moreover, the State has no legitimate "interest in separating church and state 'more fiercely' than the Federal Constitution," *Carson*, 596 U.S. at 781 (quotation omitted). "And there is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy," *Zablocki*, 434 U.S. at 379 n.5, or "in an injunction against [its] enforcement," *NOPSI v. Council of New Orleans*, 491 U.S. 350, 363 (1989).

**D.     *Pullman* abstention is disfavored, particularly in this context.**

Even if "all three of the 'special circumstances'" existed here—and not one does—the Court would also have to "make a discretionary determination as to whether abstention is in fact appropriate." *Chez Sez III*, 945 F.2d at 631. Relevant considerations include: (1) the plaintiff's choice of forum; (2) the nature of its claims; and (3) "the impact of delay." *Artway*, 81 F.3d at 1270; *see Farmer*, 220 F.3d at 151. "[T]he balance is 'heavily weighted in favor of the exercise of jurisdiction.'" *Marshall*, 372 F.3d at 183 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr.*, 460 U.S. 1, 16 (2004)).

Each factor weighs against abstention here. *First*, the Churches rely on federal law, and federal courts must "give due respect" to the "choice of a federal forum."

*Zwickler v. Koota*, 389 U.S. 241, 248 (1967); *see Mangual*, 317 F.3d at 63. *Second*, abstention is "particularly" disfavored in "facial challenges based on the First Amendment." *Hill*, 482 U.S. at 468; *see* ECF 11 ¶ 24 (bringing both an as applied and a facial challenge). Abstaining is "especially problematic where First Amendment rights are involved," *Mangual*, 317 F.3d at 64, because delay "might itself effect the impermissible chilling of the very constitutional right [the plaintiff] seeks to protect," *Zwickler*, 389 U.S. at 252; *see Baggett*, 377 U.S. at 378–79 (recognizing that "delaying ultimate adjudication on the merits" may "inhibit the exercise of First Amendment freedoms" and thus prove "quite costly").

*Third*, delay weighs against abstention, *Harman v. Forssenius*, 380 U.S. 528, 537 (1965), and is particularly problematic here. Indeed, delay "for even minimal periods" in vindicating the Churches' First Amendment freedoms "unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (quotation omitted). Here, delay would not be for a "minimal period," *id.*, but would instead requiring the Churches to endure "a full round of litigation in the state court system before any resumption of proceedings in federal court," *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 76 (1997). That, in turn, could "threaten[] any possibility of relief." *Whitman*, 99 F.3d at 107.

The Attorney General suggests that because the case—due to the intervention and abstention motions—has not yet proceeded to a dispositive ruling, abstention

would not produce undue delay. ECF 46-1 at 41. Not so. Rather, the point underscores that "the litigation [has] already been long delayed, despite the [Churches'] efforts to expedite the proceedings." *Hostetter*, 377 U.S. at 329. The Attorney General also tries to sidestep the "inherent" delay of *Pullman* abstention, *Harman*, 380 U.S. at 537, claiming that the Churches will be "free to pursue efficient resolution" through a direct appeal to the New Jersey Supreme Court, ECF 40 at 3; ECF 46-1 at 42. But New Jersey's rules generally limit direct appeal to cases that "present[] a question of general public importance which *has not been* but should be settled by the Supreme Court." N.J. Ct. R. 2:12-4 (emphasis added). *FFRF*'s on-point holding would bar this option, underscoring that state law is settled and threatening to leave the Churches to litigate through every level of the State courts.[9]

On this delay point, the Attorney General also ignores recent Supreme Court guidance indicating that where federal-state comity is truly needed, the appropriate path is certification. "Certification today covers [the] territory once dominated by" *Pullman*, as "*Pullman* abstention proved protracted and expensive in practice," and

---

[9] If the Court denies the abstention motion, it should also deny the Attorney General's request to conduct discovery before it entertains dispositive motions. The Churches and the County considered the undisputed facts to be sufficient to resolve the case. ECF 13 ¶ 2 (noting parties' "agree[ment]" on the key facts). The only aspect of the program challenged is the exclusion of religious entities, which is clear on its face: "Any property that is currently used for religious purposes or functions is ineligible" for funding. FR § 5.6.4. Likewise, the Attorney General identifies nothing about the Churches' "applications for funding" or the County's denial of them that could inform the constitutional analysis. ECF 46-1 at 47.

