## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| THE MENDHAM METHODIST CHURCH; and THE ZION LUTHERAN CHURCH LONG VALLEY,<br><br>    Plaintiffs,<br><br>    v.<br><br>MORRIS COUNTY, NEW JERSEY; MORRIS COUNTY BOARD OF COUNTY COMMISSIONERS; MORRIS COUNTY HISTORIC PRESERVATION TRUST FUND REVIEW BOARD; and JOHN KRICKUS, in his official capacity as Commissioner Director for the Morris County Board of County Commissioners,<br><br>    Defendants,<br><br>ATTORNEY GENERAL OF NEW JERSEY,<br><br>    Intervenor-Defendant. | Hon. Evelyn Padin, U.S.D.J.<br>Hon. Jessica S. Allen, U.S.M.J.<br><br>Docket No. 2:23-cv-2347-EP-JSA |

### DEFENDANT-INTERVENOR ATTORNEY GENERAL OF NEW JERSEY's REPLY IN SUPPORT OF MOTION TO STAY AND BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Michael L. Zuckerman
  *Deputy Solicitor General*

David E. Leit
  *Assistant Attorney General*

Jessica L. Palmer
Nathaniel I. Levy
Joshua P. Bohn
Emily W. Erwin
Christopher J. Ioannou
Samuel L. Rubinstein
  *Deputy Attorneys General*

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, New Jersey 08625
(862) 350-5800
Nathaniel.Levy@njoag.gov

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT ...........................................................................................................4

   I.   *Pullman* Abstention Is Appropriate...................................................................4

     A.  *Pullman*'s First And Second Special Circumstances Are Present. ..............4

     B.  *Pullman*'s Third Circumstance And Other Factors Also Favor Abstention.....9

   II.  This Court Should Deny Preliminary Relief. .................................................11

     A.  Plaintiffs Are Not Likely To Prevail On The Merits. .................................13

        1.  Constitutional Text.................................................................................14

        2.  Constitutional History. ...........................................................................15

           i.   The Backdrop Of The Federal Religion Clauses. .................................16

           ii.  New Jersey's Tradition, Culminating In The RAC. ............................17

           iii.  Founding-Era Evidence From Other States. .........................................20

           iv.  Contemporary Statements By The Framers.........................................25

        3.  Precedent. ................................................................................................27

     B.  Plaintiffs Cannot Show Irreparable Harm.................................................35

     C.  The Equities Weigh Against Any Preliminary Relief................................38

CONCLUSION ......................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                     **<u>Page(s)</u>**

*Abbott v. Perez,*
  585 U.S. 579 (2018).............................................................................39

*Acierno v. New Castle Cnty.,*
  40 F.3d 645 (3d Cir. 1994)...................................................... 12, 35, 38

*Adams v. Freedom Forge Corp.,*
  204 F.3d 475 (3d Cir. 2000)...............................................................35

*Amalgamated Transit Union Loc. 85 v. Port. Auth. of Allegheny Cnty.,*
  39 F.4th 95 (3d Cir. 2022) ...................................................... 11, 12, 38

*Anderson v. Davila,*
  125 F.3d 148 (3d Cir. 1997)...............................................................36

*Artway v. Att'y Gen. of State of N.J.,*
  81 F.3d 1235 (3d Cir. 1996)............................................................7, 8

*Az. Christian Sch. Tuition Org. v. Winn,*
  563 U.S. 125 (2011)........................................................ 25, 26, 33, 39

*Behnke v. New Jersey Highway Auth.,*
  97 A.2d 647 (N.J. 1953)......................................................................7

*Biegenwald v. Fauver,*
  882 F.2d 748 (3d Cir. 1989)................................................................8

*Cameron v. EMW Women's Surgical Ctr., P.S.C.,*
  595 U.S. 267 (2022)..........................................................................37

*Carson v. Makin,*
  596 U.S. 767 (2022).................................................................. *passim*

*Chez Sez III Corp. v. Twp. of Union*,
    945 F.2d 628 (3d Cir. 1991)....................................................................4, 5

*Citibank, N.A. v. Citytrust*,
    756 F.2d 273 (2d Cir. 1985)...........................................................................36

*City of Houston v. Hill*,
    482 U.S. 451 (1987)..................................................................................4, 7

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)......................................................................................21

*Drummond ex rel. State v. Oklahoma Statewide Virtual Charter Sch. Bd.*,
    2024 OK 53 (2024).......................................................................................30

*E & J Equities, LLC v. Bd. of Adjustment of the Twp. of Franklin*,
    146 A.3d 623 (N.J. 2016).................................................................................6

*Espinoza v. Montana Dep't of Revenue*,
    591 U.S. 464 (2020)......................................................................... *passim*

*Everson v. Bd. of Ed. of Ewing Twp.*,
    330 U.S. 1 (1947).............................................................................. *passim*

*Fischer v. Thomas*,
    52 F.4th 303 (6th Cir. 2022) ..........................................................................35

*Flast v. Cohen*,
    392 U.S. 83 (1968)........................................................................................26

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*,
    847 F.2d 100 (3d Cir. 1988)............................................................................35

*Freedom From Religion Foundation v. Morris County Board
    of Chosen Freeholders*,
    181 A.3d 992 (N.J. 2018)..................................................................... *passim*

iii

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
   546 U.S. 418 (2006) ................................................................................. 11

*Greater Phila. Chamber of Com. v. City of Phila.*,
   949 F.3d 116 (3d Cir. 2020) ..................................................................... 12

*Hawaii Hous. Auth. v. Midkiff*,
   467 U.S. 229 (1984) .................................................................................... 8

*Hayse v. Wethington*,
   110 F.3d 18 (6th Cir. 1997) ....................................................................... 9

*Hohe v. Casey*,
   868 F.2d 69 (3d Cir. 1989) ....................................................................... 36

*Kennedy v. Bremerton Sch. Dist.*,
   597 U.S. 507 (2022) ....................................................................... 11, 14, 15

*Kusper v. Pontikes*,
   414 U.S. 51 (1973) ..................................................................................... 7

*Lanin v. Borough of Tenafly*,
   515 F. App'x 114 (3d Cir. 2013) ............................................................. 36

*Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*,
   562 F.3d 553 (3d Cir. 2009) ..................................................................... 37

*Locke v. Davey*,
   540 U.S. 712 (2004) ......................................................................... *passim*

*Logic Tech. Dev. LLC v. Levy*,
   No. 17-4630, 2021 WL 3884287 (D.N.J. Aug. 31, 2021) ....................... 37

*McDaniel v. Paty*,
   435 U.S. 618 (1978) .................................................................................. 23

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................................................12

*Orr v. Orr*,
   440 U.S. 268 (1979) ..............................................................................................7

*Pharmacia Corp. v. Alcon Lab'ys, Inc.*,
   201 F. Supp. 2d 335 (D.N.J. 2002) .....................................................................37

*Planned Parenthood of Central New Jersey v. Farmer*,
   220 F.3d 127 (3d Cir. 2000) ..................................................................................7

*R.R. Comm'n of Tex. v. Pullman Co.*,
   312 U.S. 496 (1941) ..............................................................................................2

*Reetz v. Bozanich*,
   397 U.S. 82 (1970) ................................................................................................6

*Reilly v. City of Harrisburg*,
   858 F.3d 173 (3d Cir. 2017) ................................................................................12

*Reynolds v. United States*,
   98 U.S. 145 (1878) ..............................................................................................29

*Robinson v. New Jersey*,
   806 F.2d 442 (3d Cir. 1986) ............................................................................6, 8

*Schlesinger v. Councilman*,
   420 U.S. 738 (1975) ............................................................................................10

*State Farm Fire & Cas. Co. v. Gree USA Inc.*,
   514 F. Supp. 3d 628 (D.N.J. 2021) .....................................................................38

*State v. Comer*,
   266 A.3d 374 (N.J. 2022) ..................................................................................3, 5

*State v. Natale*,
   878 A.2d 724 (N.J. 2005).............................................................................5

*Tafflin v. Levitt*,
   493 U.S. 455 (1990)...................................................................................6

*Tenafly Eruv Ass'n v. Borough of Tenafly*,
   309 F.3d 144 (3d Cir. 2002).....................................................................36

*Town of Greece v. Galloway*,
   572 U.S. 565 (2014).................................................................................15

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
   582 U.S. 449 (2017)..................................................................... 3, 30, 38

*Van Orden v. Perry*,
   545 U.S. 677 (2005).................................................................................39

*Vidal v. Elster*,
   602 U.S. 286 (2024).................................................................................15

*Walz v. Tax Comm'n of City of New York*,
   397 U.S. 664 (1970)......................................................................... 14, 16

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008).....................................................................................11

*Zelman v. Simmons-Harris*,
   536 U.S. 639 (2002).................................................................................32

