<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE MENDHAM METHODIST CHURCH; and THE ZION LUTHERAN CHURCH LONG VALLEY,<br><br>    Plaintiffs,<br><br>v.<br><br>MORRIS COUNTY, NEW JERSEY; MORRIS COUNTY BOARD OF COUNTY COMMISSIONERS; MORRIS COUNTY HISTORIC PRESERVATION TRUST FUND REVIEW BOARD; and JOHN KRICKUS, in his official capacity as Commissioner Director for the Morris County Board of County Commissioners,<br><br>    Defendants. | No. 23cv2347 (EP) (JSA)<br><br>**OPINION** |

**PADIN, District Judge.**

The Court is tasked with determining whether the New Jersey Constitution's Religious Aid Clause (the "Religious Aid Clause") violates the United States Constitution's Free Exercise Clause: essentially, the degree of the separation between church and state. Plaintiffs Mendham Methodist Church ("Mendham") and Zion Lutheran Church Long Valley ("Zion") (together, the "Churches") separately applied for and were denied historical preservation grants for church repairs. D.E. 11 ("Amended Complaint" or "Am. Compl."). Together, the Churches sue various Morris County government entities and officials (collectively, "Defendants"), alleging Defendants violated the Churches' First Amendment rights. *Id.* The Court must now determine whether the First Amendment mandates taxpayer funding of religious buildings where, but-for their religious status, they would otherwise be eligible to receive funding.

The Court previously granted the New Jersey Attorney General's ("AG") motion to intervene. D.E. 33. The AG moves to stay the action under the *Pullman* abstention doctrine. D.E. 46 ("Motion to Stay" or "Stay Mot."). The Churches oppose the stay and cross-move for a preliminary injunction enjoining Defendants from enforcing Section 5.6.4 ("Rule 5.6.4") of the Morris County Historic Preservation Trust Fund Rules and Regulations[1] to exclude the Churches from eligibility for funding pending a final resolution of this matter. D.E. 49 ("Cross-Motion for Preliminary Injunction" or "Pls. Opp'n & PI Mot."). The Court heard oral argument on November 20, 2024. For the reasons below, the Court will **DENY** the AG's Motion to Stay and **GRANT** the Churches' Cross-Motion for Preliminary Injunction.

I.   BACKGROUND[2]

This case illustrates the inherent tension between the First Amendment's Free Exercise Clause guaranteeing the right to freely practice one's religion and the Establishment Clause's preclusion of government endorsement of religion. U.S. Const. amend. I. The Supreme Court has often grappled with the clauses' conflicting mandates, "nowhere more apparent than in cases involving state aid that serves religious purposes or institutions." *Espinoza v. Montana Dep't of Rev.*, 591 U.S. 464, 520 (2020) (Breyer, J., dissenting). The recognition that "government inculcation of religious beliefs has the impermissible effect of advancing religion," *Agostini v. Felton*, 521 U.S. 203, 223 (1997), exists alongside a need to protect individuals' unencumbered exercise of their religious tenets.

Since 2003, Defendants have administered a Historic Preservation Trust Fund (the "Fund"), which is "funded by a county property tax." Am. Compl. ¶ 2. "Morris County distributes

---

[1] Rule 5.6.4 states: [a]ny property that is currently used for religious purposes or functions is ineligible for Historic Preservation grant funding."
[2] This section derives mainly from the well-pleaded factual allegations in the Amended Complaint.

2

money to eligible organizations for the repair, restoration, and preservation of historic local buildings and resources" through the Fund. *Id.* From 2003 to 2017, churches and religious organizations with historical significance were eligible for and received funding. *Id.* ¶ 3.

But in 2018, the New Jersey Supreme Court decided *Freedom From Religion Foundation v. Morris Cnty. Bd. of Chosen Freeholders*, 232 N.J. 543 (2018) (hereinafter "*FFRF*"). *Id.* ¶ 4. In that case, FFRF and David Steketee, an FFRF member and Morris County resident and taxpayer, argued that the Fund's $4.6 million in grants to repair churches violated the Religious Aid Clause.[3] *FFRF*, 232 N.J. at 565. The New Jersey Supreme Court agreed, finding that the Religious Aid Clause "bars the use of taxpayer funds to repair and restore churches," and that Defendants' program "ran afoul of that longstanding provision." *Id.* at 548.