certification has the benefit of "reducing the delay, cutting the cost, and increasing the assurance of gaining an authoritative response." *Arizonans for Off. Eng.*, 520 U.S. at 75–76. The Attorney General dismisses the Supreme Court's preferred path as inferior by noting that New Jersey only accepts certification from the Third Circuit. But if this Court grants the Churches relief, the Attorney General has the right as intervenor to appeal to the Third Circuit and then seek certification—which he expressly says he "expect[s]" to do at that time. ECF 46-1 at 48. Of course, certification and abstention are both unnecessary in light of the conclusive *FFRF* decision. But if the Court disagrees and finds the *Pullman* prerequisites met, it still should not force the Churches out of court to initiate the "full round of litigation in the state court system" the Supreme Court has noted as wasteful, *Arizonans for Off. Eng.*, 520 U.S. at 76, when the preferred path of certification is available to the Attorney General.

**E.   Refusing to abstain under *Pullman* does not risk inconsistent obligations.**

The Attorney General worries that, absent an abstention order, "public entities across New Jersey would be forced to choose between following" the decisions in *FFRF* and this Court. ECF 46-1 at 38. Certainly, "conflicting . . . injunctions" from co-equal courts (a regular occurrence within the federal system itself) pose serious concerns, including inconsistent legal duties and decisions from one court that halt the debate for all others. *See, e.g.*, *Dep't of Homeland Sec. v. New York*, 140 S. Ct.

599, 601 (2020) (Gorsuch, J., concurring). But here, there is no possibility of conflicting injunctions. In *FFRF*, the New Jersey courts did not issue any injunctive relief at all. And here, the Churches do not seek a preliminary injunction that would bind non-parties. 181 A.3d at 1013; *see Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1124 (7th Cir. 1987) (reasoning that a concern over "inconsistent obligations" was missing absent conflicting injunctions); *In re Contest of Nov. 8, 2011 Gen. Election*, 40 A.3d 684 (N.J. 2012) (similar). As a result, no one will be put "to [an] impossible choice." ECF 46-1 at 9.

Instead, the only potential "conflict" here is between the reasoning of *FFRF* and of this Court on the meaning of *federal law*. But that type of conflict is commonplace. To be sure, federal courts are required to defer to the definitive rulings of state supreme courts on questions of state law. But the same is not true as to federal law, where, under the federal judicial hierarchy, federal district courts are bound by precedents of the circuits in which they sit and the U.S. Supreme Court. Thus, the possibility that federal and state courts will disagree as to the meaning of the U.S. Constitution is a common feature in our federal system. But even this is not a concern here, because here, a ruling in Plaintiffs' favor would not require any disagreement with *FFRF*, even as to its interpretation of the First Amendment. After all, *FFRF* was decided before the U.S. Supreme Court issued decisions in *Carson*

and *Espinoza*. This Court therefore need only recognize that the County's policy cannot stand in light of this post-*FFRF* precedent.

In any event, the Attorney General's arguments about a "conflict" with *FFRF* prove that New Jersey law is settled. If the meaning of the Religious Aid Clause was "unsettled" as the Attorney General elsewhere asserts, there could be no conflict with a decision from this Court. Trying another tack, the Attorney General asserts that New Jersey courts should have "the first opportunity" to address the Religious Aid Clause and to bring it "into compliance with [federal] constitutional law." ECF 46-1 at 39 (quoting *Gottfried v. Med. Plan. Servs., Inc.*, 142 F.3d 326, 330–32 (6th Cir. 1998)). But as the Supreme Court has repeatedly explained, "abstention cannot be ordered simply to give state courts the first opportunity to vindicate the federal claim." *Zwickler*, 389 U.S. at 251; *see Zablocki*, 434 U.S. at 379 n.5; *Constantineau*, 400 U.S. at 439.