**Constitutional Provisions**

Ala. Const. Art. I § 3 (1819) ........................................................................23

Del. Const. Art. I, § 1 (1792) .......................................................................21

Ga. Const. Art. IV, § 10 (1798) ...................................................................23

Ill. Const. Art. VIII, § 3 (1818)...................................................................23

Ind. Const. Art. I, § 3 (1816)......................................................................23

Ky. Const. Art. XII, § 3 (1792)...................................................................23

Md. Const., Decl. of Rights, Art. XXXIII (1776).......................................21

Mo. Const. Art. XIII, § 4 (1820).................................................................23

N.C. Const. Art. XXXIV (1776).................................................................20

N.J. Const. Art. XVIII (1776).....................................................................19

N.J. Const. Art. XVIII-IX (1776) ...............................................................19

Ohio Const. Art. VIII, § 3 (1802)...............................................................23

Pa. Const. Art. II (1776).............................................................................20

S.C. Const. Art. XXXVIII (1778)...............................................................21

Tenn. Const. Art. XI, § 3 (1796).................................................................23

Vt. Const. Ch. I, Art. 3 (1777) ...................................................................21

**Statutes**

12 Hening, Statutes of Virginia (1823)........................................................26

**Other Authorities**

11A Charles Allen Wright, Arthur R. Miller, & Alexandra D. Lahav,
   *Federal Practice & Procedure* § 2948.1 (3d ed. 2024)..........................36

11th Gen. Assembly of the State of N.J. 16 (May 24, 1787)...................................20

C. Pierce Salguero, *Buddhism in Greater Philadelphia*, Ohiho State University: American Religious Sounds Project, https://tinyurl.com/5fdheu3u .....................40

Carl H. Esbeck, *Dissent and Disestablishment: The Church-State Settlement in the Early American Republic*, 2004 B.Y.U. L. Rev. 1385 (2004) ...................... 22, 24

Douglas Laycock, *"Nonpreferential" Aid to Religion: A False Claim About Original Intent*, 27 Wm. & Mary L. Rev. 875 (1987)................................. passim

*Fundamental Laws and Constitutions of New Jersey 1664-1964* (Julian P. Boyd ed., 1964)............................................................... 18, 19

Ira C. Lupu & Robert W. Tuttle, *Federalism and Faith*, 56 Emory L.J. 19 (2006) .......................................................39

Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105 (2003) ...................................................... 22, 26, 32

Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) ...................... 17, 18, 24, 27

Neal Millikan, *Lotteries in Colonial America* 25 (2011) ........................................20

New Jersey City University, *Jersey City Past and Present: Old Bergen Reformed Church*, https://njcu.libguides.com/oldbergenchurch...........................................40

New Jersey Historic Trust, *Ahavas Sholom*, https://tinyurl.com/3p7wa47k ...........40
Noah Feldman, *The Intellectual Origins of the Establishment Clause*, 77 N.Y.U. L. Rev. 346 (2002) .....................................................................................24

St. Joseph Roman Catholic Church, *Parish History*, https://stjoseph-nj.org/parish-history ...............................................................................................40

Tharik Hussain, *The 7 Oldest Mosques in America*, History Channel
  https://www.history.com/news/oldest-mosques-arab-american ...........................40

*The Papers of William Livingston* (1979),
  https://hdl.handle.net/10929/50460 ............................................................... 26, 27

Thomas Jefferson, *Thoughts on Lotteries* (Jan. 20, 1826),
  https://tinyurl.com/3nxkybn2 .................................................................................20

## PRELIMINARY STATEMENT

Invoking two recent U.S. Supreme Court decisions about indirect funding of religious schools, *see Carson v. Makin*, 596 U.S. 767 (2022); *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464 (2020), Plaintiffs ask this Court to issue an order in direct conflict with the New Jersey Supreme Court's ruling in *Freedom From Religion Foundation v. Morris County Board of Chosen Freeholders*, 181 A.3d 992 (N.J. 2018) (*FFRF*). In *FFRF*, the New Jersey high court held that the State Constitution's Religious Aid Clause (RAC)—a provision that dates to 1776— precluded Morris County from directly funding active houses of worship, and that the RAC, so construed, does not conflict with the federal Free Exercise Clause. *Id.* at 1005-12. Plaintiffs filed this suit five years later, ECF 1, arguing that the Free Exercise Clause indeed compels the County to fund such repairs, ECF 11 (Am. Compl.). A year later, they moved for a preliminary injunction. ECF 49.

Plaintiffs' legal theory is mistaken, but their suit also suffers from a threshold defect: by asking this Court to issue a free-exercise ruling in conflict with the New Jersey Supreme Court's own free-exercise ruling, Plaintiffs invite an untenable and easily avoided collision between coequal courts. Even if Plaintiffs were correct that *Carson* and *Espinoza* conflict with *FFRF*, the New Jersey Supreme Court is the proper venue to head off any conflict. New Jersey law encompasses multiple relevant interpretive principles—including constitutional avoidance, judicial

1

surgery, and dynamic incorporation—which that court could use to obviate or narrow this dispute. The relief sought by Plaintiffs here, by contrast, would put Morris County and public entities across the State in the impossible position of having to choose between conflicting rulings from coequal courts. Given this unusual confluence of factors, this Court should stay this matter, *see R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941), so that Plaintiffs can first seek relief in the New Jersey courts, which have the power to definitively construe the RAC.

Regardless of whether this Court abstains, Plaintiffs' motion for a preliminary injunction should be denied. As to the merits, Plaintiffs are not likely to succeed because text, history, and precedent all make clear that there is no free-exercise violation. Nothing about the constitutional text suggests that a congregation's right to freely exercise its faith requires its fellow taxpayers to be compelled to directly subsidize its place of worship. Rather, history—including statements of the founders and contemporaneous state constitutional provisions—proves that the RAC's prohibition on direct public funding for building and repairing houses of worship reflects a "historic and substantial" state interest that comports with the Free Exercise Clause. *See Locke v. Davey*, 540 U.S. 712, 725 (2004). That explains why the most analogous precedent, *Locke*, upheld a bar on using state scholarship funds to study devotional theology, holding that the restriction fell within the "play in the joints" between the two Religion Clauses. *See id.* at 719.

2

Plaintiffs say nothing about text or history, and cite *Locke* only in passing, relying instead on *Carson*, *Espinoza*, and a third case, *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017), which the New Jersey Supreme Court already interpreted in *FFRF*. But *Trinity Lutheran* stands only for the proposition that a State cannot deny religious entities access to a generally available funding program for something like "playground resurfacing," *id.* at 465 & n.3—a rule that *FFRF* follows, 181 A.3d at 1012. *Carson* and *Espinoza*, meanwhile, are indirect school-funding cases twice removed from the situation here, both because churches and schools are subject to different constitutional analyses, *Carson*, 596 U.S. at 788-89; *Espinoza*, 591 U.S. 479-81, and because direct funding is constitutionally distinct from indirect funding, *id.* at 485; *Carson*, 596 U.S. at 781. In short, Plaintiffs' theory—which would upend a state provision first ratified on the eve of the Revolution—is ahistorical and lacks support in text, tradition, or precedent.

Nor can Plaintiffs establish irreparable harm, both because of their lengthy delay in seeking a preliminary injunction and because their asserted injury is monetary. The public interest also weighs against compelling New Jersey taxpayers to pay for the upkeep of houses of worship whose faith they do not share—the very type of divisive practice that animated those who framed not only the RAC, but also the Religion Clauses themselves. This Court should stay this matter under *Pullman* and deny Plaintiffs' motion for a preliminary injunction.

## ARGUMENT

### I.   *Pullman* Abstention Is Appropriate.

Plaintiffs acknowledge that conflicting judicial mandates from coequal courts are unworkable. *See* ECF 49-1 (Br.) at 24. This Court should therefore deny Plaintiffs' requested relief: an order conflicting with the New Jersey Supreme Court's ruling in *FFRF* that would put New Jersey public entities to an impossible choice. Rather than venture down that chaotic path, this Court should stay the matter under *Pullman*—an established safety-valve for such circumstances.

*Pullman* abstention is appropriate here, given that, on Plaintiffs' own theory, their federal constitutional claims are inextricably intertwined with an open state-law question that could obviate this dispute. Adopting Plaintiffs' theory in this Court would not only disrupt important state policies but also yield an unnecessary and irreconcilable collision between this Court and the New Jersey Supreme Court. *See* ECF 46-1 (AG Br.) at 15-17; *Chez Sez III Corp. v. Twp. of Union*, 945 F.2d 628, 631 (3d Cir. 1991). This matter thus presents the rare "exception" in which all special circumstances and relevant factors point toward *Pullman* abstention. *City of Houston v. Hill*, 482 U.S. 451, 467-68 (1987).