Additionally, the court undertook the more "challenging" question of whether the Religious Aid Clause violated the First Amendment's Free Exercise Clause in light of the United States Supreme Court's then-recent decision in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017). *Id.* at 568. In *Trinity Lutheran*, the Supreme Court considered the constitutionality of Missouri's Scrap Tire Program, which offered "reimbursement grants to qualifying nonprofit organizations that purchase playground surfaces made from recycled tires," but did not award grants to applicants "owned or controlled by a church, sect, or other religious entity." 582 U.S. at 454-55. The policy violated the Free Exercise Clause, the Court reasoned, because the Trinity Lutheran Church Child Learning Center, a preschool and daycare center, was expressly denied the available "public benefit solely because of its religious *character*." *Id.* at 466 (emphasis added). The distinction between religious status and religious use was key in *FFRF*.

---

[3] "No person shall . . . be obliged to pay . . . taxes, or other rates for building or repairing any church or churches, place or places of worship, or for the maintenance of any minister or ministry." N.J. CONST. ART. I ¶ 3.

3

In *FFRF*, the award of public funds went toward religious *uses*, the propriety of which the New Jersey Supreme Court noted went unaddressed in *Trinity Lutheran*. *FFRF*, 232 N.J. at 573. Therefore, the New Jersey Supreme Court determined that New Jersey's Religious Aid Clause and the Free Exercise Clause could coexist. *Id.* at 578.

The development of Supreme Court jurisprudence upsets that harmony. In *Espinoza*, the Court addressed a Montana tax credit program for taxpayers who donated to participating organizations that financed private school scholarships. 591 U.S. at 469. The Montana Department of Revenue promulgated an administrative rule precluding families from using the scholarships at religious schools, invoking the state's "no-aid" provision which barred government aid to sectarian schools. *Id.* at 470. Characterizing the no-aid provision as status-based discrimination, the Court applied strict scrutiny. *Id.* at 484. Among other state interests proffered by Montana in support of the no-aid provision, the Court found that the interest in "separating church and State 'more fiercely' than the Federal Constitution" was not a compelling interest "in the face of the infringement of free exercise" present in that case. *Id.* at 484-85.

Maine's tuition assistance program fared no better in *Carson v. Makin*, 596 U.S. 767 (2022). Parents were offered tuition assistance to send their children to public or private schools provided those schools were "nonsectarian." *Id.* at 774. The nonsectarian provision "was enacted in response to an opinion by the Maine attorney general taking the position that public funding of private religious schools violated the Establishment Clause of the First Amendment." *Id.* at 774-75. Noting the similar effect of Maine's program to that in *Espinoza*, the Court applied strict scrutiny and reaffirmed that "a neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause." *Id.* at 781. Maine's decision to "promote[] stricter separation of church

4

and state than the Federal Constitution requires" was not a compelling interest. *Id.* The Court also went further and clarified that even though the funds at issue were being *used* for religious purposes, such use-based discrimination is no "less offensive to the Free Exercise Clause" than "discrimination on the basis of religious status." *Id.* at 787.

Here, the Churches "applied for grants to repair their historic church buildings[.]" Am. Compl. ¶ 5. Relying on *FFRF*, Defendants, who administer the Fund, rejected the Churches' applications because "a church is 'ineligible' for funding if it is 'currently used for religious purposes or functions.'" *Id.*

The Churches then filed this 42 U.S.C. § 1983 action against Defendants, alleging five counts of First and Fourteenth Amendments violations. *See generally id*. They cite to *Espinoza* and *Carson* to rebut the Fund's reliance on *FFRF*, in particular the collapse of any previous status-use distinction. *Id.* ¶ 10. They say the Religious Aid Clause, and its implementing rule, Rule 5.6.4, therefore run afoul of the Free Exercise Clause of the U.S. Constitution. *Id.* ¶¶ 105-06.

## II.   PROCEDURAL HISTORY

The Churches initiated this action in April 2023, D.E. 1, and amended their complaint in July 2023. Am. Compl. The parties agreed to factual stipulations and a summary judgment briefing schedule, which the Court ordered on August 3, 2023. D.E.s 13, 15. FFRF moved to intervene on August 10, 2023, D.E. 16; the day after, the Churches moved for summary judgment. D.E. 18. The Court administratively terminated the summary judgment motion pending the outcome of FFRF's motion. D.E. 19. The AG also moved to intervene on September 25, 2023. D.E. 26. The Court granted the AG's motion and denied FFRF's motion. D.E. 33.