## II. The Court Should Grant Preliminary Injunctive Relief to the Churches.

At a minimum, the Churches are entitled to a preliminary injunction. The Attorney General's intervention to pursue abstention has already delayed a dispute that would have been fully ripe for merits resolution months ago, and has thus already prolonged the Churches' ongoing First Amendment injury. And if the Court abstains under *Pullman*, preliminary injunctive relief is imperative to avoid months, if not years, of protracted litigation in state court and the ensuing irreparable First

Amendment harm to the Churches. The Third Circuit has emphasized that *Pullman* abstention is no bar to a preliminary injunction; rather, preliminary relief "especially in [F]irst [A]mendment contexts" should "be considered without regard to the separate question whether a Pullman stay of final hearing is appropriate." *N.J.-Phila. Presbytery of Bible Presbyterian Church v. N.J. State Bd. of Higher Educ.*, 654 F.2d 868, 887 (3d Cir. 1981)

Preliminary injunction motions are governed by "[f]our factors." *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002); *see Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The movant must demonstrate: (1) that it is "reasonably likely to prevail eventually"; and (2) that it is "likely to suffer irreparable injury without relief." *Tenafly*, 309 F.3d at 157. The Court then considers "to the extent relevant" (3) the balance of harms and (4) whether "granting relief would serve the public interest." *Id*.

"In First Amendment cases, only one question generally matters to the outcome: Have the plaintiffs shown a likelihood of success on the merits of their First Amendment claim?" *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (per curiam); *see Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) ("In First Amendment cases, the likelihood of success 'will often be the determinative factor' in the preliminary injunction analysis." (quotation omitted)); *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (similar);

27

*N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (similar). That is in part because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese*, 592 U.S. at 19 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)).

### A.   Plaintiffs are likely to succeed on the merits of their Free Exercise Clause claims.

Plaintiffs are likely to succeed on the merits of their Free Exercise claims because the exclusion of churches from eligibility for generally available grants is subject to, and cannot survive, strict scrutiny.

Government action violates the Free Exercise Clause "when it excludes religious observers from otherwise available public benefits." *Carson*, 596 U.S. at 778. Here, the County denied the Churches' grant applications on one basis: Their buildings are "currently used for religious purposes." Wengert Decl. ¶ 30; Warren Decl. ¶ 35. And contrary to the Attorney General's intimation, ECF 46-1 at 47, "how exactly the Morris County Program works" is clear: "Any property that is currently used for religious purposes or functions is ineligible for Historic Preservation grant funding." Fund Regulations § 5.6.4. That rule "compl[ies]" with *FFRF* to mandate discrimination based on religious use under the State's Religious Aid Clause. ECF 46-1 at 21.

But the U.S. Supreme Court in *Carson* rejected the status-use distinction upon which *FFRF* is premised, clarifying that "use-based discrimination" is not "any less offensive to the Free Exercise Clause" and amounts to religious discrimination when used to exclude "otherwise eligible" persons or entities from public benefits. *Carson*, 596 U.S. at 787, 789. The State's asserted "antiestablishment interest" in state funds not being put to religious uses, or interest in "stricter separation of church and state than the Federal Constitution requires," made no difference there. *Id.* at 781. No such interest "justif[ies] enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise." *Id.* at 781. "[U]se-based discrimination" is as "offensive to the Free Exercise Clause" as status-based discrimination. *Id.* at 787. Indeed, "any status-use distinction," the Supreme Court explained, is simply not "meaningful." *Id.* at 788. But the consequences are: By "condition[ing] the availability of benefits" on an organization ceasing its religious activities, a State "'effectively penalizes the free exercise' of religion" and imposes "indirect coercion" on religious organizations. *Id.* at 778, 780 (quotations omitted).

The religious exclusion policy's use-based discrimination is thus subject to—and cannot withstand—strict scrutiny. "[T]arget[ing] religious conduct for distinctive treatment . . . will survive strict scrutiny only in rare cases." *Id.* at 781 (quotation omitted). To survive strict scrutiny, a state's policy "must advance

'interests of the highest order' and must be narrowly tailored in pursuit of those interests." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (quotation omitted). The County's exclusion comes nowhere close to satisfying that standard.