#### A. *Pullman*'s First And Second Special Circumstances Are Present.

*Pullman*'s first two "special circumstances" ask whether (1) the matter involves "uncertain issues of state law underlying the federal constitutional claims"

4

that (2) would be "amenable to a state court interpretation that would obviate the need for, or substantially narrow, the scope of [the] adjudication of the constitutional claims." *Chez Sez III*, 945 F.2d at 631. Plaintiffs' claims hinge on an open question about the meaning of New Jersey's RAC, which, if interpreted in line with Plaintiffs' theory of the federal Free Exercise Clause, would obviate or substantially narrow this dispute. *See id.* But Plaintiffs have brought this suit in federal rather than state court, and only the New Jersey courts can definitively construe the RAC.[1]

Plaintiffs' counterarguments hinge on arguing (1) that the meaning of the RAC was irrevocably fixed by the New Jersey Supreme in *FFRF*, and (2) that subsequent Supreme Court decisions have shown *FFRF* to be in error. Br.11-15. But New Jersey courts embrace a strong form of the constitutional avoidance doctrine, employing it to interpret statutory and state constitutional text alike. *See, e.g.*, *State v. Comer*, 266 A.3d 374, 399 (N.J. 2022); *State v. Natale*, 878 A.2d 724, 740 (N.J. 2005); AG Br.18-21. Under this doctrine, the meaning of state constitutional text can shift dynamically with developments in federal constitutional precedent and background legal context. *See, e.g.*, *E & J Equities, LLC v. Bd. of Adjustment of the*

---

[1] To be clear, the Attorney General disagrees with Plaintiffs' merits theory. *See infra* Point II.A. But if this Court were nevertheless to adopt that theory, it would lack the ability to consider a narrowing construction and thus unavoidably generate an irreconcilable conflict with the coequal New Jersey Supreme Court. Avoiding the risk of such an outcome for New Jersey public entities is the broader State interest that underlies the Attorney General's *Pullman* argument.

*Twp. of Franklin*, 146 A.3d 623, 634 (N.J. 2016); AG Br.21-23. Plaintiffs dispute none of this; indeed, it is Plaintiffs who argue that the New Jersey Supreme Court's *FFRF* decision was "steered" by the U.S. Supreme Court's 2017 decision in *Trinity Lutheran*. Am. Compl. ¶ 9; *see also, e.g.*, Br.32. And given that the New Jersey Supreme Court is undisputedly mindful of the U.S. Supreme Court's teachings, then if Plaintiffs are correct in their reading of recent precedent, it necessarily follows that the only way to know how the New Jersey Supreme Court would interpret the RAC today is to give it a chance to answer that question.

If the New Jersey Supreme Court agreed with Plaintiffs' theory, it could construe the RAC in that new light, providing Plaintiffs with some or all of what they seek—exactly the kind of narrowing or obviating that *Pullman* requires to be available—and refocusing any remaining federal constitutional challenge on the RAC as it is interpreted by the New Jersey Supreme Court in view of current U.S. Supreme Court precedents. *See, e.g.*, *Reetz v. Bozanich*, 397 U.S. 82, 87 (1970); *Robinson v. New Jersey*, 806 F.2d 442, 449 (3d Cir. 1986); *see also* AG Br.25-26 (discussing potential narrowing construction). Or, if the New Jersey Supreme Court did *not* agree with Plaintiffs, and adhered to its prior understanding of the interplay between the RAC and the Free Exercise Clause, then Plaintiffs could seek review from the only tribunal able to resolve the broader constitutional dispute definitively: the U.S. Supreme Court. *See Tafflin v. Levitt*, 493 U.S. 455, 458 (1990).

In resisting a stay, Plaintiffs invoke decisions involving state statutes, but those cases did not involve significant intervening legal developments, much less the principles of state *constitutional* interpretation that apply under New Jersey law, such as avoidance, dynamic incorporation, or changed legal context. *See* Br.11-13. *Orr v. Orr*, 440 U.S. 268 (1979), for instance, involved Supreme Court review of Alabama alimony statutes after Alabama courts had "decided the federal question without considering any state-law issues." *Id.* at 276. *Kusper v. Pontikes*, 414 U.S. 51 (1973), addressed an Illinois election statute that had already been definitively construed by the Illinois courts. *Id.* at 55-56 & n.10. *Planned Parenthood of Central New Jersey v. Farmer*, 220 F.3d 127 (3d Cir. 2000), involved a statute prohibiting certain abortions that was "so vague that it was not" even "susceptible to" narrowing interpretation. *Id.* at 131, 149; *see also Hill*, 482 U.S. at 455, 469-71 & n.18 (Houston ordinance could not plausibly be limited in a way that would obviate the underlying constitutional issue); *Artway v. Att'y Gen. of State of N.J.*, 81 F.3d 1235, 1270 (3d Cir. 1996) (application of sex-offender registration statute to plaintiff was "patent" based on the text). But unlike statutes, the New Jersey Supreme Court treats our State Constitution as uniquely "[]sensitive to the demands of a changing society," *Behnke v. New Jersey Highway Auth.*, 97 A.2d 647, 653 (N.J. 1953), which is reflected in interpretive principles like avoidance, dynamic incorporation, and sensitivity to changing legal context. Those principles are part of New Jersey state law, and if

7

Plaintiffs' legal theory is correct, then New Jersey courts should have the opportunity to apply them to the RAC. *See, e.g.*, *Robinson*, 806 F.2d at 449.

Plaintiffs incorrectly argue that a state law must be "*obviously* susceptible of a limiting" or different "construction." Br.14 (quoting *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 237 (1984) (emphasis in brief)). As the Third Circuit observed in *Artway*, the Supreme Court "has used various formulations" to describe the necessary showing, 81 F.3d at 1271, including "fairly subject"—which it called the "typical formulation," *id.* at 1271 n.34; *see also Biegenwald v. Fauver*, 882 F.2d 748, 752 n.3 (3d Cir. 1989) (quoting leading treatise to note that "fairly susceptible" and "bare possibility" standards have also been used). If Plaintiffs were right on the merits, the RAC would satisfy any of those formulations given the applicable constitutional interpretive principles. *See* AG Br.19-23.

Plaintiffs also claim that the Attorney General has failed to identify a potential limiting construction, Br.14-15, but that is not so. *See* AG Br.25-26 (while *FFRF* read the RAC "to establish a categorical provision," it could alternatively distinguish between religious elements, such as stained-glass windows, and secular elements, such as ventilation systems). Prior litigants have urged other limiting constructions. *See FFRF*, 181 A.3d at 1003-04. While the New Jersey Supreme Court did not adopt one in *FFRF*, 181 A.3d at 1006-12, the entire thrust of Plaintiffs' legal theory is that

its calculus would be different today, *see* Am. Compl. ¶¶ 9-10; Br.29, 32. *Pullman*'s

first and second circumstances therefore apply.

      B. *Pullman*'s Third Circumstance And Other Factors Also Favor Abstention.

      Plaintiffs have no meaningful answer to the significant legal and practical

conflicts that accepting their arguments would yield. Because this Court can neither

definitively construe the RAC nor abrogate the New Jersey Supreme Court's

interpretation of federal law, if this Court were to impose an injunction that conflicts

with *FFRF*'s mandate, Morris County and other public entities across New Jersey

would be put to an impossible choice. AG Br.29-30. The County itself would risk

contempt either way, as it would be bound by both this Court's ruling and the ruling

in *FFRF*. *Id.* Public entities operating similar programs across New Jersey would be

unable to do so without violating one of the two rulings. *Id.* Plaintiffs themselves

acknowledge that "'conflicting … injunctions' from co-equal courts" generate

"serious concerns," *id.* 24 (citation omitted)—a recognition that has prompted

abstention in other cases, and should do the same here, *see, e.g. Hayse v. Wethington*,

110 F.3d 18, 21 (6th Cir. 1997); AG Br.31-32.

      Plaintiffs cannot resolve this dilemma by suggesting that this Court "need only

recognize that the County's policy cannot stand in light of [] post-*FFRF* precedent."

Br.26. Because the "post-*FFRF* precedent" Plaintiffs cite does not directly invalidate

*FFRF*'s holding, this Court would have to issue its *own* ruling that *FFRF*'s mandate

cannot be squared with the Free Exercise Clause—directly conflicting with *FFRF*'s holding that it can. Neither of those two rulings could override the other, *e.g.*, *Schlesinger v. Councilman*, 420 U.S. 738, 755-56 (1975), creating an irreconcilable dilemma. In short, Plaintiffs' theory would not only upend a state constitutional provision that predates the founding, *see* AG Br.29, but also create an untenable clash between coequal courts. Only abstention avoids this concern.