The AG now moves to stay the action under the *Pullman* abstention doctrine. Motion to Stay. The Churches oppose the stay and cross-move for a preliminary injunction. Cross-Motion

for Preliminary Injunction. Defendants, in lieu of a more formal brief, contextualize the Churches' Cross-Motion for Preliminary Injunction and indicate their preparedness to implement the Court's decision. D.E. 60 ("Defs. Letter"). The AG opposes the Cross-Motion for Preliminary Injunction and replies. D.E. 62 ("AG Opp'n & Reply"). The Churches further reply to the AG's opposition to their Cross-Motion for Preliminary Injunction. D.E. 65 ("Pls. Reply").

### III.    LEGAL STANDARDS

#### A.    Motion to Stay

Courts may abstain under the *Pullman* doctrine when "presented with both a federal constitutional issue and an unsettled issue of state law whose resolution might narrow or eliminate the federal constitutional question[.]" *Chez Sez III Corp. v. Twp. of Union*, 945 F.2d 628, 631 (3d Cir. 1991) (citing *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 500 (1941)). Courts must make three findings to abstain under *Pullman*: "(1) that uncertain issues of state law underlie the federal constitutional claims brought in the district court; (2) that the state law issues are amenable to a state court interpretation that would obviate the need for, or substantially narrow, adjudication of the federal claim; and (3) that important state policies would be disrupted through a federal court's erroneous construction of state law." *Artway v. Att'y Gen. of N.J.*, 81 F.3d 1235, 1270 (3d Cir. 1996). Abstention is an "extraordinary and narrow exception," not the rule. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976). Abdication of this Court's exercise of its jurisdiction is only justifiable in "exceptional circumstances." *Allegheny Cnty. v. Frank Mashuda Co.*, 360 U.S. 185, 189 (1959).

#### B.    Motion for Preliminary Injunction

"Preliminary injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances.'" *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d

Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). In order to obtain a preliminary injunction, the moving party must show:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted . . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. Cnty. of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Del. River Port. Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)).

The movant bears the burden of establishing "the threshold for the first two 'most critical' factors . . . . If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179. A court may issue an injunction to a plaintiff "only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994) (internal citation omitted); *see also P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) ("The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate.").

IV.   **ANALYSIS**

    A.   ***Pullman* Abstention is Improper**

The AG asks this Court to abstain and afford the New Jersey courts the opportunity to further weigh in on the constitutionality of the Religious Aid Clause. Stay Mot. at 16-17. It argues

open questions of state law can and should be construed by the New Jersey Supreme Court to avoid potentially conflicting judicial decisions. *Id.* The Churches counter that there is no uncertain state law issue warranting abstention due to the plain language of the Religious Aid Clause and the New Jersey Supreme Court's previous construction of it. Pls. Opp'n & PI Mot. at 11-12. In Reply, the AG argues that the New Jersey Supreme Court's previous construction is not immovable; New Jersey courts can and regularly do revisit constitutional infirmities with statutes and state constitutional provisions in light of intervening Supreme Court pronouncements. AG Opp'n & Reply at 5. For the reasons below, the Court will not abstain.

It is true that New Jersey courts revisit state law to account for new Supreme Court precedent. *Id.* at 6. That is exactly what happened in *FFRF*—the New Jersey Supreme Court "reaffirm[ed] the vitality of the Religious Aid Clause in light of more recent federal case law." 232 N.J. at 580. The Supreme Court of New Jersey recently issued a decision reconsidering its precedent regarding ministerial exceptions in light of recent Supreme Court First Amendment jurisprudence. *Hyman v. Rosenbaum Yeshiva of N. Jersey*, 258 N.J. 208 (2024).

Nonetheless, the AG's argument for abstention is "foreclosed" by the New Jersey Supreme Court's decision in *FFRF*. *Kusper v. Pontikes*, 414 U.S. 51, 55 (1973). The AG dismisses the Churches' many authorities clarifying that abstention is inappropriate when "the court to which the question would be referred already considered the case." *Orr v. Orr*, 440 U.S. 268, 278 n.8 (1979). These authorities are inapposite, the AG argues, because those decisions "did not involve significant intervening legal developments." AG Opp'n & Reply at 7. However, just because a court is always free to revisit its own precedent does not mean the earlier decision was not final. To hold otherwise would be circuitous, effectively inviting *Pullman* abstention every time a new Supreme Court decision potentially impacts a state statute or constitutional provision.