*First*, precedent forecloses treating a State's "antiestablishment interest in not using public funds to build or repair churches" as a legitimate interest, let alone one of the "highest order," when an exclusion based on religious character is at issue. *FFRF*, 181 A.3d at 1012 (quotation omitted). The "Establishment Clause is not offended when religious observers and organizations benefit from neutral government programs." *Espinoza*, 591 U.S. at 474. New Jersey's exclusion of the Churches under the Religious Aid Clause thus reflects a "stricter separation of church and state than the Federal Constitution requires." *Carson*, 596 U.S. at 781. Like the state constitutional provisions in *Trinity Lutheran* and *Espinoza*, the Religious Aid Clause must yield to the federal Constitution. And like Maine's asserted anti-establishment interest in *Carson*, any interest "in separating church and state 'more fiercely' than the Federal Constitution . . . 'cannot qualify as compelling' in the face of [an] infringement of free exercise." *Id.* (quoting *Espinoza*, 591 U.S. at 485). That principle has been applied both against an exclusion applying narrowly to churches, *Trinity Lutheran*, 582 U.S. at 465, and against an exclusion that foreclosed a grant to a school founded as "a ministry of Bangor Baptist Church" that

intended to put the grant to religious use, *Carson*, 596 U.S. at 775. Any anti-establishment defense of the religious exclusion policy thus fails.

*Second*, even if New Jersey had a legitimate interest in preventing the "religious use" of funds (it does not), the County's policy is not narrowly tailored to advance it. The policy excludes "[a]ny property that is currently used for religious purposes or functions," regardless of whether the proposed use of funds actually affects religious use. FR § 5.6.4. Because the County's religious exclusion policy advances no compelling interest and is not narrowly tailored, it squarely violates the Free Exercise Clause.[10]

The New Jersey Supreme Court's contrary conclusion in *FFRF* predated *Espinoza* and *Carson*. While *FFRF* gives the final word on the meaning of New Jersey's Religious Aid Clause, its interpretation of the federal Free Exercise Clause does not govern here. *FFRF* does not bind this Court or these parties: The Plaintiff

---

[10] In light of this ongoing First Amendment injury, a preliminary injunction is appropriate even if—indeed, particularly if—the Court abstains under *Pullman* given the resulting delay in merits resolution. *See* Wright et al., *Federal Practice & Procedure* § 4243 & n.14 ("[T]he federal court may give whatever interim relief is appropriate to protect the party during the period of abstention."). Doing so would not put the state courts in a bind, as the Attorney General fears. *See N.J.-Phila. Presbytery*, 654 F.2d at 887 (explaining that granting a preliminary injunction "is not a final interpretation of state law" and it "leaves the state court entirely free to place any construction on its law"); *Deck House, Inc. v. N.J. State Bd. of Architects*, 531 F. Supp. 633, 645–48 (D.N.J. 1982) (similar); *see also Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 129 (3d Cir. 2023) (reasoning that a federal court does not "definitively" interpret state law by issuing a preliminary injunction).

Churches were not parties to *FFRF* and the Free Exercise Clause issue presents a question of pure *federal* law on which the New Jersey Supreme Court does not bind this Court. Moreover, regardless of whether *FFRF* were right when it was decided, the County's policy cannot stand in light of intervening Supreme Court precedent. The New Jersey Supreme Court made clear that the "plain language of the Religious Aid Clause bars the use of taxpayer funds to repair and restore churches." *FFRF*, 181 A.3d at 994. But it concluded that *Trinity Lutheran*'s Free Exercise analysis prohibited only discrimination based on "status as a church" and did not disturb distinctions based on "religious uses of funding"' *Id.* at 1008. It then concluded that the Religious Aid Clause's discrimination against "religious use" was permissible. *Id.* at 1010; *see id.* at 1006–12 (expressing concern that historic churches would use their grants to preserve spaces used for worship).