The discretionary factors likewise favor abstention. AG Br.33-38. As Plaintiffs tacitly concede, no case law disfavors abstaining in free-exercise disputes specifically, nor do concerns about the risk of chilling free expression—which animate the reluctance to abstain in free *speech* cases—apply in this context. *Compare* AG Br.35-38, *with* Br.21-22. Delayed adjudication is not a dispositive factor, and would nevertheless be minimal, since Plaintiffs could invoke various state-court procedures to pursue speedy resolution of their claims in state court. *See* AG Br.34-35 (discussing, *inter alia*, N.J. Ct. R. 2:12-1, -2, and -4). And while Plaintiffs (like the Attorney General) have noted the possibility of the Third Circuit certifying a question to the New Jersey Supreme Court, *see* Br.23-24; *see also* AG Br.39-40, certification would not avoid the risk of an irreconcilable collision: if the New Jersey Supreme Court were to adhere to its view in *FFRF* on certification, Plaintiffs would then still be back to asking a lower federal court to countermand a coequal state court's interpretation of the Federal Constitution. If, by contrast,

Plaintiffs sued in state court, they could seek certiorari review of any adverse ruling, ensuring one final and authoritative result. Abstention is warranted.

## II.   This Court Should Deny Preliminary Relief.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). As a result, a movant must first meet two "gateway factors": (1) "a reasonable probability of success on the merits," and (2) "irreparable harm [that] would result if the relief sought is not granted." *Amalgamated Transit Union Loc. 85 v. Port. Auth. of Allegheny Cnty.*, 39 F.4th 95, 102-03 (3d Cir. 2022) (internal quotation marks and citations omitted). In free-exercise cases, as in First Amendment cases generally, "the [merits] burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). Thus, a plaintiff must first "demonstrate an infringement of his rights" under the Free Exercise Clause. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524-25 (2022). If the plaintiff meets that burden, "the focus then shifts" to the government to show under "strict scrutiny" that its law is "justified by a compelling state interest and [is] narrowly tailored in pursuit of that interest." *Id.* In other words, "the plaintiff must be deemed likely to prevail if the government fails to show the constitutionality of the law" at the second step—but only if a plaintiff can first show, as a prima facie

matter, that its free exercise rights have been infringed. *See Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020) (cleaned up).

If a movant shows a likelihood of success on the merits and irreparable harm, courts must then assess two equitable factors: (3) "whether the relief would result in greater harm to the non-moving party"; and (4) "whether the relief is in the public interest." *Amalgamated Transit*, 39 F.4th at 103. "[W]hen the Government is the opposing party," these final two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Only if all the factors, "taken together, balance in favor of granting" a preliminary injunction may a court grant such relief. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). Parties seeking preliminary injunctions that would "alter the status quo" by commanding some positive act "bear[] a particularly heavy burden in demonstrating [such an injunction's] necessity." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994).

Plaintiffs cannot satisfy this standard. On the merits, nothing in constitutional text, history, or precedent requires New Jersey to force taxpayers to fund the repair of churches in active use via historic-preservation programs; rather, New Jersey has a "historic and substantial" interest in protecting its taxpayers from being compelled to do so. *See Locke*, 540 U.S. at 725. Given that interest, Defendants' "denial of funding" for Plaintiffs' churches is not "inherently constitutionally suspect," and Plaintiffs' free exercise "claim must fail." *Id.* Indeed, these applications of the RAC

12

would satisfy any level of scrutiny, given the State's deeply rooted interests—predating the founding—and the lack of any less restrictive alternative. Nor can Plaintiffs show irreparable harm: their alleged harm is monetary, and any suggestion of irreparability has been belied by their delay in seeking the extraordinary relief of a mandatory preliminary injunction directing Defendants to violate an order of the New Jersey Supreme Court. Finally, the equities of Plaintiffs' claim for direct taxpayer funding are heavily outweighed by the State's well-established interests in preventing religious resentment and strife—the very interests that motivated the original framers of both New Jersey's RAC and the Religion Clauses.

A. Plaintiffs Are Not Likely To Prevail On The Merits.

Plaintiffs' claims are likely to fail as a matter of (1) text, (2) history, and (3) precedent. The RAC furthers a "historic and substantial interest" in not requiring New Jersey taxpayers to directly fund houses of worship, and thus is not constitutionally suspect. *See Locke*, 540 U.S. at 725. Unlike religion-based restrictions on parent-directed school funding (as in *Carson* and *Espinoza*), or restrictions on direct public funding of secular facilities like playgrounds (as in *Trinity Lutheran*), restrictions on direct public funding of active houses of worship (like similar restrictions on funding of ministers) serve a substantial interest—one reflected in our Nation's constitutional history since before the founding. *See id.* at 721-23. Preventing taxpayers from being forced to directly fund houses of worship

13

whose faiths they do not share does not violate Plaintiffs' rights to freely exercise their religious faith—rather, it protects the very interests in freedom of conscience that the Religion Clauses and the RAC have long stood for.

        1.   *Constitutional Text.*

Begin with the text of the First Amendment (ratified in 1791), which has long coexisted with the RAC (first ratified in 1776). The First Amendment sets forth two guardrails ensuring religious freedom: the Establishment Clause declares that the government "shall make no law respecting an establishment of religion," while the Free Exercise Clause forbids the government from "prohibiting the free exercise" of religion. As the Supreme Court recently emphasized, the "natural reading of" the Religion Clauses reveals that they "have 'complementary' purposes, not warring ones where one Clause is always sure to prevail over the others." *Kennedy*, 597 U.S. at 532-33 (citing *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 13, 15 (1947)). Indeed, "the subject of religion is one in which both the United States and state constitutions embody distinct views—in favor of free exercise, but opposed to establishment." *Locke*, 540 U.S. at 721. Between the guardrails, in other words, lies "room for play in the joints": that is, "state actions [that are] permitted by the Establishment Clause but not required by the Free Exercise Clause." *Id.* at 718-19 (quoting *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 669 (1970)).

Nothing about this constitutional text itself suggests that because a municipality chooses to compel its taxpayers to fund the renovation of a historic train station, theater, or clubhouse, it must therefore compel its taxpayers to fund the renovation of a church, from its bell tower to its stained-glass windows. *Compare* Br.4-5; Am. Compl. ¶¶ 38, 59. Indeed, no ordinary speaker would say that a congregation's right to exercise its faith is hampered (let alone "prohibit[ed]") by not receiving a public subsidy to repair its steeple—any more than the owner of an old house would be slighted by not receiving a subsidy to repair an aging chimney. While Plaintiffs also misconstrue subsequent free-exercise *precedent*, *see infra* at 27-35, the text of the Free Exercise Clause gives no reason to think that Plaintiffs have correctly identified a violation of that provision.

2.   *Constitutional History.*

History gives further meaning to the balance that the Religion Clauses strike, and underscores that Plaintiffs are unlikely to succeed on the merits. *See Kennedy*, 597 U.S. at 535-36 (the Religion Clauses "must be interpreted by 'reference to historical practices and understandings'" (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014))); *Locke*, 540 U.S. at 722-25 & n.5 (looking to founding-era history and contemporaneous state constitutional provisions); *see also, e.g.*, *Vidal v. Elster*, 602 U.S. 286, 301 (2024) (explaining that courts consider "history and tradition" in assessing First Amendment's "scope"); *Walz*, 397 U.S. at 676-80

(considering "history and uninterrupted practice"). Here, as in *Locke*, the history is clear: the practice of "imposi[ng] … taxes to pay ministers' salaries and to *build and maintain churches and church property* aroused [the Framers'] indignation," and that indignation "found expression in the First Amendment." *Everson*, 330 U.S. at 11 (emphasis added). The backdrop of the Religion Clauses, New Jersey's own constitutional history, constitutional history in other States, and the contemporary statements of the First Amendment's framers all reflect a consensus that citizens should be protected from being forced to directly fund (1) ministers' salaries and (2) the building and maintenance of churches. These two narrow but important restrictions thus reflect a "historic and substantial" state interest in full accord with the Free Exercise Clause. *Locke*, 540 U.S. at 725.

i.   The Backdrop Of The Federal Religion Clauses.

"[I]n the minds of early Americans [was] a vivid mental picture of conditions and practices which they fervently wished to stamp out in order to preserve liberty for themselves and for their posterity." *Everson*, 330 U.S. at 8. Those Americans, in fact, "came here from Europe to escape the bondage of laws which compelled them to support and attend government favored churches," at a time "filled with turmoil, civil strife, and persecutions, generated in large part by established sects determined to maintain their absolute political and religious supremacy." *Id.* at 8-9. And while "[t]hese practices of the old world were transplanted to and began to thrive in the

soil of the new America" for a time, the "freedom-loving colonials" sought to stamp out the twin harms of persecution and establishment in the First Amendment's two "provisions embracing religious liberty." *Id.* at 9-11.