8

The Religious Aid Clause states that "[n]o person shall . . . be obliged to pay . . . taxes, or other rates for building or repairing any church or churches, place or places of worship, or for the maintenance of any minister or ministry."  The *FFRF* court previously upheld the Religious Aid Clause when it held that the award of taxpayer money to repair active houses of worship "violated the plain language of the Religious Aid Clause." 232 N.J. at 565.  Rule 5.6.4, echoing the Religious Aid Clause, states that "[a]ny property that is currently used for religious purposes or functions is ineligible for Historic Preservation grant funding."  Rule 5.6.4 "clearly applies to [the Churches]," *Artway*, 81 F.3d at 1270, and whether this Court, the New Jersey Supreme Court, or any other court might now construe the Religious Aid Clause's friction with the Free Exercise Clause differently is no cause for abstention.  As there is no "uncertain issue[] of state law," *Pullman* abstention is inappropriate.  *Id.*

### B. The Court Will Grant a Preliminary Injunction

#### 1. *The Churches will likely prevail on their Free Exercise claim*

The Churches, relying on *Carson* and *Espinoza*, argue that Rule 5.6.4 clearly violates the Free Exercise Clause by discriminating against buildings "used for religious purposes."  Pls. Opp'n & PI Mot. at 28.  They contend that the AG's antiestablishment interest does not satisfy strict scrutiny.  *Id.* at 30.  The AG relies instead on *Locke v. Davey*, 540 U.S. 712 (2004) and argues that "New Jersey has a 'historic and substantial' interest in protecting its taxpayers from being compelled" to fund the repair of churches.  AG Opp'n & Reply at 12.  The Churches make sparing mention of the Establishment Clause, seemingly observing, as this Court does too, that the scales weigh in favor of Free Exercise.

Before the Court in *Locke* was Washington's scholarship program, which offered funding to attend religious and non-religious colleges on the condition that students not "pursue degrees

9

that are 'devotional in nature or designed to induce religious faith.'" 540 U.S. at 716 (internal citations omitted). The case involved a "play in the joints" between the Establishment Clause and the Free Exercise Clause, wherein some state actions are "permitted by the [former] but not required by the [latter]." *Id.* at 718-19. Citing the "historic and substantial state interest" in precluding taxpayer financing of the clergy, the Court held that the scholarship program was not constitutionally suspect. *Id.* at 722-25.

In line with *Locke*'s analytical framework, the AG argues that history and tradition guides the antiestablishment interest here. The governing document of the English colony of New Jersey guaranteed that "no person . . . at any time shall be any ways molested, punished, disquieted, or called into question for any difference in opinion or practice in matte[r] of religious concernments." AG Opp'n & Reply at 18 (quoting *Fundamental Laws and Constitutions of New Jersey 1664-1964* at 54 (Julian P. Boyd ed., 1964) (hereinafter "*N.J. Fundamental Laws and Constitutions*")). When the colony of New Jersey split into two territories, the colony of East New Jersey concretized the separation of church and state, providing that its residents would not be "compelled to frequent and maintain any Religious Worship, Place or Ministry whatsoever." *Id.* (quoting *N.J. Fundamental Laws and Constitutions* at 120). These early proclamations culminated in the enshrinement of the first New Jersey Constitution. *Id.* at 19.

New Jersey even developed a system for voluntary financial support to churches—a founding-era lottery practice—that "reflected a harmonization of religious interests." *Id.* at 20 (citing 11th Gen. Assembly of the State of N.J. 16 (May 24, 1787); D.E. 62-1 ¶ 13 ("Lurie Decl.")). "[W]illing contributions to churches" without compulsory support resulted. *Id*. The historical record, in the AG's view, therefore "strongly supports" that delegates "understood the [Religious Aid Clause] to accord with the principles of the First Amendment they were ratifying." *Id.* at 27

10

(citing Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1456 (1990); Douglas Laycock, *"Nonpreferential" Aid to Religion: A False Claim About Original Intent*, 27 Wm. & Mary L. Rev. 875, 916 (1987)).

New Jersey's history and tradition of precluding compelled support of religion is evident. Echoing *Locke*, the AG argues that its antiestablishment interest is not simply to "separate[e] church and State 'more fiercely' than the Federal Constitution," *Espinoza*, 591 U.S. at 484, but specifically is rooted in the state's historic and substantial interest in "[p]reventing taxpayers from being forced to directly fund houses of worship whose faiths they do not share[.]" AG Opp'n & Reply at 13-14.