But now the U.S. Supreme Court has squarely rejected that status-use distinction. *See Carson*, 596 U.S. at 786–88. And *Carson* clarifies that *Locke v. Davey*—on which *FFRF* also relied—does not permit "exclud[ing] religious persons from the enjoyment of public benefits on the basis of their anticipated religious use of the benefits." *Id.* at 789. Because the County's policy—*by the New Jersey Supreme Court's own account*—discriminates based on religious use, that policy violates the Free Exercise Clause under *Carson*, which treats such discrimination on

par with discrimination based on religious status. And when a state law conflicts with the Free Exercise Clause, the latter governs. *Espinoza*, 591 U.S. at 488.

**B. Plaintiffs have suffered and will continue to suffer irreparable harm as a result of the religious exclusion policy.**

Supreme Court and Third Circuit precedent makes clear that deterring the exercise of First Amendment freedoms—whether by prohibition or disfavored treatment—inflicts irreparable harm as a matter of law. *See Diocese of Brooklyn*, 592 U.S. at 19 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quotation omitted)); *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013) (same); *Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 442 (3d Cir. 2019) (same); *see Tandon v. Newsom*, 593 U.S. 61, 64 (2021) (per curiam) (similar); *Tenafly*, 309 F.3d at 178 (similar).

The Churches continue to suffer that irreparable harm here. A State "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). "The imposition of such a condition upon even a gratuitous benefit inevitably deters or discourages the exercise of First Amendment rights." *Trinity Lutheran*, 582 U.S. at 463 (quotation marks omitted and alterations adopted). The Free Exercise Clause protects against even "indirect coercion" such as this, and "a State 'punish[s] the free exercise of

religion' by disqualifying the religious from government aid." *Espinoza*, 591 U.S. at 478 (quoting *Trinity Lutheran*, 582 U.S. at 462).

In addition to the irreparable harm to their First Amendment rights, the Churches also face "permanent" harm to their historic structures. Wengert Decl. ¶¶ 24–25; Warren Decl. ¶¶ 29–30. Without access to preservation funding, the Churches will not be able to repair key architectural features (like stained glass windows and bell towers), some of which have been maintained for over 150 years, Wengert Decl. ¶¶ 6, 18–19; Warren Decl. ¶¶ 6, 22–23. Equally dire, the status quo would leave the Churches without the ability to redress recent flood damage, a leaking roof, a wall that is "in danger of collapse," and "major leakage and flooding" due to a damaged foundation, and much more. Warren Decl. ¶¶ 15–21; Wengert Decl. ¶¶ 17–20. "The urgency, extent, and cost of the necessary repairs" only "increase[] with time." Wengert Decl. ¶ 25; *see* Warren Decl. ¶ 30.

As with the policy in *Trinity Lutheran*, the County's no-churches-need-apply policy "puts [the Churches] to a choice:" they may either participate in the grant program or continue using their churches as churches. 582 U.S. at 462. That choice faces the Churches every day—if they gave up their religious practices tomorrow, they would be eligible for the grants. The County's policy thus "punish[es] the free exercise of religion," a classic irreparable injury. *Espinoza*, 591 U.S. at 478; *see Diocese of Brooklyn*, 592 U.S. at 19; *Tenafly*, 309 F.3d at 178. And while First

Amendment injuries for even "minimal periods of time" are irreparable, in light of the Attorney General's proposed course, the Churches stand to suffer this coercion for years. Prior to intervention, the parties expected that fully conclusive dispositive motions would be briefed for decision within six months of the case's filing. This would have minimized the need for preliminary relief, obtained a speedy final judgment, and conserved this Court's resources.

But the delay caused by intervention has precluded this efficient resolution. And the Attorney General's litigation strategy might well compound the delay. He would force the Churches to litigate through multiple levels of state court proceedings, and rely on discretionary review from the New Jersey Supreme Court, before vindicating their constitutional rights. Alternatively, he would mire the Churches in unnecessary discovery. Throughout, the County's unconstitutional policy would "put [the Churches] to the choice" between their religious exercise and generally-available grants. *Trinity Lutheran*, 582 U.S. at 465. And that choice would become ever harder as their case languishes, intensifying the "indirect coercion" the Churches face. *Id.* at 463 (quotation omitted); *see Zwickler*, 389 U.S. at 252 (refusing to abstain because "the delay of state-court proceedings might itself effect the impermissible chilling of the very constitutional rights [plaintiff] seeks to protect"). So too, delay would allow the Churches' buildings to deteriorate further, increasing the "risk [of] permanent disrepair." Wengert Decl. ¶ 25; Warren Decl. ¶ 30.