The First Amendment reflects this backdrop by prohibiting taxpayer-compelled support of churches—that is, establishments. Indeed, around the time of the framing "tax support for churches was deeply controversial and widely thought inconsistent with religious liberty." Douglas Laycock, *"Nonpreferential" Aid to Religion: A False Claim About Original Intent*, 27 Wm. & Mary L. Rev. 875, 917 (1987). Thus, the people who drafted and ratified the Religion Clauses understood them to be a reaction against coerced taxpayer-subsidies for religion.

ii.   New Jersey's Tradition, Culminating In The RAC.

Though hardly alone, New Jersey was at the forefront of this effort. It was among the colonies that never established an official religion—along with Delaware, non-metropolitan New York, Pennsylvania, and Rhode Island. *See* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1422-26 (1990) (McConnell, *Free Exercise*). Unsurprisingly, residents of the area valued and maintained religious neutrality due to the area's "extraordinary religious diversity." *Id.* at 1424. Indeed, the first governing document of the English colony of New Jersey, 1664's *The Concessions and Agreement of the Lords Proprietors of the Province of New Caesarea or New*

17

*Jersey*, guaranteed that "no person … at any time shall be any ways molested, punished, disquieted, or called into question for any difference in opinion or practice in matte[r] of religious concernments." *Fundamental Laws and Constitutions of New Jersey 1664-1964* at 54 (Julian P. Boyd ed., 1964). This language was taken "almost verbatim" from the 1663 Charter of Rhode Island, *id.* at 5, which was founded "as a refuge for those who could not endure the Massachusetts establishment," McConnell, *Free Exercise*, 103 Harv. L. Rev. at 1424-25.[2]

After the colony of New Jersey split into two territories (from 1674 to 1702), the colony of East New Jersey made the separation of church and state even more explicit. Specifically, the *Fundamental Constitutions for the Province of East New Jersey in America* (1683) provided that "[a]ll Persons living in the Province who confess and acknowledge the one Almighty and Eternal God, and hold[] themselves obliged in Conscience to live peaceably and quietly in a civil Society, shall in no way be molested or prejudged for their Religious Pers[u]asions and Exercise in matters of Faith and Worship; *nor shall they be compelled* to frequent and *maintain* any Religious Worship, *Place or Ministry* whatsoever." Boyd ed., *supra*, at 120

---

[2] While the *Concessions* granted the General Assembly the power to "appoint such and soe many Ministers or Preachers as they shall think fit, and to establish their maintenance," *FFRF*, 181 A.3d at 998, this "was never done"—"owing to the strong interest in avoiding the creation of an established church," Lurie Decl. ¶ 7—and was in any event soon superseded by East and West New Jersey's own governing documents discussing religious freedom. Boyd ed., *supra*, at 11.

(emphases added). This was the first New Jersey law prohibiting public funding for ministers and houses of worship—and the RAC's direct ancestor.

As the colonies were collectively declaring independence in 1776, the framers of the first New Jersey Constitution enshrined this guarantee of religious freedom for the new State. Dismissing the view of the British loyalists who wished to compel public support for the Anglican Church, Lurie Decl. ¶ 14, the framers instead adopted the RAC, which "rejected the establishment of *and compelled support for* religion," *FFRF*, 181 A.3d at 998 (emphasis added); *see also* Lurie Decl. ¶ 20 ("The New Jersey Constitution of 1776 was adopted on July 2, 1776, as New York harbor filled with British war ships and troops."). The Clause specified that no "Person within this Colony [shall] ever be obliged to pay Tithes, Taxes, or any other Rates, for the Purpose of building or repairing any Church or Churches, Place or Places of Worship, or for the Maintenance of any Minister or Ministry, contrary to what he believes to be right, or has deliberately or voluntarily engaged himself to perform." N.J. Const. of 1776 Art. XVIII. The 1776 New Jersey Constitution also protected free exercise and prohibited religious establishments, just as the First Amendment would fifteen years later. *See id.* Art. XVIII-IX.

Rather than compelled funding, New Jersey developed a system for *voluntary* financial support to churches, consistent with the RAC, by allowing the legislature to sanction lotteries to raise funds for specific projects. *See, e.g.*, Neal Millikan,

*Lotteries in Colonial America* 25 (2011). Such lotteries helped raise money "for an useful undertaking for which a direct tax would be disapproved …. wherein the tax is laid on the willing only." Thomas Jefferson, *Thoughts on Lotteries* (Jan. 20, 1826), https://tinyurl.com/3nxkybn2. New Jersey's founding-era lottery practice thus reflected a harmonization of religious interests—allowing localities to organize "willing" contributions to churches while precluding compulsory support. *See, e.g.*, 11th Gen. Assembly of the State of N.J. 16 (May 24, 1787); Lurie Decl. ¶ 13.

### iii.   Founding-Era Evidence From Other States.

Just as New Jersey's framers clearly saw no conflict between protecting free exercise and prohibiting direct funding to churches, neither did the vast majority of founding-era States. Several other States adopted constitutional provisions similarly prohibiting compelled financial support for houses of worship or ministers. Indeed, many of the States that, like New Jersey, ratified what became the First Amendment included compelled-support provisions in their own constitutions. *See* Pa. Const. Art. II (1776) ("No man ought or of right can be compelled to … erect or support any place of worship, or maintain any ministry, contrary to, or against, his own free will and consent."); N.C. Const. Art. XXXIV (1776) ("[N]either shall any person … be obliged to pay, for the purchase of any glebe, or the building of any house of worship, or for the maintenance of any minister or ministry."); Md. Const., Decl. of Rights, Art. XXXIII (1776) ("[N]or ought any person to be compelled to frequent or

maintain, or contribute, unless on contract, to maintain any particular place of worship, or any particular ministry."); Vt. Const. Ch. I, Art. 3 (1777) ("[N]o man ought, or of right can be compelled to attend any religious worship, or erect, or support any place of worship, or maintain any minister, contrary to the dictates of his conscience."); S.C. Const. Art. XXXVIII (1778) ("No person shall, by law, be obliged to pay towards the maintenance and support of a religious worship that he does not freely join in, or has not voluntarily engaged to support."); Del. Const. Art. I, § 1 (1792) ("[N]o man shall or ought to be compelled to attend any religious worship, to contribute to the erection or support of any place of worship, or to the maintenance of any ministry."). The ubiquity of state constitutional clauses prohibiting state subsidies of churches demonstrates that the founding generation understood such prohibitions to be wholly consistent with the Free Exercise Clause that they contemporaneously approved. *See Locke*, 540 U.S. at 723 (collecting provisions from many of the same constitutions, including New Jersey's RAC, prohibiting the funding of ministries); *cf. District of Columbia v. Heller*, 554 U.S. 570, 600-03 (2008) (relying on "analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment" to interpret the federal Second Amendment right).

New England initially took a different approach, but its history only underscores the majority approach's consistency with religious freedom. "Only in

New England … did a system of compulsory financial support for religion actually survive the Revolution." Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2157-58 (2003) (McConnell, *Establishment*). That hardly suggests harmony between direct financial support and the Religion Clauses. To the contrary, "Massachusetts and Connecticut did not ratify the [F]irst [A]mendment," limiting the usefulness of those states' perspectives on the federal Free Exercise and Establishment Clauses. Laycock, 27 Wm. & Mary L. Rev. at 901-02. And crucially, those systems compelling taxpayer subsidies of religion "generat[ed] controversy and litigation all the time." McConnell, *Establishment*, 44 Wm. & Mary L. Rev. at 2158-59; *accord* Laycock, 27 Wm. & Mary L. Rev. at 900-02 (observing that they "demonstrably caused bitter religious strife"). They soon died out, with the last—Massachusetts's—enduring only until 1833. Carl H. Esbeck, *Dissent and Disestablishment: The Church-State Settlement in the Early American Republic*, 2004 B.Y.U. L. Rev. 1385, 1458, 1524, 1591 (2004). So just as "the New England establishments were not the model for what is permitted under the establishment clause," Laycock, 27 Wm. & Mary L. Rev. at 913, they only reinforce that the Religion Clauses' original meaning included room for state-level prohibitions of compelled support. *Cf. McDaniel v. Paty*, 435 U.S. 618, 622-25, 628-29 (1978)

(relying on States' 19th-century abandonment of a given practice as an "aspect of our national history" shedding light on the meaning of the Religion Clauses).