The Churches disagree and reply that the asserted historic interest is no different than those rejected in recent Supreme Court cases. Pls. Reply at 1. They bemoan that the AG's historical analysis is "tendentious," as recent precedent held that no state interests reflected in no-aid clauses are historic and substantial. *Id.* at 5-6. That is a bit more sweeping than true.

In *Espinoza*, Montana "argue[d] that a tradition *against* state support for religious schools arose" as states adopted no-aid provisions. 591 U.S. at 482 (emphasis in original). That development on its own was not enough to "establish an early American tradition" and the Court found that the historical record did not sufficiently establish a tradition against aiding religious *schools* specifically, as compared to the tradition against state-supported clergy established in *Locke*. *Id.* at 482-83. The Court reiterated this point in *Carson* and observed that "a neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause." 596 U.S. at 781. Here, the analysis focuses not on a history and tradition of precluding compelled funding to religious schools, but to houses of worship; the AG's point that the imposition of taxes to "*build and

11

*maintain churches and church property* aroused [the Framers'] indignation" suggests that Rule 5.6.4 merely reflects New Jersey's choice to not directly fund religious proselytizing. AG Opp'n & Reply at 16 (quoting *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 11 (1947)). And in *Locke*, the Court recognized that "[s]ince the founding of our country, there have been popular uprisings against procuring taxpayer funds to support church leaders, which was one of the hallmarks of an 'established' religion." 540 U.S. at 722.

The Churches seek funding for certain aspects of their buildings that could be seen as inherently religious, which could conceivably be viewed as requiring a taxpayer to support religion. For example, Plaintiff Mendham seeks to reshingle and paint its bell tower. Warren Decl. ¶ 32. The sound of church bells instinctively brings to mind a call to Christian worshippers to convene. Plaintiff Zion seeks to repair the historic stained glass windows in its sanctuary. D.E. 49-3 ¶ 18 ("Wengert Decl."). Stained glass in churches often reflect Christian iconography. Forcing taxpayers to fund one sect's iconography teeters dangerously close to endorsement of that sect. At oral argument, counsel for the Churches conceded that under their interpretation of current law, the state could not prohibit taxpayer funding to be used to repair gendered seating in places of worship if they are otherwise eligible to receive funding. Naturally, the Court is concerned with such a broad interpretation.

But the remains of *Locke* grow more distant. As the Court made clear in *Carson*, "*Locke* cannot be read beyond its narrow focus on vocational religious degrees to generally authorize the State to exclude religious persons from the enjoyment of public benefits on the basis of their anticipated religious use of the benefits." 596 U.S. at 789. It eschewed "any status-use distinction" as lacking in "meaningful application not only in theory, but in practice as well." *Id.* at 788. The Court has also already rejected invocation of a constitutional tradition precluding

direct taxpayer funding to churches when, unlike in *Locke*, the state's program forced a choice between religion and access to government benefits. *Trinity Lutheran*, 582 U.S. at 465. Under binding Supreme Court precedent, the denial of funding to the Churches—that would otherwise be eligible under Rule 5.6.4—forces such a choice.

As Justice Sotomayor explained, *Locke* once stood for "the reasonable proposition that the government may, but need not, choose to not fund certain religious entities (there, ministers) where doing so raises 'historic and substantial' establishment and free exercise concerns," but has since been "recast" as a case "about a restriction that prohibited the would-be minister from 'us[ing] the funds to prepare for the ministry.'" *Trinity Lutheran*, 582 U.S. at 492 (Sotomayor, J., dissenting).

Recent Supreme Court precedent, therefore, characterizes many states' disentanglement of government and religion as a Faustian bargain: to gain public benefits, you must forgo your faith. But the bargain depends on the bargainer. So, too, could the calculus read: to benefit from the results of public funding, you must endorse a faith to which you do not belong.

The "play in the joints" seems to be over, because a piece is missing. *Locke*, 540 U.S. at 718. The Supreme Court has made clear that when a state makes public benefits available, it cannot deny that benefit "based on a recipient's religious exercise." *Carson*, 596 U.S. at 785. In turn, as the Churches aver, strict scrutiny must apply. *Espinoza*, 591 U.S. at 475. "To satisfy it, government action must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Id.* at 486 (cleaned up).