"[T]he purpose of [a preliminary] injunction is to protect the moving party from irreparable injury until the court can render a meaningful decision on the merits." *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995). While the original parties expected a speedy decision on the merits, intervention proceedings and the instant motion for stay have foreclosed such a speedy merits decision. The Court should grant a preliminary injunction to protect the Churches from suffering further irreparable harm in the meantime.

### C. The balance of hardships and public interest favor a preliminary injunction.

Granting that preliminary relief would not harm Morris County (let alone more so than denying relief would harm the Churches) and would favor the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (explaining the factors "merge when the Government is the opposing party"). Preliminarily enjoining the County's religious exclusion policy to permit the Churches to apply on the same terms they could have just a few years before "would cause neither the [County] nor its residents any serious injury." *Tenafly*, 309 F.3d at 178. The County's misconceived antiestablishment interest "hardly compare[s] to the deprivation of [the Churches'] . . . constitutional right to engage" in the free exercise of their religion without government coercion. *Freethought Soc'y*, 938 F.3d at 442 (quotation omitted). And the public interest favors an injunction where there is a reasonable prospect of success on a constitutional claim, as "the enforcement of an

unconstitutional law vindicates no public interest." *Ayers*, 710 F.3d at 114; *see Tenafly*, 309 F.3d at 178.

## CONCLUSION

For the foregoing reasons, the Churches respectfully request that this Court deny the Attorney General's motion to stay and his alternative request for discovery and grant their motion for a preliminary injunction.

Dated: May 28, 2024                     Respectfully submitted,


                                        */s/ Mark Roselli*
                                        Mark Roselli (NJ Bar No. 038431988)
                                        Roselli Griegel Lozier, PC
                                        1337 Highway 33
                                        Hamilton, NJ 08690
                                        Telephone: (609) 586-2257
                                        mroselli@roselligriegel.com

                                        Noel J. Francisco (*pro hac vice*)
                                        Megan Lacy Owen (*pro hac vice*)
                                        Christopher C. Pagliarella (*pro hac vice*)
                                        JONES DAY
                                        51 Louisiana Avenue, N.W.
                                        Washington, DC 20001
                                        Telephone: (202) 879-3939
                                        njfrancisco@jonesday.com
                                        mlacyowen@jonesday.com
                                        cpagliarella@jonesday.com

                                        Jeremy Dys (*pro hac vice*)
                                        Ryan Gardner (*pro hac vice*)
                                        First Liberty Institute
                                        2001 W. Plano Pkwy, Suite 1600
                                        Plano, TX 75075
                                        Telephone: (972) 941-4444
                                        jdys@firstliberty.org
                                        rgardner@firstliberty.org

                                        Camille P. Varone (*pro hac vice*)
                                        First Liberty Institute
                                        1331 Pennsylvania Avenue, NW, Suite 1410
                                        Washington, DC 20004
                                        Telephone: (202) 941-4105
                                        cvarone@firstliberty.org

Eric C. Rassbach (*pro hac vice*)
The Hugh and Hazel Darling Foundation
Religious Liberty Clinic
Pepperdine University Caruso School of Law
24225 Pacific Coast Highway
Malibu, CA 90263
Telephone: (310) 506-4611
eric.rassbach@pepperdine.edu

*Attorneys for Plaintiffs*
*The Mendham Methodist Church and The*
*Zion Lutheran Church Long Valley*

## **CERTIFICATE OF SERVICE**

I certify that on May 28, 2024, I electronically filed the foregoing brief and accompanying papers with the Clerk of the U.S. District Court for the District of New Jersey.  Counsel for all parties will be served via CM/ECF.


By: */s/ Mark Roselli*
Mark Roselli (NJ Bar No. 038431988)


Dated: May 28, 2024