Other founding-era history confirms that New Jersey's RAC conformed to the dictates of the new First Amendment. In the Nation's first years, other States followed the lead of New Jersey and the early majority, ratifying their own compelled-support clauses. *See, e.g.*, Ky. Const. Art. XII, § 3 (1792) ("[N]o man can of right be compelled to attend, erect, or support any place of worship or to maintain any ministry against his consent"); Tenn. Const. Art. XI, § 3 (1796) (similar); Ga. Const. Art. IV, § 10 (1798) (similar); Ohio Const. Art. VIII, § 3 (1802) (similar); Ind. Const. Art. I, § 3 (1816) (similar); Ill. Const. Art. VIII, § 3 (1818) (similar); Ala. Const. Art. I, § 3 (1819) (similar); Mo. Const. Art. XIII, § 4 (1820) (similar); *see also FFRF*, 181 A.3d at 1000 n.3 (collecting later examples). And notably, neither the RAC nor these other compelled-support clauses were so-called "Blaine Amendments," *see FFRF*, 181 A.3d at 1002, 1012—provisions that arose out of anti-Catholic animus in the late-nineteenth century to prohibit aiding sectarian schools, *see Espinoza*, 591 U.S. at 482. This founding-era tradition is untainted by that sordid chapter in the Nation's history. *See Locke*, 540 U.S. at 723 n.7.[3]

---

[3] Indeed, New Jersey's 1844 and 1947 constitutional conventions both *rejected* proposed Blaine Amendments. *See FFRF*, 181 A.3d at 1005; *Proceedings of the New Jersey State Constitutional Convention of 1844*, at 346, https://tinyurl.com/ym7ydvk6.

"By 1834, no state in the Union would have an established church, and the tradition of separation between church and state would seem an ingrained and vital part of our constitutional system." McConnell, *Free Exercise*, 103 Harv. L. Rev. at 1437; *accord* Esbeck, 2004 B.Y.U. L. Rev. at 1393-94. By that time, "almost no one in America thought that government legitimately could compel taxes for religious purposes without offering some possibility of formally opting out of the tax." Noah Feldman, *The Intellectual Origins of the Establishment Clause*, 77 N.Y.U. L. Rev. 346, 351 (2002). Compelled support for houses of worship and ministries was prohibited in state constitutions throughout the country.

Since nearly all of these States also ratified free-exercise analogues, "[t]hese state constitutions provide the most direct evidence of the original understanding, for it is reasonable to infer that those who drafted and adopted the [F]irst [A]mendment assumed the term 'free exercise of religion' meant what it had meant in their states." McConnell, *Free Exercise*, 103 Harv. L. Rev. at 1455-58. Tellingly, some were enacted before the First Amendment was ratified in 1791; all were enacted "well before the religion clauses of the First Amendment were applied to the States." *FFRF*, 181 A.3d at 1000. This founding-era history of state constitutional law amply confirms a "historic and substantial" state interest in avoiding direct, compelled funding of places of worship and ministries

specifically—as opposed to schools, playgrounds, or the like—that conforms with the Free Exercise Clause. *Locke*, 540 U.S. at 725.

                iv.    Contemporary Statements By The Framers.

Were that not enough, the Framers of the First Amendment made clear that they supported such provisions. Consider James Madison—"the leading architect of the religion clauses of the First Amendment." *Az. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 141 (2011) (citation omitted). In 1785 (before the First Amendment was drafted), Madison wrote the *Memorial and Remonstrance Against Religious Assessments*, a petition against a Virginia bill that would have used tax funds to support a "Minister or Teacher of the Gospel … or the providing place of divine worship." *See Everson*, 330 U.S. at 72-74 (appendix of Rutledge, J., dissenting). Madison called that bill an "experiment on our liberties" that could lead to the State demanding support for a particular sect. *Id.* at 65. And if the State could "force a citizen to contribute three pence only of his property for the support of any one establishment," Madison asked, could it not "force him to conform to any other establishment in all cases whatsoever?" *Id.* at 65-66.

Madison's writing, "published to rally the citizenry," was momentous. Laycock, 27 Wm. & Mary L. Rev. at 897. The pending bill failed, and in its place arrived Thomas Jefferson's Bill for Establishing Religious Freedom. *Az. Christian*, 563 U.S. at 141. That law provided that "no man shall be compelled to frequent or

support any religious worship, place, or ministry whatsoever." *Everson*, 330 U.S. at 13 (citing 12 Hening, Statutes of Virginia (1823)). "Virginians understood" the turn of events "as a rejection of any form of financial aid to churches." Laycock, 27 Wm. & Mary L. Rev. at 899. This chapter, in other words, "vividly illustrates … one of the specific evils feared by those who drafted the Establishment [and Free Exercise] Clause and fought for its adoption": "that the taxing and spending power would be used to favor one religion over another or to support religion in general." *Flast v. Cohen*, 392 U.S. 83, 103 (1968). The dangers of such support were manifest: given the importance of churches, establishment could "enable the government to control the institutions for dissemination of opinions and ideas, to suppress ideas dangerous to the regime, and to encourage ideas supportive of the regime." McConnell, *Establishment*, 44 Wm. & Mary L. Rev. at 2183-84.

Individuals who played a role in framing both the federal Bill of Rights *and* the first New Jersey Constitution saw no contradiction between the RAC and the First Amendment, either. In 1778, New Jersey's first Governor, William Livingston, criticized established state religions in England and elsewhere as "manifest violations of the right of private judgment in matters of religion." William Livingston, *Cato* (Feb. 18, 1778), in *The Papers of William Livingston*, Vol. 2, at 236 (1979), https://hdl.handle.net/10929/50460. Livingston contrasted such establishment with New Jersey's Constitution, which he praised as "renouncing all

discrimination between men, on account of their sentiments about the various modes of church government"—quoting New Jersey's various religion clauses, including the RAC, in full. *Id.* at 237 (emphasizing the "voluntar[iness]" of faith in the State). In November 1787, while still serving as Governor, Livingston served as a delegate to the federal Constitutional Convention, and ultimately, New Jersey (with Livingston's strong support) became the First State to ratify the Bill of Rights, adopting eleven of twelve proposed amendments to the Constitution, including what would become the First Amendment. Livingston, *Bill to Amend Constitution* (Nov. 20, 1789), in *Papers*, Vol. 5, at 408. That historical record strongly supports the conclusion that the delegates understood the RAC to accord with the principles of the First Amendment they were ratifying—and thus that it is wholly consistent with the First Amendment for the RAC to prohibit direct public funding or church construction or repair, in this case and others. *See* McConnell, *Free Exercise*, 103 Harv. L. Rev. at 1456; Laycock, 27 Wm. & Mary L. Rev. at 916.

       3.   *Precedent.*

In light of all that history (none of which Plaintiffs address in their moving brief), it is unsurprising that when the Supreme Court was confronted with a strikingly similar challenge in *Locke v. Davey*, it confirmed that a State does not violate the Free Exercise Clause when, pursuant to legitimate antiestablishment interests, it declines to directly support religious worship. *Locke* itself centered on a

Washington State scholarship program that, "[i]n accordance with the State Constitution," could not be used to pursue "a degree in devotional theology." 540 U.S. at 715. Rejecting a free-exercise challenge to that exclusion, the Court examined the kinds of founding-era history and contemporaneous state constitutional provisions just described, *see id.* at 722-23, explaining that this history revealed the "play in the joints" between the Religion Clauses, *id.* at 719. The Court could "think of few areas in which a State's antiestablishment interests come more into play" in light of the "popular uprisings against procuring taxpayer funds to support church leaders" dating back to the founding. *Id.* at 722. And the fact that "early state constitutions saw no problem in explicitly excluding *only* the ministry from receiving state dollars"—even if the State "supported other professions or if the amount at stake was *de minimis*"—further confirmed that direct support of the ministry was of a different constitutional dimension. *Id.* at 723. Thus, Washington could choose "not to fund a distinct category of instruction" that was "an essentially religious endeavor"—and the mere fact that it dealt "differently with religious education for the ministry than with education for other callings" was a permissible "product of these views, not evidence of hostility toward religion." *Id.* at 721. In other words, the State's "historic and substantial" interest meant that "a presumption of unconstitutionality" was uncalled for, dooming the free-exercise claim. *Id.* at 725.

This case is *Locke*'s doctrinal twin: *Locke* involved direct taxpayer funding of ministers; this case involves direct taxpayer funding of churches. As the history cited above makes clear, the "imposition of taxes [1] to pay ministers' salaries and [2] to build and maintain churches and church properties" were the two core practices that "aroused [the framers'] indignation" and thus "found expression in the First Amendment." *Everson*, 330 U.S. at 11; *accord Reynolds v. United States*, 98 U.S. 145, 162-63 (1878); *see also supra* at 17-27 (explaining that the RAC and other anti-compelled-support provisions were enacted in response to such practices, often by the same people who championed free exercise rights). Thus, the exact same history and precedent that the Court relied on in *Locke* supports the RAC in precluding direct public funding to build, maintain, or repair houses of worship.