The Religious Aid Clause does not "zero in on any particular 'essentially religious'" aspect of funding. *Id.* at 480. Therefore, Rule 5.6.4 is not narrowly tailored. It states that "*[a]ny* property that is currently used for religious purposes or functions is ineligible for Historic Preservation grant funding." Rule 5.6.4 (emphasis added). Plaintiff Mendham was informed in 2022 that it was

13

ineligible for grant funding from the Fund because the application involved "the principle [sic] church building that is currently used for religious purposes." D.E. 49-2 ¶ 36 ("Warren Decl."). Rule 5.6.4 does not limit funding to religious institutions to secular aspects of repair. Instead, it excludes the institutions from eligibility wholesale because they are religious institutions. Rule 5.6.4, as currently written and construed, therefore, likely violates the Free Exercise Clause.

The current construction of Rule 5.6.4 does not mean, however, that *Locke* is not still good law, nor that *any* restriction on taxpayer funding of religious institutions is unconstitutional. Without deciding the issue, the Court notes that a different version of Rule 5.6.4 restricting mandated taxpayer funding of purely religious iconography or purposes may still survive under *Locke*. However, such a hypothetical, narrower provision is not before the Court.

### 2. *First Amendment harms are presumed irreparable*

The Court next turns to whether the Churches have demonstrated irreparable harm. "Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989). Although the Churches primarily invoke free speech cases, it is true an exception exists for the First Amendment, and that the "loss of [those] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The First Amendment interest is protection against "even 'indirect coercion,'" and the punishment of free exercise of religion "by disqualifying the religious from government aid[.]" *Espinoza*, 591 U.S. at 478 (quoting *Trinity Lutheran*, 582 U.S. at 462). Having found a likely Free Exercise Clause violation, the Court therefore also finds irreparable injury.

The AG, among its arguments, avers that the Churches' asserted monetary harm dooms their claim. AG Opp'n & Reply at 37. It is true that "an injury measured in solely monetary terms

cannot constitute irreparable harm." *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 557 (3d Cir. 2009). The Churches do cite to the deterioration of the buildings and the need for funding to make improvements. Pls. Opp'n & PI Mot. at 34 (citing Warren Decl. ¶¶ 6, 15-21, 29-30; Wengert Decl. ¶¶ 6, 18-20, 24-25). But the Churches' injury is not predicated solely only on their stated need for funding; they also claim non-pecuniary harm stemming from the alleged punishment to their free exercise of religion. *Id.* The harm suffered derives from an alleged violation of First Amendment rights. Any injunction would not force the Fund to disburse grants to the Churches; rather, it would make them *eligible* for funding. That eligibility would not guarantee any monetary relief.[4]

3. *The equities do not weigh against a preliminary injunction*

While all four preliminary injunction factors must be met, the final two, "harm to the opposing party and the public interest, 'merge when the Government is the opposing party.'" *Del. State Sportsmen's Assoc., Inc. v. Del. Dep't of Safety & Homeland Sec.,* 108 F.4th 194, 205 (3d Cir. 2024) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Without endorsing the Churches' characterization of the antiestablishment interest as "misconceived," Pls. Opp'n & PI Mot. at 36, the Court does agree that "the enforcement of an unconstitutional law vindicates no public interest." *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013). The Court has only opined on the *likelihood* that the Churches will prevail on their Free Exercise Clause claim, but that finding functionally collapses into its equities assessment. It would be wholly inconsistent for the Court to side with the AG and find that equity demands "avoid[ing] the divisive

---

[4] The AG argues that the Churches cannot establish irreparable harm because of their delay in seeking a preliminary injunction. AG Opp'n & Reply at 3. The Court chooses not to delay this case further by hinging its decision on the time between the Churches' filing and the instant motion. Pls. Reply at 10. A review of the docket does not reveal an undue delay.

15

effects of compelling taxpayers to support the maintenance of houses of worship whose faith they do not share," AG Opp'n & Reply at 39, when it also finds that barring eligibility for funding likely violates the Free Exercise Clause. Accordingly, the Court finds that the final two factors weigh in favor of issuing a limited injunction.

V.  **CONCLUSION**

For the reasons stated above, the Court will **DENY** the AG's Motion to Stay and **GRANT** the Churches' Cross-Motion for Preliminary Injunction. An appropriate Order accompanies this Opinion.

Dated: November 27, 2024

*Evelyn Padin*
Evelyn Padin, U.S.D.J.

16