Plaintiffs make no serious effort to distinguish *Locke*, *see* Br.32 (mentioning the case once), and instead overread later precedent—*Trinity Lutheran*, and especially *Espinoza* and *Carson*—to argue that *Locke* has been eclipsed. Br.29-33. But *Locke* remains good law, still standing for the core proposition that State governments may permissibly rely on such "historic and substantial" antiestablishment interests in refraining from providing direct public funding of a core religious institution like a minister or a church. *See id.* at 722-23, 725; *see also Carson*, 596 U.S. 788-89 (explaining why *Locke*'s rule did not extend more broadly to cover parent-directed tuition assistance to schools of parents' choice).

Accordingly, while a government may make historic grant funding generally available, it is not thereby constitutionally required to finance the repair of an active church—much as a municipality may make funding available for charter schools but is not thereby required to establish a charter yeshiva just because it has a large Orthodox Jewish population. *Cf. Drummond ex rel. State v. Oklahoma Statewide Virtual Charter Sch. Bd.*, 2024 OK 53, ¶ 44 (rejecting free exercise challenge by would-be Catholic charter school and noting overriding antiestablishment interests).

*Trinity Lutheran* is wholly consistent with that rule. *Trinity Lutheran* involved a daycare center, owned by a church, that sought state funding to resurface its playground. 582 U.S. at 454-55. The Court distinguished *Locke* and applied strict scrutiny to the denial of funding because the case "involve[d] express discrimination based on religious identity with respect to playground resurfacing." *Id.* at 465 & n.3 ("We do not address religious uses of funding or other forms of discrimination."). *FFRF* follows this rule, and the RAC in no way contravenes it. Thus, a church that owns or operates a soup kitchen, daycare center, or museum is just as eligible for generally available funding for those purposes as anyone else. *Cf.* ECF 59, JCRL Br.7-10. But that is not what is at issue here. Plaintiffs seek direct funding of the maintenance of their churches *qua* churches—and, indeed, for some of those churches' most central religious features. *See* Am. Compl. ¶¶ 38, 59 (requests for repairing stained-glass windows, narthex, and sanctuary). That is what takes this

case out of *Trinity Lutheran*'s lane and puts it squarely in *Locke*'s—as the New Jersey Supreme Court already recognized. *See FFRF*, 181 A.3d at 1006-12.

*Espinoza* and *Carson* are even further afield. Both concerned indirect (parent-driven) funding of church-affiliated schools, not direct public funding of churches. *Espinoza* centered on a Montana program that created a tax credit for donations to organizations that financed scholarships at private elementary and secondary schools. 591 U.S. at 468-69. *Carson* involved a Maine tuition-assistance program for parents living in rural districts with no public secondary schools of their own—and which therefore operated essentially as a voucher program for those parents. *See* 596 U.S. at 773-74. They differ from this case, both because schools are different from churches, and because indirect funding is different from direct funding.

First, schools and churches are not similarly situated for purposes of this constitutional analysis. As the Supreme Court noted in both *Espinoza* and *Carson*, school funding is subject to a different historical tradition than church funding. *See Espinoza*, 591 U.S. 479-81 ("[N]o comparable 'historic and substantial' tradition supports Montana's decision to disqualify religious schools from government aid."); *Carson*, 596 U.S. at 788-89 (same). And the historical sources cited above support that distinction. For one, "there was no sharp distinction between public and private, religious and secular schools, until well into the nineteenth century," and "[e]ven after disestablishment of religion, most schools in the United States were conducted

under religious auspices." McConnell, *Establishment*, 44 Wm. & Mary L. Rev. at 2171-74. "Even States with bans on government-supported clergy, such as New Jersey, Pennsylvania, and Georgia, provided various forms of aid to religious schools." *Espinoza*, 591 U.S. at 481. For another, any "tradition *against* state support for religious schools arose in the second half of the 19th century," and was fueled by the Blaine Amendments' "pervasive hostility to the Catholic Church and to Catholics in general." *Id.* at 482 (citation omitted). So "[t]he no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause." *Id.* By contrast, provisions like the RAC date to the founding era—the RAC itself goes back to July 1776—and are uncontaminated by such animus. *See supra* at 17-20 & 23 n. 3.

Second, direct funding of religious practice is different from indirect funding. *Espinoza* and *Carson* reflect the Court's recognition that antiestablishment interests are diminished when "the link between government and religion is attenuated by private choices." *See Espinoza*, 591 U.S. at 485; *accord Carson*, 596 U.S. at 781 ("[A] neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause."); *cf. Zelman v. Simmons-Harris*, 536 U.S. 639, 649 (2002) (noting that the Court has consistently rejected Establishment Clause challenges to "programs of true private choice, in which government aid reaches religious schools

only as a result of the genuine and independent choices of private individuals"). Thus, Montana and Maine could not bar religious families from putting those benefits toward religious education. *See, e.g.*, *Carson*, 596 U.S. at 784-85; *Espinoza*, 591 U.S. at 486. The RAC, by contrast, concerns direct public funding of ministers and churches—and thus protects against compelled support of religion. Indeed, *Carson*, *Espinoza*, and the RAC are all consistent with a strong tradition of *voluntary* church support, including through government-approved mechanisms such as lotteries to which residents can contribute if they choose. *See supra* at 19-20.[4]

Plaintiffs further misread *Carson* by claiming that the application of the RAC at issue here constitutes "use-based discrimination" meriting strict scrutiny. Br.29 (quoting 596 U.S. at 787). *Carson* confirms that governments cannot treat "use-based discrimination" as a safe harbor from Free Exercise Clause scrutiny. After all, Maine had relied on religious *use* of the tuition-assistance funds as a proxy for status: a religious school would be excluded from funding if it "present[ed] academic material through the lens of … faith"—something that is inherent in the mission of

---

[4]A tax credit or voucher program that enabled individuals to contribute to the renovation of historic churches if they *wished* to do so would present a very different question from the compelled support that Plaintiffs would impose on *all* taxpayers. *Compare, e.g.*, *Az. Christian*, 563 U.S. at 142 ("A dissenter whose tax dollars are 'extracted and spent' knows that he has in some small measure been made to contribute to an establishment in violation of conscience."), *with id.* ("When Arizona taxpayers choose to contribute to [religious schools], they spend their own money, not money the State has collected from … other taxpayers.")).

a sectarian school, and that would moreover be constitutionally problematic to monitor in the first place. *See* 596 U.S. at 786-87. That was different, *Carson* explained, from the "'historic and substantial state interest' against 'using taxpayer funds to support church leaders'" that undergirds *Locke*. 596 U.S. at 788 (quoting *Locke*, 540 U.S. at 722, 725). Neither the policy nor the RAC entail "use-based discrimination" of this sort any more than Washington State did in *Locke*. The RAC merely enshrines New Jersey's historic and substantial interest in protecting taxpayers from being compelled to pay for the building or maintenance of houses of worship. This cornerstone of religious freedom appears repeatedly in founding-era sources, including state constitutions, and thus wholly comports with the guarantee of free exercise. *See Locke*, 540 U.S. at 723; *supra* at 20-24. *Carson* in no way displaces that decisive historical tradition. *See Carson*, 596 U.S. at 788-89; *accord* Laycock, 27 Wm. & Mary L. Rev. at 917 (in founding era, "tax support for churches was deeply controversial and widely thought inconsistent with religious liberty").

At bottom, the application of the RAC challenged here is part of a compelling, historically rooted, and untainted tradition of protecting religious freedom by avoiding direct public funding for active places of worship. Because the RAC is the least restrictive (and, indeed, only) means of promoting this substantial and historic interest, Morris County's program would survive any level of constitutional scrutiny. But because the RAC plainly furthers "the historic and substantial state interest at

issue," no heightened scrutiny is triggered to begin with, and Plaintiffs' claims simply "must fail." *Locke*, 540 U.S. at 725.[5]

B. <u>Plaintiffs Cannot Show Irreparable Harm</u>.

Even if Plaintiffs could show a likelihood of success on the merits, they would not be entitled to the "extraordinary remedy" of a preliminary injunction, *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988), because they have not shown the other gateway factor: irreparable harm. Such harm must be "specific[] and personal[]," *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000)—speculative harm is insufficient, *see id.* at 488 & n.13 (collecting cases); *accord Acierno*, 40 F.3d at 655 (rejecting the "possibility of a remote future injury" (citation omitted)). Here, any claim of imminent harm is belied by Plaintiffs' delay in seeking preliminary relief and, in any event, is not irreparable.

As an initial matter, Plaintiffs' standard of review mistakenly collapses the merits with irreparable harm. *See* Br.27-28 (suggesting that there is "only one question" (quoting *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (per

---

[5] Though Plaintiffs gesture briefly at "facial" relief, Br.22, they appear to seek an injunction as to any applications of the RAC that would exclude "churches from eligibility for generally available grants," Br.28. To the extent Plaintiffs indeed seek to invalidate the RAC in *all* its applications (including, *e.g.*, targeted municipal funding for specific churches or ministers), they have not attempted to meet the high bar necessary for facial invalidation, and such a challenge would plainly fail given the RAC's "plainly legitimate sweep." *See, e.g., Moody v. NetChoice, LLC*, 2024 WL 3237685, at *8 (U.S. July 1, 2024).

curiam)). While all of Plaintiffs' cited cases come from other circuits, *see id.*, the Third Circuit has held that "the assertion of First Amendment rights *does not* automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits," *Hohe v. Casey*, 868 F.2d 69, 72-73 (3d Cir. 1989) (emphasis added); *accord Anderson v. Davila*, 125 F.3d 148, 164 (3d Cir. 1997) (explaining that the "traditional prerequisites for injunctive relief" do not disappear "simply because First Amendment freedoms were implicated"); *cf. also Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 2002) (discussing the irreparable harm of preventing real-time religious worship). Plaintiffs' efforts to equate the merits with *per se* irreparable harm thus fail.

Plaintiffs' long delay in seeking a preliminary injunction also counsels against granting this extraordinary relief. Plaintiffs bear the burden to make a "clear showing of *immediate* irreparable injury," *Hohe*, 868 F.2d at 72 (emphasis added) (citation omitted), and "[d]elay in seeking enforcement of those rights … tends to indicate at least a reduced need for such drastic, speedy action." *Lanin v. Borough of Tenafly*, 515 F. App'x 114, 118 (3d Cir. 2013) (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985)); *accord* 11A Charles Allen Wright, Arthur R. Miller, & Alexandra D. Lahav, *Federal Practice & Procedure* § 2948.1 (3d ed. 2024). That is why "many courts have found that a delay of just weeks or months precludes a

36

showing of irreparable harm." *Logic Tech. Dev. LLC v. Levy*, No. 17-4630, 2021 WL 3884287, at *3 (D.N.J. Aug. 31, 2021) (collecting cases). And as this Court has recognized, a "full year" delay "knocks the bottom out of any claim of immediate and irreparable harm." *Pharmacia Corp. v. Alcon Lab'ys, Inc.*, 201 F. Supp. 2d 335, 383 (D.N.J. 2002). Plaintiffs' delay of more than one "full year"—having first filed suit on April 28, 2023, and not moving for preliminary relief until May 28, 2024— does the same here. *See id.*; *see also* ECF 1; ECF 49. Plaintiffs try to attribute their delay to the Attorney General, Br.35-36, but the State is not responsible for their litigation decisions. Nothing about the pre-intervention briefing schedule, *compare* Br.34, nor the Attorney General's prerogative to defend the constitutionality of the RAC, *see Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 277-78 (2022), prevented Plaintiffs from moving for a preliminary injunction sooner.

Even if Plaintiffs' delay did not doom their claim of irreparable harm, the harm they assert is monetary. The Third Circuit has "long held that an injury measured in solely monetary terms cannot constitute irreparable harm." *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 557 (3d Cir. 2009) (collecting cases). Here, Plaintiffs asked Morris County to fund church repairs, and that request was denied, ECF 18-2 ¶ 46—an alleged monetary harm. That is so even if "permanent" harm to the buildings later ensues, Br.34, because even "permanent"

damage to buildings is calculable, *e.g.*, *State Farm Fire & Cas. Co. v. Gree USA Inc.*, 514 F. Supp. 3d 628, 632 (D.N.J. 2021) (discussing quantification methods).

Nor have Plaintiffs offered any reason to conclude that the temporary denial of a monetary benefit would "deter[] or discourage[] the exercise of First Amendment rights" for purposes of showing irreparable harm. Br.33 (quoting *Trinity Lutheran*, 582 U.S. at 463). *Trinity Lutheran* discussed such deterrence and discouragement in the context of recognizing a constitutional injury in the first place—not to suggest that such an injury was *irreparable*. *See* 582 U.S. at 463. Nor do Plaintiffs offer any basis to conclude that deterrence or discouragement persisted after the Supreme Court held that Trinity Lutheran *was* eligible to apply for the playground funding at issue in that case. Rather, the clear implication is that Trinity Lutheran's harms were repaired by that ruling—and that Plaintiffs have not established irreparable harm here.

C. <u>The Equities Weigh Against Any Preliminary Relief</u>.

Even if Plaintiffs met both gateway factors, a preliminary injunction would still not be warranted because the combined equitable factors—including the public interest—do not "balance in favor of granting the requested preliminary relief." *Amalgamated Transit*, 39 F.4th at 103 (citation omitted). That is especially so considering Plaintiffs' "particularly heavy burden" to upend the status quo. *Acierno*, 40 F.3d at 653. A State's "inability to enforce its duly enacted plans clearly inflicts

irreparable harm on the State," *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018)—and that is doubly true for a state constitutional principle that predates the founding.

The public interest also warrants denial to avoid the divisive effects of compelling taxpayers to support the maintenance of houses of worship whose faith they do not share—the very type of practice that has been a trigger for "civil strife" since before the founding. *See Everson*, 330 U.S. at 8-11; *see also Locke*, 540 U.S. at 722 (similar); *Az. Christian*, 563 U.S. at 142 ("A dissenter whose tax dollars are extracted and spent knows that he has in some small measure been made to contribute to an establishment in violation of conscience."). Indeed, such protections ensure a beneficial "separation of church and state" that nourishes the "peaceful dominion" of each. *See Van Orden v. Perry*, 545 U.S. 677, 698 (2005) (Breyer, J., concurring in the judgment); *see also* Ira C. Lupu & Robert W. Tuttle, *Federalism and Faith*, 56 Emory L.J. 19, 79 (2006) (noting framers' fears that religious institutions coming to depend on secular funds would result "in government use of religion for political purposes, or incentives to religious entities to pursue governmental power for religious purposes").

That concern is especially vital in New Jersey. New Jersey is proud of its religious diversity, which has distinguished it since the founding. *See* Lurie Decl. ¶ 13. But while some faiths have been represented in our State since the eve of the Revolution when the RAC was first ratified, others have come to call the State home

39

more recently—including many faiths whose houses of worship would be too recently constructed to be eligible for historic preservation funds.[6] Granting Plaintiffs' requested relief would not only have the effect of favoring some (longer-represented) religions over others, but also, in so doing, risk generating the very strife and resentment that the Religion Clauses were meant to prevent. No matter how long a given congregation has worshipped here, the public interest does not favor compelling believers and nonbelievers alike to fund the maintenance of other faiths' houses of worship while this litigation continues.

## CONCLUSION

This Court should grant the Attorney General's motion to stay and deny Plaintiffs' motion for a preliminary injunction.

---

[6] While some of the State's churches date back to the 1660s, the State's oldest synagogues, temples, and mosques were only built in the 1900s. *Compare* New Jersey City University, *Jersey City Past and Present: Old Bergen Reformed Church*, https://njcu.libguides.com/oldbergenchurch (last visited July 11, 2024), *with, e.g.*, New Jersey Historic Trust, *Ahavas Sholom*, https://tinyurl.com/3p7wa47k (last visited July 11, 2024) (oldest active Jewish synagogue in Newark built in 1923), C. Pierce Salguero, *Buddhism in Greater Philadelphia*, Ohiho State University: American Religious Sounds Project, https://tinyurl.com/5fdheu3u (last visited July 11, 2024) (Buddhist temple established in Bridgeton, NJ in the 1940s), *and* Tharik Hussain, *The 7 Oldest Mosques in America*, History Channel https://www.history.com/news/oldest-mosques-arab-american (last visited July 11, 2024) (oldest surviving Muslim mosques in America date back to 1920s). So too with the churches of other Christian sects. *See, e.g.*, St. Joseph Roman Catholic Church, *Parish History*, https://stjoseph-nj.org/parish-history (last visited July 11, 2024) (oldest surviving Catholic Church in New Jersey was built in 1905).

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:     /s/ Nathaniel I. Levy
        Nathaniel I. Levy (NJ No. 386322021)
        Deputy Attorney General

Dated: July 12, 2024

## CERTIFICATE OF SERVICE

I certify that on July 12, 2024, I electronically filed the foregoing brief and accompanying papers with the Clerk of the U.S. District Court for the District of New Jersey. Counsel for all parties will be served via CM/ECF.

By:     /s/ Nathaniel I. Levy
        Nathaniel I. Levy (NJ No. 386322021)
        Deputy Attorney General

Dated: July 12, 2024